JANET LEE HOFFMAN, OSB No. 781145
E-mail: janet@jhoffman.com
KATHERINE MARCHANT, OSB NO. 161147
E-mail: katie@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone: (503) 222-1125

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 6:22-cr-00317-MC |
| Plaintiff, | **DEFENDANT ANNE HANKINS' MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT** |
| v. | |
| ANNE HANKINS, | **HEARING REQUESTED** |
| Defendant. | |

Ms. Hankins, through counsel, requests that the Court exercise its supervisory powers to dismiss the Superseding Information with prejudice.

## I.    Introduction

The United States Attorney's Office flagrantly violated its legal and ethical duties when it issued a sensational press release immediately following Ms. Hankins' guilty plea to wire fraud and money laundering. The press release gratuitously maligns Ms. Hankins' character and claims that that she engaged in criminal conduct for which there is no factual basis in her plea. Although Ms. Hankins pled guilty to two specific charges, this case is still in a full litigation posture. Pursuant to the terms of the plea agreement, Ms. Hankins is entitled to a full and fair opportunity to present evidence at a sentencing hearing that would have mitigated her conduct and justified a

probationary sentence. The prosecution's misconduct, however, has poisoned potential witnesses' perceptions of Ms. Hankins and deprived her of once-favorable testimony. The government has not only refused to remediate the harm it caused, but also it has also continued to publicly disseminate its inflammatory and false narrative.

Accordingly, Ms. Hankins requests that the Court exercise its supervisory powers and dismiss the case. Ms. Hankins further requests a hearing, where she intends to present evidence demonstrating the prejudice the government's misconduct has caused.

## BACKGROUND AND PROCEDURAL HISTORY

## II.    Factual background and basis for Ms. Hankins' plea agreement

On September 28, 2022, Ms. Hankins waived grand jury and pleaded guilty to one count of Wire Fraud, in violation of 18 U.S.C. § 1343, and one count of Money Laundering, in violation of 18 U.S.C. § 1957. The facts supporting her guilty plea are fully laid out in her Petition to Enter Guilty Plea. *See* Declaration of Counsel, Ex. 1 (plea petition) [hereinafter "Decl."].

By way of background, Ms. Hankins began managing the Willamette Country Music Festival around 2009. The Willamette Country Music Festival was an annual, multi-day event featuring a variety of country musicians. Ms. Hankins grew the festival into a nationally recognized event that attracted top country artists and tens of thousands of festivalgoers.

In or around early 2013, William Morris Endeavor Entertainment, LLC and/or its related entities ("Endeavor"), approached Ms. Hankins about investing in the festival. Endeavor is a multinational talent agency and entertainment conglomerate, which represented a number of country music artists.  On April 4, 2013, Endeavor and Ms. Hankins created a joint venture called Willamette Country Music Concerts, LLC ("WCMC"). *See* Decl., Ex. 1 at 7. Endeavor

owned 51 percent of the new entity, and Ms. Hankins owned 49 percent. *See id.* Ms. Hankins

also served as president of WCMC and was responsible for its day-to-day operations. *See id.*

This included preparing monthly financial statements. *See id.* Over the course of the next two

years, WCMC added two additional events, the Mountain Home Music Festival, which was held

in Idaho, and the Country Crossings Music Festival (originally named Cape Blanco), which took

place in the Medford area.

     For reasons further explained below, between approximately September 2016 and March

2018, Ms. Hankins altered WCMC's bank statements and provided false financial summaries to

Endeavor. *See id.* Around November 2017, Endeavor approached Ms. Hankins about selling her

interest in the company and staying on as president. *See id.* Ms. Hankins wanted to purchase

Endeavor's 51% interest in WCMC, however, Endeavor refused her offer, and she ultimately

agreed to the sale. The transaction closed around March 1, 2018. *See* Decl., Ex. 1 at 7. As part of

that transaction, Endeavor paid Ms. Hankins $1,500,000. *See id.* Ms. Hankins used a portion of

those proceeds to satisfy a restitution obligation for her then 17-year old bank fraud conviction.

*See id.* at 7-8. It is that single transaction that forms the basis of the money laundering charge,

which is further explained below. *See id.*

     Ms. Hankins stayed on as president until around late September 2018, when Endeavor

claimed it discovered evidence of criminal conduct and terminated her the following month.

Shortly thereafter, Endeavor closed WCMC's offices and announced that it was cancelling the

2019 festivals.  It is worth noting that following the announcement, a number of vendors from

the 2018 festivals filed reports with the Linn County Sheriff's Office and the Oregon Department

of Justice stating that they had not received payment for goods sold (or services rendered) at the

festivals. *See* Decl., Ex. 15 (media coverage of WCMC closure). Although these complaints did

not blame Ms. Hankins for the non-payment, Endeavor publicly blamed Ms. Hankins for

diverting WCMC funds for her own use — a baseless claim that she steadfastly denied. Although

the issue of vendor payment is not related to the factual basis of her plea, the prejudicial narrative

that Ms. Hankins is to blame has been revived following the government's press release (see

discussion regarding *Willamette Week's* coverage below).

### III.    The opportunity to present mitigating evidence at sentencing was the central motivation behind Ms. Hankins' decision to plead guilty

The plea agreement was the product of more than 18 months of thorough and thoughtful

negotiations between Ms. Hankins' counsel and the prosecutor. By way of background, on

March 21, 2021, Ms. Hankins received a target letter from the United States Attorney's Office

stating that it had probable cause to charge her with Wire Fraud and Conspiracy to Commit Wire

Fraud, in violation of 18 U.S.C. § 1343 and 1349. *See* Decl., Ex. 3. Pursuant to the letter's

recommendation, Ms. Hankins retained counsel and began settlement discussions with the

government.

On March 9, 2022, Ms. Hankins, through counsel, met with the assigned Assistant United

States Attorney and his agents to outline her theory of defense. During the meeting, it became

clear to defense counsel that the government was operating under some materially inaccurate

information regarding Ms. Hankins' conduct. Ms. Hankins, through counsel, readily

acknowledged that she had altered bank statements but explained that her purpose in doing so

was not to steal from or otherwise harm WCMC. Rather, it was to allow Ms. Hankins the

autonomy to manage WCMC without the hostile interference of Endeavor. It was made clear that

Ms. Hankins was prepared to try the case and defend her conduct.

In response, the government took the position that Ms. Hankins' factual evidence and

legal arguments were better presented to a judge at sentencing, rather than to a jury at trial.

Ultimately, the parties reached an agreement under which Ms. Hankins would plead guilty to two charges and then have a meaningful opportunity to present mitigation evidence to support a sentence of probation. The government, in turn, would argue for no more than 27 months in custody. *See* Decl., Ex. 2 (plea agreement).

Throughout the negotiations, Ms. Hankins made clear to the government the types of evidence and arguments that she intended to put forth at sentencing. *See* Decl., Ex. 4 (defense correspondence regarding plea negotiations). Of crucial importance to her was the fact that she did not steal money from WCMC. *See id.* To the contrary, Ms. Hankins poured her own financial resources into the festivals and even made herself personally liable on WCMC's debts — and she did so both before and after the time period at issue in the Superseding Information. For example, Ms. Hankins used approximately $1.2 million of the $1.5 million that she received from Endeavor to cover business expenses. *See id.* She also assumed more than $5 million of WCMC's debt.

The government does not dispute these facts. What the government does dispute, however, was whether, for purposes of the sentencing guidelines, the money that Ms. Hankins put into WCMC could qualify as a credit against the agreed-upon $1.5 million in loss. *See* Decl., Ex. 5 (correspondence from government to defense regarding plea negotiations). The parties' resolution is reflected in the plea agreement, where the government agreed to recommend a three-level downward variance under 18 U.S.C. § 3553(a), ostensibly in recognition of the unique circumstances of Ms. Hankins' offense conduct. *See* Decl., Ex. 2. And Ms. Hankins reserved the right to seek further downward variances and departures under both §3553(a) and U.S.S.G. §2B1.1 cmt n.20(C) (amount of loss overstates seriousness of offense). *See id.*

The government was also aware of the evidence and arguments that Ms. Hankins intended to raise regarding her motive for engaging in the offense conduct. In the summer of 2016, WCMC faced a cash shortfall, largely due to record-high temperatures and other circumstances outside of Ms.  Hankins' control. Ms. Hankins notified Endeavor that WCMC could not meet its immediate financial obligations. Endeavor used this as an opportunity to seize further control and extract onerous concessions from Ms. Hankins. For example, in exchange for financial assistance, Endeavor demanded that, going forward, all ticket revenue, which was traditionally used to cover operating expenses, would be diverted into an Endeavor-controlled account. This starved WCMC of much-needed working capital. Endeavor also failed to provide enough funding to cover the forecasted expenses. Endeavor prioritized payments to the artists that it represented, many of whom commanded nearly $1 million per performance, and dismissed Ms. Hankins' concerns about where the money to pay the small businesses, vendors and employees would come from.

It was against this backdrop that Ms. Hankins made the admittedly poor choice of altering WCMC's financial statements to mask the need for any further funding from Endeavor. Notably, her primary intent was not to defraud Endeavor, but rather to regain autonomy to run the festivals as she had traditionally done. Of course, as Ms. Hankins readily acknowledged, two wrongs do not make a right, but both a defendant's motive and a victim's conduct are relevant mitigation evidence. *See e.g. United States v. Ranun*, 353 F. Supp. 2d 984 (E.D. Wis. 2005) ("[T]he defendant's motive for committing the offense is one important factor."); *see also Koon v. United States,* 518 U.S. 81 (1996) (holding that the district court acted within its discretion to downward depart five levels based on its finding that the victim's wrongful conduct contributed significantly to provoking the defendant's excessive use of force).

Furthermore, with respect to Ms. Hankins' primary intent and during this same time period, Ms. Hankins saw value in WCMC. This is corroborated by the fact that a number of government witnesses reported that Ms. Hankins expressed a desire to buy out Endeavor. Even knowing the true financial condition, Ms. Hankins believed in the inherent worth of the company and its future potential.

Finally, as the government was aware, another theme that Ms. Hankins intended to present at sentencing involved her efforts to provide financial opportunities to local schools, small business and other nonprofits, as well as her efforts to make sure that they were paid for their work at the festivals. *See* Decl., Ex. 14 (media coverage of WCMC's financial support of local organizations). These efforts stand in stark contrast to Endeavor's self-dealing and focus on paying its own artists before local organizations.

1. Ms. Hankins' prior conviction from 21 years ago is not relevant to this proceeding

As indicated in Count Two of the Superseding Information, Ms. Hankins has one prior conviction. The underlying conduct, submitting a false loan application for $350,000 to U.S. Bank, occurred around October 1997. *See United States v. Hankins,* 858 F.3d 1273, 1275 (9th Cir. 2017). Approximately four years later, in October 2001, the government charged Ms. Hankins with one count of bank fraud under 18 U.S.C. § 1344. *See id.* Ms. Hankins waived indictment and pled guilty the same month. *See id.* In January 2002, the district court sentenced Ms. Hankins to 30 days in jail and ordered her to pay U.S. Bank $350,000 in restitution. *See id.* U.S. Bank then assigned its interest in the restitution judgment to Horton & Associates, LLC, and the district court substituted Horton as the assigned victim. *See id.*

In September 2013, Horton and Ms. Hankins, through her then-defense counsel, settled the outstanding restitution obligation. *See id.* Horton filed with the district court a notice entitled

"Full Satisfaction of Judgment," and Ms. Hankins stopped making payments. *See id.* Neither the court nor the government took any action in response until 18 months later, when the government objected to the settlement. *See id.*

The resulting issue before the district court — a matter of first impression in the Ninth Circuit — was whether a defendant may discharge a restitution judgment based on a private settlement between the victim and the defendant. *See Hankins*, 858 F.3d at 1274. On October 30, 2015, the district court ruled that a defendant could not. *See id.* at 1276. On June 6, 2017, the Ninth Circuit Court of Appeals affirmed the judgment, *see id.*, and the United States Supreme Court denied certiorari on January 8, 2018. *Hankins v. United States*, 2018 U.S. LEXIS 360 (U.S. Jan. 8, 2018).

The above timeline is important because it is only by happenstance that the government was able to incorporate her prior conviction into this case. The conviction itself is too stale to factor into her criminal history score under the sentencing guidelines. *See* U.S.S.G. § 4A1.2(e)(3) (sentences imposed more than 10 years prior to the instant offense are not counted in defendant's criminal history score); *see also United States v. Bolt*, 782 F.3d 388 (8th Cir. 2015) (prior convictions too old to be used in computing criminal history category can support an upward departure only where conviction is factually similar to instant offense). And it is likely too old to be admissible as impeachment evidence had the case proceeded to trial. *See* Fed. R. Evid. 608(b) (limiting use of convictions older than ten years).

It also cannot reasonably serve as a motive for Ms. Hankins' conduct. Indeed, the obligation remained outstanding for as long as it did due to reasons largely outside of Ms. Hankins' control. She believed, in good faith, that the obligation was satisfied in 2013, and she had no way to predict how and when the appellate courts would resolve the issue. Had the

Supreme Court issued its ruling a few months earlier, or a few months later, the government

likely would have had to identify a different transaction, such as her $550,000 deposit into

WCMC's operating account, as the basis for the money laundering charge. *See* Decl., Ex. 4.

## IV.    The prosecution's false extrajudicial statements and subsequent media coverage

      Immediately after Ms. Hankins entered her guilty plea, the United States Attorney's

Office issued a press release touting the conviction. The press release prominently quoted both

the Criminal Chief of the U.S. Attorney's Office and the Special Agent in Charge of Seattle's

IRS Criminal Investigation Field Office:

>  "With today's guilty plea, Ms. Hankins has proven herself to be a **serial fraudster**," said
> Craig Gabriel, **Criminal Chief** for the U.S. Attorney's Office. "Falsifying bank
> statements and **laundering money to fraudulently inflate the value** of a company are
> serious federal crimes."

> "Ms. Hankins blatantly deceived her business associate and **stole money that never
> belonged to her**. However, **today the curtains have come down** and **Ms. Hankins is
> facing the music for her fraud**," said **Special Agent in Charge** Bret Kressin, IRS
> Criminal Investigation (IRS:CI), Seattle Field Office.

Decl., Ex. 6 (government press release) (emphasis added).

      The government's above statements are false and inflammatory. First, they create the

false impression that Ms. Hankins stole money from WCMC. *See e.g.,* Decl., Ex. 9 at 12

(*Willamette Week* article demonstrating such an understanding). She did not. Nor is theft an

element of the offenses to which she pleaded guilty. *See e.g.,* Decl., Ex. 1 at 7 (factual basis for

her guilty plea). Yet by dramatically proclaiming that Ms. Hankins — a "serial fraudster" —

"stole money that never belonged to her" and that "the curtains have come down and [she] is

facing the music for her fraud," the prosecution told the public that Ms. Hankins not only stole

money but did so repeatedly and over a protracted period of time. This phrasing was designed to

conjure an image of an unrepentant, serial thief — one who will finally "face the music." This is not supported by either the allocution or the charge.

Second, Ms. Hankins did not "launder[] money to fraudulently inflate the value of WCMC." This is demonstrated in the plea petition. The factual basis of Ms. Hankins' money laundering charge is that she used the proceeds from the sale of her interest in WCMC to pay a bill that was more than $10,000, in violation of 18 U.S.C. § 1957. *See* Decl., Ex. 1.  The government's statement, however, invokes the more serious money laundering crime set forth in 18 U.S.C. § 1956, which Ms. Hankins was not charged with violating, and which addresses the commonly understood definition of money laundering: financial transaction schemes intended to conceal the source and destination of illegally obtained money, often done with the aim of perpetuating the criminal activity. *See* Merriam-Webster Dictionary, <https://www.merriam-webster.com/dictionary/launder> (last accessed Nov. 4, 2022). In the popular imagination, this type of conduct is often associated with drug cartels and other organized crime. *See id.* (providing recent examples how the term "money laundering" has appeared in the media). The government's incorrect description of the offense conduct creates the false and unfair impression that Ms. Hankins engaged in far more serious and insidious conduct than she in fact she did.

Third, Ms. Hankins is not a "serial fraudster." In the criminal context, the word "serial" is defined as a person who "repeatedly commit[s] the same offense and typically follow[s] a characteristic, predictable behavior pattern." *See id.* at <https://www.merriam-webster.com/dictionary/serial> (last accessed Nov. 4, 2022). A fraudster is defined as a "person who engages in fraud" and connotes both the idea of a con artist and a thief. *See id.* at <https://www.merriam-webster.com/dictionary/fraudster> (last accessed Nov. 4, 2022). A "serial fraudster" is, thus, a person who repeatedly commits fraud in a typical or characteristic pattern.

This is not Ms. Hankins. Ms. Hankins has a single prior fraud conviction. It is factually distinct from and unrelated to the present case. Ms. Hankins was sentenced on for it more than 20 years ago, and the underlying conduct occurred another five years before that. To call Ms. Hankins a "serial fraudster" is to exaggerate her criminal history beyond recognition.

Not surprisingly, the government's salacious quotes were immediately picked up by the media.  KOIN6 News, for example, posted the following headline to its website: "Serial Fraudster: Willamette Country Music Concerts President Pleads Guilty." *See* Decl., Ex. 9 at 12 (copy of article). The *Central Oregon Daily* similarly wrote, "Oregon music festival promoter pleads guilty; dubbed 'serial fraudster' by DOJ." *See id.* at 7.  Other outlets, such as the *Willamette Week*, used the government's quotes as evidence to draw conclusions that are not factually supported but nonetheless prejudicial to Ms. Hankins.

In the *Willamette Week* article, the newspaper asserted that the Criminal Chief's quote provided an answer to the long-standing question of why the festivals shut down and why the vendors got "stiffed." *See id.* at 4-6. As the article indicates in its introduction, the reason why the festivals stopped and vendors went unpaid was never made public. *See id.* at 4-5. "Now," the newspaper surmises, "federal prosecutors are filling in the details of why. That promoter, Anne Hankins, 53, was a 'serial fraudster,' according to [the Criminal Chief] for the U.S. Attorney's Office." *Id.*

The article conveys the idea that Ms. Hankins, as a "serial fraudster," drained WCMC's coffers and left the vendors and other small businesses who provided services at the festivals high and dry. The article's inaccurate conclusion is a natural consequence of the government's statements, particularly in light of the media coverage surrounding WCMC's closure and the

public clamor for an explanation as to why it happened. *See* Decl., Ex. 16 (media coverage of same).

### A. Defense counsel's unsuccessful efforts to remedy the harm

After the government issued its press release, counsel for Ms. Hankins immediately confronted the prosecutors to point out the unprecedented false and inflammatory language and to ask for their help to rectify the likely prejudice that would result. *See* Decl., Ex.7 at 2. Over the course of the next several days, defense counsel continued alerting the prosecutors to the growing media coverage, as well as the increasing harm it would cause at sentencing due to witness prejudice. *See* Decl., Exs 7-10. Counsel pointed out that the government's statements violated Department of Justice regulations, as well as the American Bar Association and state ethics rules. *See e.g.,* Decl., Ex. 9 at 2. Defense counsel further warned that, if left unchecked, the false statements could harm Ms. Hankins in the related civil proceeding. *See id.* at 3. Counsel proposed a variety of potential remedies, such as issuing a retraction or joining with the defense in recommending a probationary sentence. *See id.* at 1-3.

The prosecution not only refused to take any action but also continued disseminating the false statements themselves. On October 4, for example, after multiple communications with defense counsel, the FBI posted the press release to its Twitter account. *See* Decl., Ex. 11. Later that same day, the prosecution glibly acknowledged in an email that while the statements were "unfortunate," they allowed Ms. Hankins an opportunity to argue for a further reduction in her sentence based on the damage to her reputation. *See* Decl., Ex. 10 at 2. Despite this implicit understanding that the case is still in a litigation posture, the email made clear that the government would undertake no effort to remediate the harm. *See id.*

## LEGAL STANDARD

### V.    The prosecution's legal and ethical responsibilities

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). As such, the prosecutor's interest "is not that he shall win a case, but that justice shall be done." *Id.* Because of the unique role played by prosecutors in the justice system, the prevailing view is that prosecutor statements are more likely to influence members of the public than those of other advocates. *United States v. Smith,* 985 F. Supp 2d 506, 541 (S.D.N.Y. 2013) (quoting Scott M. Matheson, Jr., The Prosecutor, the Press, and Free Speech, 58 Fordham L. Rev. 865, 868 (1990); *see also* Lipman, 47 Am. Crim. L. Rev. at 1533 ("Statements by prosecuting attorneys, in particular, have increased likelihood to influence the public because the attorneys speak with the inherent authority of the government," (citation and internal quotation marks omitted)).

Thus, "it is essential that prosecutors respect both the power of their words and their office, and ensure that their public comments are carefully tailored solely to further valid law enforcement interests and to steer clear of violating a defendant's fundamental right to a fair trial." *Smith*, 985 F. Supp. 2d at 541 (S.D.N.Y. 2013) (citing to Barkow, 44 Ga. L. Rev. at 1019 for the proposition that press conferences "provide little benefit relative to the dangers that they may pose in creating bias against the defendant.").

Accordingly, extrajudicial statements by prosecutors are subject to a wide array of legal and ethical rules that address the content, circumstances, and the timing of the statements. The Department of Justice has promulgated regulations that address the statements federal prosecutors may make about active criminal actions. *See* 28 C.F.R. 50.2(b)(1) (regulations apply

to "release of information to news media from the time a person is the subject to a criminal investigation until any proceeding resulting from such an investigation has been terminated by trial or otherwise."). The regulations have a constitutional dimension, as their purpose is to strike "a fair balance between the protection of individuals accused of crime" and the public's right to information regarding "the problems of controlling crime and administering government[.]" *See id.* at 50.2(a)(2).

The regulations prohibit prosecutors from "furnish[ing] any statement or information for the purpose of influencing the outcome of a defendant's trial," as well as "furnish[ing] any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such statement or information may reasonably be expected to influence the outcome of a pending or future trial." *Id.* at 50.2(b)(2). Prosecutors are further prohibited from "disseminat[ing] any information concerning a defendant's prior criminal record." *Id.* at 50.2(4). And, recognizing that certain categories of information "generally tends to create dangers of prejudice without serving a significant law enforcement function[,]" the regulations further advise against making public "[o]bservations about  a defendant's character," "[s]tatements concerning evidence or arguments in the case, whether or not it is anticipated that such evidence or argument will be used at trial[,]" as well as "[a]ny opinion as to the accused's guilt[.]" *See id.* at 50.2(6)(i), (v)-(vi).

Pursuant to the regulations, "Department of Justice employees are permitted only to release identifying information regarding the defendant, the substance of the charges, the identity of the investigating agency and the circumstances immediately surrounding an arrest." *Smith*, 985 F. Supp. 2d (citing 28 C.F.R. 50.2(3)) (internal quotation marks omitted). But, even permissible disclosures, "should only include incontrovertible, factual matters, and should not

include subjective observations." 28 C.F.R. 50.2(3). "In addition, where background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public." *Id.*

The United States Attorney's Manual, published and circulated by the Department of Justice, likewise sets forth rules limiting the public statements of prosecutors. The Manual expressly prohibits a prosecutor from making public observations about a defendant's character, expressing his or her opinion as to a defendant's guilt, as well as discussing statements, admissions, or the evidence in the case. U.S. Attorney's Manual § 1-7.550. Where there exists a substantial public interest in a pending matter, the guidelines further provide that extrajudicial statements should be confined to the public record and should not contain information that has a substantial likelihood of materially prejudicing the fairness of an adjudicative proceeding. *See id.* § 1-7.401(H), 1-7.500.

Professional and ethical rules of conduct also restrict extrajudicial comments on pending cases.[1] Oregon Rule of Professional Conduct Rule 3.6 provides that any attorney participating in litigation of a matter "shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." Rule 3.6(a). This restriction extends to other lawyers who work for the same law firm or government agency but are not working on the matter.  *See* Rule 3.6(d). In addition, "a lawyer shall exercise

---

[1] 28 USC § 530(B)(a) provides that "an attorney for the [federal] Government shall be subject to the state laws and rules, and local federal court rules, governing attorneys in each state where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that state."

reasonable care to prevent the lawyer's employees from making an extrajudicial statement that the lawyer would be prohibited from making under this rule." See Rule 3.6(e).

Moreover, under the ethical rules set forth by the American Bar Association ("ABA), prosecutors have special responsibilities, which include "refraining from making, causing to be made or authoring or condoning the making of extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused." Special Responsibilities of a Prosecutor, Model Rules of Prof'l Conduct R.3.8 n32(f). Prosecutors are likewise expected to exercise reasonable care in preventing investigators and other law enforcement personnel associated with the prosecutor from making such statements as well.  *See* ABA Standards for Prosecutorial Function at 3-1.10(e). And prosecutors uninvolved in a matter who are commenting as media sources must also avoid statements that risk prejudicing a specific criminal proceeding, and, to that end, are expected to "make reasonable efforts to be well-informed about the facts of the matter and the governing law." *See id.* at 3-1.10(i).

In addition to the Model Rules, the ABA has also set forth the Criminal Justice Standards on Fair Trial and Public Discourse ("the Standards"). Like the Model Rules, the Standards indicate that lawyers involved in a criminal mater shall not make any extrajudicial statements that may have a substantial likelihood of prejudicing the adjudicatory proceeding or "unnecessarily heightening public condemnation of the accused." Fair Trial and Pub. Discourse 8-2.1(a)(i)(ii) (Am. Bar Ass'n 2013). The Standards also urge lawyers to seek out the advice of their supervisors before making any public extrajudicial statements regarding a pending criminal matter. *Id.* 8-2.1(a).

Finally, the local rules of this Court provide clear boundaries with respect to appropriate public commentary by lawyers in pending criminal matters. The Local Rules require compliance

with the Oregon Rules of Professional Conduct (LR-83-7(a)), as well as the Court's Statement of

Professionalism, which, among other things, mandates against unjust and improper criticism and

personal attacks on opponents, judges and others, as well as not knowingly misstating facts or

law or knowingly cause someone else to form a mistaken conclusion of fact or law. *See*

Statement of Professionalism Guidelines 1.9 and 1.11.

## VI.    Courts authority to dismiss an indictment pursuant to their supervisory powers

A district court may dismiss an indictment under its inherent supervisory powers "(1) to

implement a remedy for the violation of a recognized statutory or constitutional right; (2) to

preserve judicial integrity by ensuring that a conviction rests on appropriate considerations

validly before a jury; and (3) to deter future illegal conduct."  *United States v. Bundy*, 968 F.3d

1019, 1030 (9th Cir. 2020). Courts are not limited to these three grounds, however, and they

must consider whether to exercise their supervisory power to dismiss an indictment on a fact-

specific, case-by-case basis. *United States v. De Ros*a, 783 F.2d 1401, 1406 (9th Cir. 1986) ("The

facts of each case determine when Government conduct has placed in jeopardy the integrity of

the criminal justice system."); *United States v. W.R. Grace*, 526 F.3d 499, 511 n. 9 (9th

Cir.2008) (disavowing prior cases to the extent that they purported to "limit the inherent powers

to those three areas").

Indeed, the Ninth Circuit has recognized that "'[a]n important function of the

supervisory power is to guarantee that federal prosecutors act with due regard for the integrity of

the administration of justice.'" *United States v. Samango,* 607 F.2d 877, 884 (9th Cir. 1979)

(quoting *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1974) (Hufstedler, J.,

concurring)). Accordingly, courts have held that exercise of the supervisory powers is an

appropriate means of policing ethical misconduct by prosecutors. *United States v. Lopez,* 4 F.3d

1455, 1463 (9th Cir. 1993) (declining to dismiss an indictment because the defendant failed to demonstrate that he suffered prejudice from prosecutor's violation of state ethical rules but nevertheless recognizing that "we have no doubt that federal courts are empowered to deal with such threats to the integrity of the judicial process"); *see also Wheat v. United States,* 486 U.S. 153, 160 (1988) ("federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the procession and that legal proceedings appear fair to all who observe them.").

Courts engage in a two-step analysis to determine whether to invoke their supervisory powers. *See e.g., United States v. Chapman*, 524 F.3d 1073, 1084-88 (9th Cir. 2008). First, facts must exist that support invocation of the supervisory power (e.g. policing ethical misconduct by prosecutors). The facts need not amount to a constitutional or statutory violation, and they may be considered in the cumulative. *See e.g., Aguilar Noriega,* 831 F. Supp. 2d at 1184 ("[A] few mistakes here and a few mistakes there and pretty soon you're talking misconduct.") (citation omitted).

Second, the court must decide the appropriate sanction. *See Chapman*, 524 F.3d at 1087. Courts have broad authority to tailor relief suitable to the circumstances. This includes dismissal with prejudice. A court may use its supervisory powers to dismiss with prejudice for prosecutorial misconduct if there is (1) flagrant misbehavior; (2) substantial prejudice to the defendant, and (3) no lesser remedial action is available. *Bundy,* 968 F.3d at 1031. For conduct to be "flagrant," it does not have to be intentional or malicious. *See id.* at 1038 (so stating). Although it must be more than "accidental or merely negligent," flagrancy is demonstrated where the prosecution acts with "reckless disregard" for its legal and ethical obligations. *See id.*

In sum, a court may exercise its supervisory powers to dismiss with prejudice where a prosecutor's flagrant misconduct prejudiced the defendant and no lesser remedy will fully address the damage caused. *Bundy*, at 1043.

## ARGUMENT

**VII. The prosecutor's flagrant misconduct prejudiced Ms. Hankins and warrants dismissal with prejudice**

### A. The government's extrajudicial statements ran afoul of its legal and ethical duties

The prosecution plainly violated its legal and ethical duties when it publicly called Ms. Hankins a "serial fraudster" and allowed its agents to wrongfully accuse her of stealing money that did not belong to her.  As a threshold matter, there can be no genuine dispute that the prosecution "expected these statements to be disseminated by means of public communication." *See e.g.,* 28 C.F.R. 50.2(b) (prohibiting the making of certain statements that would be so publicized). The statements appear in a press release, and that press release makes clear that it is for "FOR IMMEDIATE RELEASE [*sic*]." *See* Decl., Ex. 6.

In addition, government's public statements "could reasonably be expected to influence" the outcome of the pending litigation. *See e.g.,* 28 C.F.R. 50.2(b) (so prohibiting). It well known that a prosecutor's statements carry great weight because prosecutors "speak with the inherent authority of the government." *Smith*, 985 F. Supp. 2d at 541 (citation and internal quotation marks omitted). This applies to law enforcement agents as well, whose extrajudicial statements prosecutors are responsible for ensuring comply with the same legal and ethical rules. Here, the government's statements were not simply cloaked in the authority of the prosecuting attorney or the investigating agent. They were cloaked in the added authority of the Criminal Chief of the

United States Attorney's Office and the Special Agent in Charge of the IRS Criminal Investigation's Seattle Field Office.

The government's concession that the statements reflected an "unfortunate" word choice is a remarkable example of understatement. *See* Decl., Ex. 10. The Criminal Chief's description of Ms. Hankins as a "serial fraudster" is nothing more than playground-level name calling designed to get a headline-grabbing reaction. And it worked, repeatedly, both locally and statewide. Such conduct is unbecoming of a representative of the United States government, and it runs afoul of the above-described legal and ethical prohibitions against commenting on a defendant's background, character and record. The IRS Special Agent's allegation that Ms. Hankins "stole money," which creates the inference that she stole it from her business associates as part of her fraud, is likewise false and inflammatory. Theft is not an element of the charges or the plea. The Special Agent's emotionally florid metaphorical statement that "the curtains have come down" and "she is facing the music for her fraud" incorrectly, and misleadingly, conveys that theft is connected to her guilty plea.

**B.  The government's conduct was flagrant and prejudicial to Ms. Hankins**

These extrajudicial statements are so divorced from the facts of the guilty plea as to demonstrate flagrant misconduct. Furthermore, the assigned prosecutor, as well as the Criminal Chief, are experienced government attorneys, well versed in their legal and ethical responsibilities. These include not offering subjective opinions on a defendant or disseminating information about a defendant's prior criminal record or character. And, the Criminal Chief, who is not the assigned prosecutor, bore the added duty of informing himself of the nature and content of his statements before releasing them to the public.

The purpose of the press release and its gratuitous and inflammatory statements appears designed to sway public opinion against Ms. Hankins. They plainly serve no law enforcement or other public safety purpose. The government deliberately published these statements, and the colorful language it chose guaranteed that it would be picked up by the press.

This is not a situation in which the press release was inadvertently issued before someone could review it. Somebody in the U.S. Attorney's Office took the time to write it prior to Ms. Hankins' change of plea hearing. The prosecution had the statement in his possession at least 24 hours beforehand. *See* Decl., Ex. 9. There is no plausible explanation for its release other than an intent to inflame and turn public sentiment against Ms. Hankins. And there is no justification for the government to tout a criminal plea with so much animus.

Predictably, the government's vitriol has prejudiced Ms. Hankins and tainted these proceedings. The government's statements, amplified by the media coverage, appears to have influenced potential witnesses, and the defense has only just begun its investigation. Some potential witnesses, who were willing to speak on Ms. Hankins' behalf prior to the press release, are no longer willing to cooperate. At least one will no longer speak with the defense, and others have indicated that they may have changed their minds.

The prejudice extends beyond the courtroom and has polluted the related civil proceeding. By way of background, in July 2020, Endeavor filed a lawsuit against Ms. Hankins. Among the allegations set forth in the complaint are claims that Ms. Hankins stole money and failed to disclose her prior conviction — allegations that the government did not make in the criminal case. The complaint was later dismissed, and the case is now proceeding in arbitration with the same claims. It is defense counsel's understanding that the government has been aware of Endeavor's civil claims since the outset.

During the plea negotiations, the prosecution was particularly careful to safeguard the civil proceedings and the rights of the civil plaintiffs. For example, the government specifically precluded Ms. Hankins from using information obtained in the criminal case in defense of the civil one. *See e.g.,* Decl., Ex. 13 (pre-indictment protective order precluding use of the materials provided by the government for purposes other than defense of the criminal investigation). The prosecutor also made clear that every effort was made by his office not to impact the civil suit for either party.

Now, as defense counsel warned, Endeavor is using the government's false claims in the civil proceedings as evidence that Ms. Hankins is not credible. This week, on November 2, 2022, Endeavor filed a pleading opposing Ms. Hankins' demand for discovery. *See* Decl., Ex. 12 (relevant excerpts from pleading). In it, Endeavor attached the press release as an exhibit, and used the Criminal Chief's description of Ms. Hankins' as a "serial fraudster" as evidence that Ms. Hankins' representations to the arbitrator cannot be trusted. As Endeavor wrote, "The Arbitrator should not accept the representations of the serial fraudster Hankins[.]" *Id.* at 3.

Endeavor also used the Criminal Chief's quote to bolster its contention that Ms. Hankins's discovery requests are nothing more than improper gamesmanship:

> "Hankins — who has a prior criminal conviction for bank fraud and submitting a false loan application, and **who the Department of Justice has now appropriately publicly described as a 'serial fraudster'** — has now decided to utilize the arbitration and discovery process to continue to inflict more damage on Claimants."

*See id.* at 2. And Endeavor quotes the Criminal Chief a third time in its related argument that the arbitrator should preclude Ms. Hankins from joining her attorney to inspect the physical evidence held at Endeavor's offices. *See id.* at 8 ("Respondents insisted that Hankins herself — an

admitted serial fraudster — be physically present at [Endeavor's] offices to conduct the inspection.").[2]

In short, the government was on notice that its extrajudicial statements were false and likely to prejudice Ms. Hankins' defense of the civil suit. The government ignored defense counsel's warning, and instead republished them. Now the prosecutor's statements are being used in the civil suit to impeach Ms. Hankins' credibility and preclude her from obtaining the exculpatory materials that she needs to defend herself.  .

**C. No lesser remedy can rectify the harm caused by the misconduct**

Under the unique posture of this case, dismissal with prejudice is the only remedy available that can adequately address the damage caused by the government's misconduct. *See* Bundy, 968 F.3d at 1043 (observing that the standard cannot be taken at face value, since, "in theory, a lesser remedy is will always be available").  In *Bundy*, the Ninth Circuit explained that the phrase "no lesser remedial action is available" means that "any lesser sanction will put the defense at a greater disadvantage" than it would have faced had the government not engaged in the misconduct.  *See id.* (so stating).

Here, dismissal without prejudice cannot adequately rectify the damage. Given the posture of the case, this remedy would have the same effect as allowing Ms. Hankins to withdraw her plea, either of which would deprive Ms. Hankins of the bargain that she diligently negotiated. Ms. Hankins invested significant time and resources into settling her case, and she

---

[2] On November 3, 2022, the arbitrator held a hearing on the pleadings. During oral argument, Endeavor expressly relied upon the government's statements, including its description of Ms. Hankins' as a "serial fraudster," in support of its position that Ms. Hankins should be denied the discovery she has requested. Defense counsel has requested a transcript of this hearing and can submit it when it becomes available.

should not be deprived of her right to resolve her case through a plea because of the government's misconduct.

Following a dismissal and any new plea negotiation, Ms. Hankins would be in the same position that she is now: with public sentiment hardened against her and once-favorable witnesses no longer willing to support her. In other words, withdrawal of the plea (or dismissal without prejudice) would not remedy the damage. If anything, it would advantage the prosecution by providing it an opportunity to shore up any holes in its case, now that it has had a full preview of Ms. Hankins' evidence and arguments. *See Chapman*, 524 F.3d at 1087 (concluding that a mistrial remedy would advantage the government, which should not be permitted "a chance to try out its case, identify any problem areas, then correct those problems in a retrial"). The government cannot capitalize on its own self-inflicted injury.

Also relevant to this analysis is the "related need to impose a sanction that will serve to deter future prosecutions from engaging in the same misconduct as occurred here." *Bundy*, 968 F.3d at 1044 (so explaining). The prosecution has repeatedly refused to take responsibility for its conduct or engage in any remedial measures, despite repeated requests from defense counsel. *See Chapman*, 524 F.3d at 1088 (specifically highlighting the prosecutor's unwillingness to assume responsibility and finding that this supported the district court's decision to dismiss with prejudice). To make matters worse, the government did not simply refuse to undertake any remedial measures. It allowed the FBI to *continue* to disseminate the false and inflammatory statements, in total disregard of defense counsel's repeated warnings of prejudice. Had the prosecution acted sooner, for example, Endeavor might not have been able to use the prosecutor's statements as evidence in support of its civil claims.

Although a retraction may have been sufficient at the outset, it is unlikely to be so now. *Cf. United States v. Barragan,* 871 F.3d 689, 709 (9th Cir. 2017) (explaining, in the context of prosecutorial misconduct in summation, limiting instructions are most effective if given "immediately after the damage is done"). If anything, a retraction now risks further prejudice to Ms. Hankins by calling even more attention to the falsities. *Cf. Blackmon v. Dep't of Corr.* 34 F.4th 1014, 1021 (11th Cir. 2022) (recognizing that when a defense attorney objects to a prosecutor's misstatement in closing, the defense may end up drawing more attention to the improper remark).

The prosecution's acknowledgement that the statements were "unfortunate," and its cavalier suggestion that Ms. Hankins could use the resulting reputational damage as mitigation evidence at sentencing trivializes its misconduct and the prejudice it has caused. "A prosecutor's first obligation is to serve truth and justice, and assure that those accused are given a fair trial." *United States v. Hill*, 953 F.2d 452, 458 (9th Cir. 1991). In this case, the prosecution deliberately chased notoriety with its salacious and false claims. When confronted by what they had done, they turned a blind eye and allowed the misconduct to continue.

## VIII.   Conclusion

The prosecution's false and inflammatory statements violate Department of Justice regulations, as well as the applicable ABA and Oregon State ethical rules. The violations were flagrant and appear tailored to harden public sentiment against Ms. Hankins. The salacious word choice was deliberate and, foreseeably, spread and amplified by the media. The statements were prepared at least 24 hours before they were published.

The prosecution had both an opportunity and a duty to review the statements before they were disseminated, and the prosecution violated that duty by not stopping it. Even after defense

counsel brought the violations to the government's attention, the government agents continued to

disseminate the press release. The government has flatly refused to remedy the harm it has

caused. The falsehoods have unfairly stigmatized Ms. Hankins as a "serial fraudster" – a stigma

that will survive beyond the termination of any sentence she receives.

Moreover, they have likely tainted potential mitigation witnesses in this proceeding, and

are now being used to impeach her credibility in the civil suit. Under these circumstances, no

lesser remedy is available to rectify the damage. Accordingly, Ms. Hankins respectfully requests

that the Court exercise its supervisory powers to dismiss the case.

DATED: November 4, 2022

Respectfully submitted,

 s/Janet Hoffman
JANET HOFFMAN, OSB No. 781145
KATHERINE MARCHANT, OSB No. 161147
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Phone: (503) 222-1125
Email:  janet@jhoffman.com
Attorneys for Defendant Anne Hankins