JANET LEE HOFFMAN, OSB No. 781145
E-mail:  janet@jhoffman.com
KATHERINE MARCHANT, OSB NO. 161147
E-mail:  katie@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone: (503) 222-1125

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 6:22-cr-00317-MC |
| Plaintiff, | **DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANT ANNE HANKINS' MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT** |
| v. | |
| ANNE HANKINS, | |
| Defendant. | |

I, Katherine Marchant, for my declaration pursuant to 28 U.S.C. § 1746, state:

1. I am one of the attorneys representing Anne Hankins in the above-captioned case. I make this declaration in support of Ms. Hankins' Motion to Dismiss.

2. Attached hereto as Exhibit "1" is a true and accurate copy of the Plea Petition filed on September 28, 2022.

3. Attached hereto as Exhibit "2" is a true and accurate copy of the Plea Agreement filed on September 28, 2022.

4. Attached hereto as Exhibit "3" is a true and accurate copy of the Target Letter that the United States Attorney's Office sent to Ms. Hankins dated March 15, 2021.

5.  Attached hereto as <u>Exhibit "4"</u> is a true and accurate copy of correspondence that defense counsel sent to the assigned prosecutor in furtherance of plea negotiations dated May 15, 2022.

6.  Attached hereto as <u>Exhibit "5"</u> is a true and accurate copy of an email that the assigned prosecutor sent to defense counsel on May 17, 2022. It is in response to the defense counsel's correspondence in Exhibit 4 in furtherance of plea negotiations.

7.  Attached hereto as <u>Exhibit "6"</u> is a true and accurate copy of the press release that the U.S. Attorney's Office issued on September 28, 2022, regarding Ms. Hankins' guilty plea.

8.  Attached hereto as <u>Exhibit "7"</u> is a true and accurate copy of an email chain between defense counsel and the prosecution regarding the government's press release. The emails exchanged are dated September 28 and September 29, 2022.

9.  Attached hereto as <u>Exhibit "8"</u> is a true and accurate copy of an email chain between defense counsel and the prosecution further regarding the government's press release. The emails exchanged are dated September 29 and September 30, 2022.

10. Attached hereto as <u>Exhibit "9"</u> is a true and accurate copy of an email defense counsel sent to the prosecution regarding the government's press release and subsequent media coverage on October 3, 2022. The exhibit includes true and accurate copies of the press coverage attached to the email.

11. Attached hereto as <u>Exhibit "10"</u> is a true and accurate copy of the email the prosecution sent to defense counsel on October 4, 2022, regarding the government's press release and subsequent media coverage, as well defense counsel's response dated October 12, 2022.

12. Attached hereto as <u>Exhibit "11"</u> is a true and accurate copy of a post the FBI Portland office published to its official Twitter account on October 4, 2022. The post includes a link to the government press release originally published on September 28, 2022, regarding Ms. Hankins' guilty plea.

13. Attached hereto as <u>Exhibit "12"</u> are true and accurate copies of pages from a pleading that Endeavor filed in the related arbitration proceeding on November 2, 2022. The excerpted pages include references to the government's press release (Exhibit 6). The pleading also attached the press release as an exhibit.

14. Attached hereto as <u>Exhibit "13"</u> is a true and accurate copy of the protective order governing the use of pre-indictment case materials, which the prosecution provided to the defense in an effort to facilitate an early resolution. The protective order is dated June 24, 2021.

15. Attached hereto as <u>Exhibit "14"</u> is a true and accurate copy of an article written by Alex Paul and published to the *Albany Democratic-Herald's* website dated October 29, 2014, and titled "Central Linn students earn $100,000 at Bi-Mart Willamette Country Music Festival."

16. Attached hereto as <u>Exhibit "15"</u> is a true and accurate copy of an article written by Tracy Loew and published to the *Stateman Journal's* website dated October 12, 2015, and titled "Willamette Country Music Festival may be canceled following unpaid bills, ridiculous alcohol consumption."

///

**I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.**

DATED this 4th day of November 2022

Respectfully submitted,

 s/Katherine Marchant
KATHERINE MARCHANT, OSB No. 161147
JANET HOFFMAN, OSB No. 781145
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Phone: (503) 222-1125
Email:  katie@jhoffman.com
Attorneys for Defendant Anne Hankins

JANET LEE HOFFMAN, OSB No. 78114
E-mail: janet@jhoffman.com
KATHERINE MARCHANT, OSB NO. 161147
E-mail: katie@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone: (503) 222-1125
Attorneys for Defendant Anne Hankins

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 6:22-cr-00317-MC |
| Plaintiff, | **PETITION TO ENTER PLEA OF GUILTY, CERTIFICATE OF COUNSEL, AND ORDER ENTERING PLEA** |
| v. | |
| ANNE HANKINS, | |
| Defendant. | |

I, Anne Hankins, the defendant in the above-captioned matter, hereby petition the Court

to accept and enter my plea of guilty to the charges in the information. I represent to the Court

the following:

1. My name is Anne Hankins. I am 53 years old. I have an Associate's Degree.

2. My attorneys are Janet Hoffman and Katherine Marchant of Janet Hoffman & Associates

   LLC.

3. My attorneys and I have discussed my case fully. I have received a copy of the information.

   I have read the information, or it has been read to me, and I have discussed it with my

   attorneys. My attorneys have counseled and advised me concerning the nature of the

   charges, any lesser-included offense(s), and the possible defenses that I might have in this

case. I have been advised and understand that the elements of the charge alleged against me

to which I am pleading "GUILTY" are as follows:

As to Count 1 – Wire Fraud:

    First, the defendant knowingly devised a scheme or plan to defraud, or a scheme
    or plan for obtaining money or property by means of false or fraudulent pretenses,
    representations, or promises;

    Second, the statements made as part of the scheme were material; that is, they had
    a natural tendency to influence, or were capable of influencing, a person to part
    with money or property;

    Third, the defendant acted with the intent to defraud, that is, the intent to deceive
    and cheat; and

    Fourth, the defendant used, or caused to be used, an interstate wire
    communication to carry out or attempt to carry out an essential part of the
    scheme.

As to Count 2 – Money Laundering

    First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

    Second, the defendant knew the transaction involved criminally derived property;

    Third, the property had a value greater than $10,000;

    Fourth, the property was, in fact, derived from Wire Fraud in violation of 18 U.S.C. §
    1343; and

    Fifth, the transaction occurred in the United States.

I have had a full and adequate opportunity to disclose to my attorneys all facts known to me

that relate to my case. I understand that the Court may ask whether I am satisfied with the

advice I have received from my attorneys.

4. I know that if I plead "GUILTY," I will have to answer any questions that the judge asks me

about the offense to which I am pleading guilty. I also know that if I answer falsely, under

oath, and in the presence of my attorney, my answers could be used against me in a
prosecution for perjury or false statement.

5. I am not under the influence of alcohol or drugs. I am not suffering from any injury, illness,
or disability affecting my thinking or my ability to reason.

6. I understand that conviction of a crime can result in consequences in addition to
imprisonment. Such consequences include deportation, or removal from the United States, or
denial of naturalization, if I am not a United States citizen; loss of eligibility to receive
federal benefits; loss of certain civil rights (which may be temporary or permanent depending
on applicable state or federal law), such as the right to vote, to hold public office, and to
possess a firearm; and loss of the privilege to engage in certain occupations licensed by the
state or federal government.

7. I know that I may plead "NOT GUILTY" to any crime charged against me and that I may
persist in that plea if it has already been made. I know that if I plead "NOT GUILTY" the
Constitution guarantees me:

   a. The right to a speedy and public trial by jury, during which I will be presumed to be
   innocent unless and until I am proven guilty by the government beyond a reasonable
   doubt and by the unanimous vote of twelve jurors;

   b. The right to have the assistance of an attorney at all stages of the proceedings;

   c. The right to use the power and process of the court to compel the production of
   evidence, including the attendance of witnesses in my favor;

   d. The right to see, hear, confront, and cross-examine all witnesses called to testify
   against me;

   e. The right to decide for myself whether to take the witness stand and testify, and if I
   decide not to take the witness stand, I understand that no inference of guilt may be
   drawn from this decision; and

   f. The right not to be compelled to incriminate myself.

8. I know that if I plead "GUILTY" there will be no trial before either a judge or a jury, and that I will not be able to appeal from the judge's denial of any pretrial motions I may have filed concerning matters or issues not related to the court's jurisdiction.

9. In this case I am pleading "GUILTY" under Rule 1 1(c)(l)(B). My attorney has explained the effect of my plea under Rule 1 1(c)(l)(B) to be as follows:

> My plea of guilty is under Rule 1 1(c)(l)(B); therefore, although the judge will consider the recommendations and agreements of both the prosecution and defense attorneys concerning sentencing, the judge is not obligated to follow those recommendations or agreements. If the judge imposes a sentence different from what I expected to receive under the terms of my Plea Agreement with the prosecutor, I do not have a right to withdraw my plea.

10. I know the maximum sentence which can be imposed upon me for the crime to which I am pleading guilty is, for Count 1, Wire Fraud, 20 years' imprisonment and a fine of $250,000 (or twice the gross pecuniary gains or losses resulting from the offense if such amount exceeds $250,000); and for Count 2, Money Laundering, it is 10 years' imprisonment and a fine of $250,000 (or twice the gross pecuniary gains or losses resulting from the offense if such amount exceeds $250,000).

11. I know that the judge, in addition to any other penalty, will order a special assessment as provided by law in the amount of $100 per count of conviction.

12. I know that if I am ordered to pay a fine, and I willfully refuse to pay that fine, I can be returned to court, where the amount of the unpaid balance owed on the fine can be substantially increased by the judge and I can be imprisoned for up to one year.

13. My attorney has discussed with me the Federal Sentencing Guidelines. I know that the Guidelines are advisory, not mandatory. I also know the sentencing judge, in determining the particular sentence to be imposed, must consider those factors set forth in Title 18, United States Code, Section 3553(a), including but not limited to: the nature and circumstances of

the offense, my own history and characteristics, the goals of sentencing (punishment, deterrence, protection and rehabilitation), and the sentencing range established by the advisory Guidelines. If my attorney or any other person has calculated a guideline range for me, I know that this is only a prediction and advisory and that it is the judge who makes the final decision as to what the guideline range is and what sentence will be imposed. I also know that a judge may not impose a sentence greater than the maximum sentence referred to in paragraph ten (10) above.

14. I know from discussions with my attorney that, under the Federal Sentencing Guidelines, if I am sentenced to prison I am not entitled to parole. I will have to serve the full sentence imposed except for any credit for good behavior that I earn. I can earn credit for good behavior in prison at a rate of up to 54 days for each year of imprisonment served. Credit for good behavior does not apply to a sentence of one year or less.

15. I know that if I am sentenced to prison, the judge will impose a term of supervised release to follow the prison sentence. During my supervised release term, I will be supervised by a probation officer according to terms and conditions set by the judge. In my case, a term of supervised release can be up to three years. If I violate the conditions of supervised release, I may be sent back to prison for up to three years.

16. I know that in addition to or in lieu of any other penalty, the judge can order restitution payments to any victim of any offense to which I plead guilty. I am also informed that, for certain crimes of violence and crimes involving fraud or deceit, it is mandatory that the judge impose restitution in the full amount of any financial loss or harm caused by an offense. If imposed, the victim can use the order of restitution to obtain a civil judgment lien. A restitution order can be enforced by the United States for up to twenty (20) years from the

date of my release from imprisonment, or, if I am not imprisoned, twenty (20) years from the date of the entry of judgment. If I willfully refuse to pay restitution as ordered, a judge may resentence me to any sentence, which could originally have been imposed.

17. On any fine or restitution in an amount of $2,500 or more, I know that I will be required to pay interest unless that fine or restitution is paid within fifteen (15) days from the date of the entry of judgment.

18. If I am on probation, parole, or supervised release in any other state or federal case, I know that by pleading guilty in this court my probation, parole or supervised release may be revoked and I may be required to serve time in that case, which may be consecutive, that is, in addition to any sentence imposed on me in this court.

19. If I have another case pending in any state or federal court, I know that my Petition and Plea Agreement in this case do not, in the absence of an express and written agreement, apply to my other case(s), and that I can be faced with consecutive sentences of imprisonment.

20. My plea of "GUILTY" is based on a Plea Agreement that I have made with the prosecutor. That Plea Agreement is attached hereto and incorporated herein. I have read or had read to me the Plea Agreement, and I understand the Plea Agreement.

21. The Plea Agreement contains the only agreement between the United States government and me. No officer or agent of any branch of government (federal, state, or local) or anyone else has promised or suggested that I will receive a lesser term of imprisonment, or probation, or any other form of leniency if I plead "GUILTY" except as stated in the Plea Agreement. I understand that I cannot rely on any promise or suggestion made to me by a government agent or officer which is not stated in writing in the Plea Agreement, or which is not

presented to the judge in my presence in open court at the time of the entry of my plea of guilty.

22. My plea of "GUILTY" is not the result of force, threat, or intimidation.

23. I hereby request that the judge accept my plea of "GUILTY" to the following counts: Count 1 (Wire Fraud in violation of 18 U.S.C. § 1343) and Count 2 (Money Laundering in violation of 18 U.S.C. § 1957).

24. I know that the judge must be satisfied that a crime occurred and that I committed that crime before my plea of "GUILTY" can be accepted. With respect to the charges to which I am pleading guilty, I represent that I did the following acts and that the following facts are true:

I was president of Willamette Country Music Concerts, LLC ("WCMC"), located in Eugene, Oregon. Hankins' sole-member limited liability company, WCMC, Inc., owned 49% of WCMC. William Morris Endeavor Entertainment, LLC and/or its related entities (hereinafter referred to as "Endeavor"), owned a 51% controlling interest in WCMC.

As president of WCMC, I was responsible for preparing monthly financial statements, which I provided to Endeavor by email.

Starting on or around September 2016, and continuing until on or around March 1, 2018, I began providing altered bank statements and false financial summaries. These altered bank statements and false financial summaries concealed the true financial condition of WCMC. I admit that I intended to defraud Endeavor as to the accurate financial condition of WCMC.

On or around November 2017, Endeavor approached me about purchasing WCMC Inc.'s 49% interest in WCMC and having me continue to serve as WCMC's president.

On or about February 7, 2018, I sent an email to Endeavor that contained a financial summary of WCMC as of January 30, 2018. The summary falsely reported that WCMC had approximately $1.1 million in cash in its operating account, when, in reality, there was approximately $16,000 in the account. I admit that the statement was capable of influencing Endeavor's decision to purchase my interest in WCMC.

On March 1, 2018, Endeavor purchased my remaining 49% interest in WCMC. As part of that transaction, Endeavor paid me $1,500,000. The false financial statement provided on February 7, 2018, was a material factor in Endeavor's decision to purchase my remaining interest in WCMC.

Following receipt of the $1,500,000 payment from Endeavor, on March 26, 2018, I knowingly engaged in a monetary transaction with the proceeds of the fraud, causing SELCO

Community Credit Union to issue a $251,444.70 cashier's check from my account in Oregon to the Clerk of Court for the U.S. District Court for the District of Oregon, to satisfy restitution in Case No. 6:01-CR-600100.

25. I offer my plea of "GUILTY" freely and voluntarily and of my own accord and with a full understanding of the allegations set forth in the Indictment or Information, and with a full understanding of the statements set forth in this Petition and in the Certificate of my attorney that is attached to this Petition.

SIGNED by me in the presence of my attorney, after reading (or having had read to me) all of the foregoing pages and paragraphs of this Petition.

DATED: September 27, 2022

_____
Defendant Anne Hankins

## CERTIFICATE OF COUNSEL

The undersigned, as attorney for defendant Anne Hankins hereby certifies:

1. I have fully explained to the defendant the allegations contained in the Indictment in this case, any lesser-included offense(s), and the possible defenses which may apply in this case.

2. I have personally examined the attached Petition To Enter Plea of Guilty And Order Entering Plea, explained all its provisions to the defendant, and discussed fully with the defendant all matters described and referred to in the Petition.

3. I have explained to the defendant the maximum penalty and other consequences of entering a plea of guilty described in paragraphs (6)-(20) of the Petition, and I have also explained to the defendant the applicable Federal Sentencing Guidelines.

4. I recommend that the Court accept the defendant's plea of "GUILTY."

SIGNED by me in the presence of the above-named defendant, and after full discussion with the defendant of the contends of the Petition to Enter Plea of Guilty, and any Plea Agreement.

DATED: September 28, 2022

Janet Hoffman, OSB No. 781145  *Katherine Marhart*
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Phone: (503) 222-1125
Email: janet@jhoffman.com
Attorney for Defendant Anne Hankins

## ORDER ENTERING GUILTY PLEA

I find that the defendant's plea of GUILTY has been made freely and voluntarily and not out of ignorance, fear, inadvertence, or coercion. I further find that the defendant has admitted facts that prove each of the necessary elements of the crime to which the defendant has pled guilty.

Based on the above, I hereby affirm and adopt the order accepting and entering the defendant's guilty plea

DATED this **28** of September, 2022, in open court.

The Honorable Mustafa T. Kasubhai
United States Magistrate Judge

Based on the above, I hereby affirm and adopt the order accepting and entering the defendant's guilty plea

DATED this 28th of September, 2022, in open court.

MICHAEL J. MCSHANE
United States District Court Judge

**PORTLAND MAIN OFFICE**
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1000
*www.usdoj.gov/usao/or*



**EUGENE BRANCH**
405 E 8th Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771

**Gavin W. Bruce**
Assistant U.S. Attorney
Gavin.Bruce@usdoj.gov
(541) 465-6771
*Reply to Eugene Office*

**U.S. DEPARTMENT OF JUSTICE**
United States Attorney's Office
District of Oregon
Natalie K. Wight
United States Attorney

**MEDFORD BRANCH**
310 West Sixth Street
Medford, Oregon 97501
(541) 776-3564

September 27, 2022

Janet Hoffman
1000 S.W. Broadway, Suite 1500
Portland, OR 97205

> Re:   *United States v. Anne Hankins*  6:22-cr-00317-MC
>        Plea Agreement Letter

Dear Counsel:

1.    **Parties/Scope**: This plea agreement is between this United States Attorney's Office
(USAO) and defendant, and thus does not bind any other federal, state, or local prosecuting,
administrative, or regulatory authority. This agreement does not apply to any charges other than
those specifically mentioned herein.

2.    **Charges**: Defendant agrees to waive grand jury and plead guilty to Counts One and Two
of the Superseding Information, which charges Wire Fraud in violation of Title 18, United States
Code, Section 1343, and Money Laundering in violation of Title 18, United States Code, Section
1957.

3.    **Penalties**: The maximum sentence for Count 1, Wire Fraud, is 20 years' imprisonment, a
fine of $250,000 or twice the gross pecuniary gains or losses resulting from the offense if such
amount exceeds $250,000, three years of supervised release, and a $100 fee assessment. The
maximum sentence for Count 2, Money Laundering, is 10 years' imprisonment, a fine of
$250,000 or twice the gross pecuniary gains or losses resulting from the offense if such amount
exceeds $250,000, three years of supervised release, and a $100 fee assessment.

4.    **No Further Prosecution**: The USAO agrees not to bring additional charges against
defendant in the District of Oregon arising out of this investigation, known to the USAO at the
time of this agreement.

Revised Aug. 2022

**Exhibit 2**
**Page 1 of 8**

Janet Hoffman
Re: Anne Hankins Plea Agreement Letter
Page 2
September 27, 2022

5. **Elements and Factual Basis**: In order for defendant to be found guilty of Counts One and Two of the Superseding Information, the government must prove the following elements beyond a reasonable doubt:

Wire Fraud

First, the defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

Second, the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

Money Laundering

First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from Wire Fraud in violation of 18 U.S.C. § 1343; and

Fifth, the transaction occurred in the United States.

Defendant has fully discussed the facts of this case and any potential defenses with defense counsel. Defendant has committed each of the elements of the crimes to which defendant is pleading guilty and admits there is a factual basis for defendant's guilty pleas. The following facts are true and undisputed:

Revised Aug. 2022

**Exhibit 2**
**Page 2 of 8**

Janet Hoffman
Re: Anne Hankins Plea Agreement Letter
Page 3
September 27, 2022

Anne Hankins was president of Willamette Country Music Concerts, LLC ("WCMC"), located in Eugene, Oregon. Hankins' sole-member limited liability company, WCMC, Inc., owned 49% of WCMC. William Morris Endeavor Entertainment, LLC and/or its related entities (hereinafter referred to as "Endeavor"), owned a 51% controlling interest in WCMC.

As president of WCMC, Hankins was responsible for preparing monthly financial statements, which she provided to Endeavor by email.

Starting on or around September 2016, and continuing until on or around March 1, 2018, Ms. Hankins began providing altered bank statements and false financial summaries. These altered bank statements and false financial summaries concealed the true financial condition of WCMC. Hankins admits that she intended to defraud Endeavor as to the accurate financial condition of WCMC.

On or around November 2017, Endeavor approached Hankins about purchasing WCMC Inc.'s 49% interest in WCMC and having Hankins continue to serve as WCMC's president.

On or about February 7, 2018, Hankins sent an email to Endeavor that contained a financial summary of WCMC as of January 30, 2018. The summary falsely reported that WCMC had approximately $1.1 million in cash in its operating account, when, in reality, there was approximately $16,000 in the account. Hankins admits that the statement was capable of influencing Endeavor's decision to purchase Hankins' interest in WCMC,

On March 1, 2018, Endeavor purchased Hankins' remaining 49% interest in WCMC. As part of that transaction, Endeavor paid Hankins $1,500,000. The false financial statement provided on February 7, 2018 was a material factor in Endeavor's decision to purchase Hankins' remaining interest in WCMC.

Following receipt of the $1,500,000 payment from Endeavor, on March 26, 2018, Hankins knowingly engaged in a monetary transaction with the proceeds of the fraud, causing SELCO Community Credit Union to issue a $251,444.70 cashier's check from Hankins' account in Oregon to the Clerk of Court for the U.S. District Court for the District of Oregon, to satisfy restitution in Case No. 6:01-CR-600100.

6.  **Sentencing Factors**:  The parties agree that the Court must first determine the applicable advisory guideline range, then determine a reasonable sentence considering that range and the factors listed in 18 U.S.C. § 3553(a). Where the parties agree that sentencing factors apply, such agreement constitutes sufficient proof to satisfy the applicable evidentiary standard.

Revised Aug. 2022

**Exhibit 2**
**Page 3 of 8**

Janet Hoffman
Re: Anne Hankins Plea Agreement Letter
Page 4
September 27, 2022

7.    **Relevant Conduct**: The parties agree that defendant's total offense level for Counts 1 and Two is as follows, prior to any adjustments per paragraphs 8 and 9.

| Enhancements | Offense Level |
|---|---|
| Base - USSG § 2B1.1(a)(1) | 7 |
| Loss - USSG § 2B1.1(b)(1)(H) More than $550,000 | +14 |
| Sophisticated Means - USSG § 2B1.1(b)(10)(C) | +2 |
| Money Laundering Conviction USSG § SB1.1(b)(2)(A) | +1 |
| **TOTAL OFFENSE LEVEL** | **24** |

8.    **Acceptance of Responsibility**: Defendant must demonstrate to the Court that defendant fully admits and accepts responsibility under USSG § 3E1.1 for defendant's unlawful conduct in this case. If defendant does so, the USAO will recommend a three-level reduction in defendant's offense level (two levels if defendant's offense level is less than sixteen). The USAO reserves the right to change this recommendation if defendant, between plea and sentencing, commits any criminal offense, obstructs or attempts to obstruct justice as explained in USSG § 3C1.1, or acts inconsistently with acceptance of responsibility as explained in USSG § 3E1.1.

9.    **Additional Departures, Adjustments, or Variances**:

The USAO agrees not to seek any upward departures, adjustments, or variances to the advisory sentencing guideline range, or to seek a sentence in excess of that range, except as specified in this agreement. The government will agree to a three-level downward variance under 18 U.S.C. § 3553.

Defendant reserves the right to seek a downward departure, adjustment, or variance from the applicable sentencing guideline range determined by the Court and understands that the government reserves its right to oppose such a request. The basis for the departure, adjustment, or variance shall be limited to USSG § 2B1.1 cmt n.20(C) or 18 U.S.C. § 3553. Defendant agrees that, should defendant seek a downward departure, adjustment, or variance from the applicable guideline range determined by the Court and Probation Office, defendant will provide the government with notice of: (1) the factual basis for such request; (2) any evidence defendant intends to introduce or rely upon at the sentencing hearing; and (3) any witnesses, including expert witnesses, defendant intends to call or rely upon at the sentencing hearing. Such notice

Revised Aug. 2022

**Exhibit 2**
**Page 4 of 8**

Janet Hoffman
Re: Anne Hankins Plea Agreement Letter
Page 5
September 27, 2022

must be provided to the government no later than the Wednesday prior to the week during which the sentencing hearing is scheduled. Defendant agrees that if defendant fails to comply with this notice requirement, defendant will not oppose a government motion for a postponement of the sentencing hearing.

9. **Sentencing Recommendation:** The USAO will recommend the low end of the applicable guideline range as long as defendant demonstrates an acceptance of responsibility as explained above.

10. **Waiver of Appeal/Post-Conviction Relief:** Defendant knowingly and voluntarily waives the right to appeal from any aspect of the conviction and sentence on any grounds, except for a claim that: (1) the sentence imposed exceeds the statutory maximum, or (2) the Court arrives at an advisory sentencing guideline range by applying an upward departure under the provisions of Guidelines Chapters 4 or 5K, or (3) the Court exercises its discretion under 18 U.S.C. § 3553(a) to impose a sentence which exceeds the advisory guideline sentencing range as determined by the Court. Should defendant seek an appeal, despite this waiver, the USAO may take any position on any issue on appeal. Defendant also waives the right to file any collateral attack, including a motion under 28 U.S.C. § 2255, challenging any aspect of the conviction or sentence on any grounds, except on grounds of ineffective assistance of counsel, and except as provided in Fed. R. Crim. P. 33 and 18 U.S.C. § 3582(c)(2). In the event that any of defendant's convictions under this agreement are vacated, the government may reinstate and/or file any other charges, and may take any position at a resentencing hearing, notwithstanding any other provision in this agreement.

11. **Court Not Bound:** The Court is not bound by the recommendations of the parties or of the presentence report (PSR) writer. Because this agreement is made under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, defendant may not withdraw any guilty plea or rescind this plea agreement if the Court does not follow the agreements or recommendations of the parties.

12. **Full Disclosure/Reservation of Rights:** The USAO will fully inform the PSR writer and the Court of the facts and law related to defendant's case. Except as set forth in this agreement, the parties reserve all other rights to make sentencing recommendations and to respond to motions and arguments by the opposition.

13. **Breach of Plea Agreement:** If defendant breaches the terms of this agreement, or commits any new criminal offenses between signing this agreement and sentencing, the USAO is relieved of its obligations under this agreement, but defendant may not withdraw any guilty plea.

Revised Aug. 2022

**Exhibit 2**
**Page 5 of 8**

Janet Hoffman
Re: Anne Hankins Plea Agreement Letter
Page 6
September 27, 2022

If defendant believes that the government has breached the plea agreement, defendant must raise any such claim before the district court, either prior to or at sentencing. If defendant fails to raise a breach claim in district court, defendant has waived any such claim and is precluded from raising a breach claim for the first time on appeal.

14. **Restitution**: Defendant agrees fully to disclose all assets in which defendant has any interest or over which defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or third party. Defendant agrees to truthfully complete the Financial Disclosure Statement provided herein by the earlier of fourteen days from defendant's signature on this plea agreement or the date of defendant's entry of a guilty plea, sign it under penalty of perjury, and provide it to both the USAO and the United States Probation Office. Defendant agrees to provide updates with any material changes in circumstances, as described in 18 U.S.C. § 3664(k), within seven days of the event giving rise to the changed circumstances.

Defendant expressly authorizes the USAO to obtain a credit report on defendant. Defendant agrees to provide waivers, consents, or releases requested by the USAO to access records to verify the financial information. Defendant also authorizes the USAO to inspect and copy all financial documents and information held by the U.S. Probation Office.

The parties agree that defendant's failure to timely and accurately complete and sign the Financial Disclosure Statement, and any update thereto, may, in addition to any other penalty or remedy, constitute defendant's failure to accept responsibility under USSG § 3E1.1.

**Transfer of Assets**
Defendant agrees to notify the Financial Litigation Unit of the USAO before defendant transfers any interest in property with a value exceeding $1000 owned directly or indirectly, individually or jointly, by defendant, including any interest held or owned under any name, including trusts, partnerships, and corporations.

**Restitution**
The Court shall order restitution to each victim in the full amount of each victim's losses as determined by the Court.

Defendant understands and agrees that the total amount of any monetary judgment that the Court orders defendant to pay will be due. Defendant further understands and agrees that pursuant to 18 U.S.C. § 3614, defendant may be resentenced to any sentence which might have originally been imposed if the court determines that defendant has knowingly and willfully refused to pay a fine or restitution as ordered or has failed to make sufficient bona fide efforts to pay a fine or restitution. Additionally, defendant understands and agrees that the government

Revised Aug. 2022

**Exhibit 2**
Page 6 of 8

Janet Hoffman
Re: Anne Hankins Plea Agreement Letter
Page 7
September 27, 2022

may enforce collection of any fine or restitution imposed in this case pursuant to 18 U.S.C. §§ 3572, 3613, and 3664(m), notwithstanding any initial or subsequently modified payment schedule set by the court. Defendant understands that any monetary debt defendant owes related to this matter may be included in the Treasury Offset Program to potentially offset defendant's federal retirement benefits, tax refunds, and other federal benefits.

Pursuant to 18 U.S.C. § 3612(b)(1)(F), defendant understands and agrees that until a fine or restitution order is paid in full, defendant must notify the USAO of any change in the mailing address or residence address within 30 days of the change. Further, pursuant to 18 U.S.C. § 3664(k), defendant shall notify the Court and the USAO of any material change in defendant's economic circumstances that might affect defendant's ability to pay restitution, including, but not limited to, new or changed employment, increases in income, inheritances, monetary gifts, or any other acquisition of assets or money.

15.    **Memorialization of Agreement**: No promises, agreements, or conditions other than those set forth in this agreement will be effective unless memorialized in writing and signed by all parties listed below or confirmed on the record before the Court. If defendant accepts this offer, please sign and attach the original of this letter to the Petition to Enter Plea.

16.    **Deadline**: This plea offer expires if not accepted by September 16, 2022 at 5:00p.m.

Sincerely,

NATALIE K. WIGHT
United States Attorney

*/s/ Gavin W. Bruce*
GAVIN W. BRUCE
Assistant United States Attorney

Revised Aug. 2022

**Exhibit 2**
**Page 7 of 8**

Janet Hoffman
Re: Anne Hankins Plea Agreement Letter
Page 8
September 27, 2022

I have carefully reviewed every part of this agreement with my attorney. I understand and voluntarily agree to its terms. I expressly waive my rights to appeal as outlined in this agreement. I wish to plead guilty because, in fact, I am guilty.

9/28/22
Date

Anne Hankins, Defendant

I represent the defendant as legal counsel. I have carefully reviewed every part of this agreement with defendant. To my knowledge, defendant's decisions to make this agreement and to plead guilty are informed and voluntary ones.

9-28-2022
Date

Janet Hoffman, Attorney for Defendant

Katherine Marchant, Attorney for Defendant

Revised Aug. 2022

**Exhibit 2**
**Page 8 of 8**

**PORTLAND MAIN OFFICE**
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1000
*www.usdoj.gov/usao/or*

Gavin W. Bruce
Assistant United States Attorney
Gavin.Bruce@usdoj.gov
(541) 465-6771
*Reply to Eugene Office*



**U.S. DEPARTMENT OF JUSTICE**
United States Attorney's Office
District of Oregon
Scott Erik Asphaug
Acting United States Attorney

**EUGENE BRANCH**
405 E 8th Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771

**MEDFORD BRANCH**
310 West Sixth Street
Medford, Oregon 97501
(541) 776-3564

March 15, 2021

Anne Hankins
6010 Graystone Loop
Springfield, OR 97478

Dear Ms. Hankins:

This office is in receipt of investigative reports from the FBI and IRS regarding your actions as a Partner of WCMC, LLC. I have reviewed these reports, as well as materials obtained during the grand jury investigation, and have determined that there is sufficient evidence to warrant the initiation of criminal charges against you for Wire Fraud and Conspiracy to Commit Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1349.

Ordinarily, this office would proceed by presenting evidence to a federal grand jury and asking that you be indicted on this charge. If an indictment were returned, you would then be required to appear in court pursuant to a summons or a warrant for your arrest.

In an attempt to expedite proceedings, I am writing to advise you as to the status of this matter and suggest that you retain an attorney to represent you immediately. If you are unable to afford an attorney, you may contact the Federal Public Defender's Office in Eugene, Oregon at (541) 465-6937, and ask them to appoint an attorney for you. After you have obtained an attorney, please tell them to contact me to discuss the disposition of this case.

I look forward to hearing from your attorney expeditiously so this matter can be resolved.

Sincerely,

SCOTT ERIK ASPHAUG
Acting United States Attorney

*/s/ Gavin W. Bruce*
GAVIN W. BRUCE
Assistant United States Attorney

## JANET HOFFMAN & ASSOCIATES LLC

### 1000 S.W. BROADWAY, SUITE 1500 | PORTLAND, OREGON 97205

Janet Lee Hoffman
Justin T Rusk
Katherine Marchant
Ian M. Downs
Christopher Heywood
Ethan Hazel

TEL: 503-222-1125
www.jhoffman.com

Naomi Inouye
Office Manager

Daniel Ellison
PARALEGAL

May 15, 2022

**<u>Via email</u>**
Gavin Bruce
Assistant United States Attorney
U.S. Attorney's Office – District of Oregon
405 East 8th Avenue, Suite 2400
Eugene, OR 97401
gavin.bruce@usdoj.gov

Re: Anne Hankins

Dear Gavin:

Pursuant to our settlement discussions, we are writing to provide you with our proposed sentencing guideline range. As promised when we met in person, Howard Levine sent a letter that analyzed the legal rights of the respective parties as related to Ms. Hankins' authority to borrow funds on behalf of WCMC, LLC ("WCMC") under WCMC's operating documents. Mr. Levine concluded that Ms. Hankins, as president, had the authority to take out loans on WCMC's behalf. Therefore, based on the operating documents, for purposes of establishing the proper guideline range, Ms. Hankins' payments that reduced the loans are a reduction of loss under the Sentencing Guidelines.

After applying the payments that Ms. Hankins made, we believe that a sentence of probation is justified under the Sentencing Guidelines. We do not expect you to make a probationary recommendation. However, a potential resolution that includes the credit for her payments would provide an opportunity for both sides to make their arguments to the court.

**Exhibit 4**
**Page 1 of 6**

There are two avenues that support Ms. Hankins' eligibility for a probationary sentence. The first is through the following calculation, which would result in a guideline range of 0-6 months imprisonment (or 6-12 months without the reduction for acceptance of responsibility):

- Base offense level for wire fraud: +7
- Sophisticated means enhancement: +2
- Money laundering conviction: +1
- Early acceptance of responsibility: -3

This calculation does not include an enhancement for loss. We have reviewed the documents you provided following our March meeting. Based on our review, we believe that Ms. Hankins put more of her personal funds into WCMC than is captured in the government's work product. Specifically, there may be at least $1.5 million in credits against loss. This would offset the $1.5 million in actual loss, which we are not currently contesting.

The second avenue to a probationary sentence would recognize a loss amount but would require a downward departure and/or variance because the government's proposed 14-level increase (for a loss amount between $550,000 and $1,500,000) "substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 cmt. n.20(C). Similarly, Section 3553(a)(2), which directs courts to consider the nature and circumstances of an offense, would justify a probationary sentence. In this scenario, we would hope that you would recognize, as part of the plea, that the amount Ms. Hankins paid to reduce the loss prior to \ discovery of the offense, in conjunction with the surrounding circumstances discussed below, qualifies her for a variance. Both sides would be free to argue the appropriate sentence.

As we have previously discussed, the context surrounding Ms. Hankins' conduct, including the effect of WME's behavior on Ms. Hankins, reduces her overall blameworthiness.[1] For example, Ms. Hankins personally guaranteed third-party loans she caused WCMC to take out. Even after she sold her 49% interest, she continued to personally guarantee not only the existing loans but also the post-sale debts.[2] Government witnesses reported that Ms. Hankins had wanted to buy out WME's interest in the festivals — showing both a belief that WCMC was worth what WME paid and an intent seemingly incompatible with efforts to fraudulently inflate the value of the company. But WME refused to sell its shares. WME's own potential misconduct and self-dealing, such as its unilateral decision to lock up ticket revenues and keep those revenues from WCMC, which deprived WCMC of desperately needed operating capital, corroborate Ms. Hankins' position that her decision to "go underground," so to speak, was a reaction to corporate bullying and malfeasance — not a premeditated scheme to defraud.

As you have previously pointed out, these are matters for a sentencing court, so we will not belabor the point here. Instead, as requested, please find our loss analysis below.

---

[1] WCMC Holdings, LLC, William Morris Endeavor Entertainment, LLC, WME, and other similarly named companies are all related entities. Because of the abbreviations the WME-related entities use to identify its various companies, it is difficult to know with certainty which entity affiliated with WCMC Holdings, LLC is responsible for a specific action. For present purposes, and convenience, we will use "WME" to refer to all relevant WME-related entities.

[2] This includes, for example, Ryan Ringer's $300,000 loan to WCMC in August 2018. WCMC (wholly owned by a WME-related entity) did not repay the loan, so, in 2020, Mr. Ringer filed suit against both WCMC and Ms. Hankins personally for repayment. The court has recently entered judgment against Ms. Hankins for approximately $175,000, which will become a lien on her house.

**Exhibit 4**
**Page 2 of 6**

**Loss Analysis**

The Guidelines define "loss" as the "the greater of actual or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). It is our understanding that actual loss is the relevant measure in this case, and it is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at cmt. n.3(A)(i). If a defendant returned any money to the victim or rendered any legitimate services to the victim before the fraud was detected, courts will reduce the loss amount by the fair market value of the returned money or the services rendered. *Id.* at cmt. n3(E)(i).[3]

This "loss credit" is not limited to only money or property that a defendant obtained from and later gave back to a particular victim. *See* Federal Sentencing Guidelines Handbook § 2B1.1 Theft and Fraud, Author's Discussion § 10 (discussing the Sentencing Commission's statement of reasons accompanying the updated economic crime guideline and quoting from U.S.S.G. App. C, Amendment 617 (Reason for Amendment) (Nov. 1, 2001)). Rather, it encompasses all economic benefits that passed from the defendant to the victim prior to detection of the offense. *See id.; see also United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010) (explaining that "for any given victim, it is the net loss that matters"). This is intended to account for the fact that "value may be rendered even amid fraudulent conduct." *United States v. Sayakhom*, 186 F.3d 928, 946 (9th Cir. 1999) (quotation marks omitted). As the Sentencing Commission explained when it adopted this "net loss" approach, "the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not." *United States v. Campbell*, 765 F.3d 1291 (11th Cir 2014) (citing U.S. Sentencing Guidelines Manual, app. C, vol. II, amend. 617, at 183 (2003)).

Of course, a defendant convicted of fraud may not receive credit for value that is provided to a victim for the sole purpose of enabling him or her to conceal or perpetuate his scheme, nor may he or she deduct the costs incurred in running a fraudulent scheme. *Campbell,* 765 F.3d at 1303. But, a defendant is entitled to offset the value of legitimate services rendered or value provided in the course of a scheme to defraud.

For example, in *United States v. Zolp*, the defendant had conducted a "pump and dump" scheme, in which he fraudulently inflated the value of stocks from legitimate companies. *See Zolp*, 479 F.3d 715, 717-18 (9th Cir. 2007). The district court calculated the actual loss as the amount that the victims paid to buy the stocks. *Id.* at 720. On appeal, the Ninth Circuit held that calculation was erroneous. *Id.* at 721. The court explained that the trial court failed to assess the actual value, if any, of the underlying stocks and offset that value against the victims' losses. *Id.* Only if the underlying company was worthless, or practically worthless, would it have been reasonable for the district court to have used the total investment as actual loss. *Id.* Accordingly, the appellate court reversed the sentence and remanded to the district court for further findings. *Id.*

Similarly, a sentencing court would have to determine the intrinsic value of WCMC and credit that amount against the $1.5 million that WME paid for Ms. Hankins' shares. Such a determination is beyond the scope of this letter. But, it could present interesting valuation issues. For example, a court may find that WME was willing to pay a premium to gain full control of WCMC because it expected to

---

[3] For present purposes, we have estimated that the offense was detected between August 19 and September 24, 2018. This is based on WME's factual allegations in its Demand for Arbitration (which largely mirrors its prior civil complaint). This also matches the government's work product tracking the money that Ms. Hankins put into the company over time.

**Exhibit 4**
Page 3 of 6

get more value out of the acquisition than its intrinsic value. [4] WME's talent agency received commissions when WME-represented artists performed at WCMC festivals. With headline artists able to charge $1.6 million for two festivals, WME's commissions were significant. WCMC also offered opportunities for other WME-controlled subsidiaries to expand their offerings by providing services to the festivals. Under the terms of the 2013 LLC Agreement, however, Ms. Hankins retained creative control of the festivals, which included artist selection, as well as certain other "veto powers." Buying out Ms. Hankins' interest gave WME sole control. Again, such issues are beyond the scope of this letter. The point is simply that a court would be required to assess the intrinsic value of WCMC and credit that amount against the $1.5 million in loss.

   In addition, the loss credit should account for the monies that Ms. Hankins put into funding the business operations, prior to the sale of her 49% interest, as well as the money that she returned to the company following the sale. The latter is a straight-forward return of proceeds: Ms. Hankins received $1.5 million and returned, by our calculation, approximately $1.2 million (this is further detailed below). The former represents legitimate value that WME received prior to discovery of the offense. To our knowledge, there is no dispute that Ms. Hankins' funds (which are also further accounted for below) were used for genuine business operations — to the benefit of her business partner.

   The records demonstrate that Ms. Hankins returned $1,202,701.52 of the $1.5 million that she received from WME prior to discovery of the offense. This is approximately $400,000 more than the government's calculation. The difference is primarily due to the fact that we have included payments that Ms. Hankins made to third parties for WCMC-borrowed funds. For the reasons Mr. Levine articulated in his earlier letter, we believe that she had the authority to make these loans, and, so, she should receive credit for their repayment.

   The following is the breakdown of payments making up the $1,202,701.52 loss credit [**NB**: the highlighted transactions represent payments <u>not</u> included in the government's calculation]:

**March 9:** Ms. Hankins signed and delivered a personal check payable to WCMC for $50,000.

**March 12:** Ms. Hankins signed and delivered a personal check payable to Ryan Ringer for $252,362.96. This was to repay a $250,000 loan that Ringer made to WCMC in January 2018.

**March 18:** Ms. Hankins deposited $550,000 into WCMC's operating account.

**April 9:** Ms. Hankins signed and delivered a personal check for $25,000 payable to Bi-Mart to repay the "BOGO promotion" overpayment.

**April 12:** Ms. Hankins signed and delivered a personal check for $13,900 payable to Anderson Trail in repayment of Anderson Trail's loan to WCMC around September 25, 2017.

**April 20:** Ms. Hankins signed and delivered a personal check for $50,000 payable to Bi-Mart to repay the "BOGO promotion" overpayment.

---

[4] Such a determination would also be relevant to a court's requisite threshold finding that Ms. Hankins' conduct (i.e. the altered bank statements and financial records) was the cause of the $1.5 million loss. *United States v. Lonich,* 23 F.4th 881, 916-17 (9th Cir. 2022) (explaining that the definition of "actual loss" incorporates and requires both factual or "but for" causation and legal or foreseeable causation).

**Exhibit 4**
**Page 4 of 6**

**April 30:** Ms. Hankins signed and delivered a personal check for $27,438.56 payable to Bonnie Layton. This was for the remaining balance on an approximately $262,000 loan from Bonnie to WCMC.

**May 4**: Ms. Hankins signed and delivered a personal check for $50,000 payable to Bi-Mart to repay the "BOGO promotion" overpayment.

**August 18:** Ms. Hankins facilitated a payment of $100,000.

**August 18:** Ms. Hankins facilitated a payment of $49,000.

**August 18:** Ms. Hankins facilitated a payment of $35,000.

In addition to the above payments, Ms. Hankins also put her own money into WCMC prior to the sale of her 49% interest. We have reviewed the government's work product that tracks the money that she deposited into (and took out of) WCMC between August 2015 and January 2018.[5] We have found some potential discrepancies, which, we believe, increase the total amount of money that Ms. Hankins loaned to WCMC (for which she was not reimbursed). We have provided the following sample, the total of which may be more than $300,000. Although there may be more payments, we have not included those here, since this amount, combined with the above, would reduce the total actual loss to less than $6,500 (and therefore there would be no loss-based enhancement):

**September 2015**: the government recorded Ms. Hankins as having repaid herself the $50,000 that she had previously loaned to WCMC (thus reducing the amount of WCMC's debt to Ms. Hankins). This money did not go to Ms. Hankins, however. It was a repayment to Dan Hill (who owns Arbor South) for the $50,000 that he loaned to WCMC the prior month.

**Salary draws**: It appears that, over the course of 12 months (or more), many of Ms. Hankins' payroll draws might have been misclassified as repayments for monies Ms. Hankins loaned. We do not have Ms. Hankins' payroll records to confirm, but the same amount of money, which appears to correspond with Ms. Hankins' wages, was transferred to her construction account at the same time each month.

**Credit cards**: Ms. Hankins used her personal credit cards to pay a variety of festival-related expenses, for which it does not appear that she was ever reimbursed. For example, in October 2016, she paid $2,872.44 to Pacific Headwear to cover an outstanding invoice for 2016 festival hats. The LLC Agreement required that Ms. Hankins be repaid for all expenses incurred on behalf of WCMC.

**Pre-2015 payments:** There are records indicating that Ms. Hankins transferred $245,000 from her personal bank account into WCMC's operating account in 2014. Money that Ms. Hankins loaned to WCMC prior to August 2015 does not appear to have been accounted for (at least in the documents we have received thus far).

---

[5] The government's work product goes through September 2018. The work product between January 31, 2018 and September 2018 is accounted for in the preceding section.

**Exhibit 4**
**Page 5 of 6**

**Unknown repayments:** There are some entries for which we need more documentation to understand whether they are properly classified as repayments for funds that Ms. Hankins loaned. For example, an entry dated November 15, 2015 reclassifies a $20,000 payment to Arbor South to Ms. Hankins.

**Conclusion**

As previously mentioned, we do not expect you to make a recommendation of probation. However, we believe our analysis under applicable law is accurate. We look forward to discussing these issues with you further. To the extent we rely on documents in this letter, we believe that you already have those described above. If you do not, please let us know, and we are happy to provide them.

Sincerely,

Janet Hoffman and Katie Marchant

**Exhibit 4**
**Page 6 of 6**

| | |
|---|---|
| **From:** | Bruce, Gavin (USAOR) |
| **To:** | Katherine Marchant; Janet Hoffman |
| **Cc:** | Boyer, Joseph (USAOR)[Contractor] |
| **Subject:** | Hankins: Plea Outline |
| **Date:** | Tuesday, May 17, 2022 8:42:38 AM |

> **External Sender:** This email came from outside of the firm. Exercise caution with any attachments or links.

Hi Janet and Katie,

Thanks for sending me your letter and loss calculation. Here are my thoughts. I see two options moving forward that would be acceptable to the government.

1. The parties agree to the guidelines outlined in your letter and on the $1.5 million loss amount. I will agree to a three-level variance under 3553, which would put the guidelines at 27-33 months. I will recommend the low end of the guideline range. In the plea, the government will permit defense to request a downward departure under 2B1.1 cmt n.20(C) or under 3553. You can then request whatever sentence you deem appropriate; or

2. The parties agree on the base (7), sophisticated means (+2) and ML conviction (+1), and we leave loss to be determined by the court at sentencing. We can both provide evidence and argument to the court on loss, and the government will recommend a guideline sentence based on the loss the court determines. You'd be free to argue for a departure or variance, and any sentence you deem appropriate.

These are also subject to supervisory approval, per usual. Please let me know how you'd like to move forward.

Thanks,

Gavin

**Gavin W. Bruce**

**Assist Ant United S t Ates Attorney**

United State S a ttorney 's O ffice

d iStrict of O regon

405 e . 8th a venue | Suite 2400 | e ugene, o regon 97401

**(541) 465-6839 | gavin.bruce@usdoj.gov**

**Exhibit 5**
**Page 1 of 1**



United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

DISTRICT *of* OREGON

**Department of Justice**

U.S. Attorney's Office

District of Oregon

---

FOR IMMEDIATE RELEASE        Wednesday, September 28, 2022

## Willamette Country Music Concerts President Pleads Guilty to Wire Fraud and Money Laundering

EUGENE, Ore.—The former president and minority owner of Willamette Country Music Concerts, LLC, who planned, managed, and promoted the annual Willamette Country Music Festival in Linn County, Oregon, pleaded guilty today after she falsified bank statements and financial summaries to influence the sale of her stake in the company.

Anne Hankins, 53, a resident of Springfield, Oregon, pleaded guilty to one count each of wire fraud and money laundering.

"With today's guilty plea, Ms. Hankins has proven herself to be a serial fraudster," said Craig Gabriel, Criminal Chief for the U.S. Attorney's Office. "Falsifying bank statements and laundering money to fraudulently inflate the value of a company are serious federal crimes."

"Ms. Hankins blatantly deceived her business associate and stole money that never belonged to her. However, today the curtains have come down and Ms. Hankins is facing the music for her fraud," said Special Agent in Charge Bret Kressin, IRS Criminal Investigation (IRS:CI), Seattle Field Office.

According to court documents, as former minority owner of Willamette Country Music Concerts (WCMC), Hankins owned 49% of the company. As president of WCMC, Hankins was responsible for preparing monthly financial statements which she provided by email to the company's majority owner who was based in Beverley Hills, California.

Beginning in September 2016 and continuing until March 2018, Hankins provided altered banks statements and false financial summaries to the majority owner to conceal WCMC's true financial condition. In November 2017, the majority owner approached Hankins about purchasing her stake in the company and having Hankins continue to serve as the company's president.

On or about February 7, 2018, Hankins sent an updated financial summary to the majority owner falsely reporting that the company had approximately $1.1 million in its operating account. In reality, there was only $16,000 in the company's account. Based on these false financial statements, on March 1, 2018, the majority owner purchased Hankins' stake in the company for $1.5 million.

**Exhibit 6**
**Page 1 of 2**

9/30/22, 4:08 PM     Willamette Country Music Concerts President Pleads Guilty to Wire Fraud and Money Laundering | USAO-OR | Department of Ju...

Case 6:22-cr-00317-MC   Document 15   Filed 11/07/22   Page 32 of 80

After receiving the majority owner's payment, Hankins directed her credit union to issue a cashier's check from her account to the Clerk of the Court for the District of Oregon to satisfy a restitution order on a previous bank fraud conviction from 2001. Hankins thereby laundered the proceeds from one crime to pay her restitution on another.

On September 12, 2022, Hankins was charged by criminal information with one count each of wire fraud and money laundering.

Wire fraud is punishable by up to 20 years in federal prison and money laundering by up to 10 years in federal prison. Both charges also may result in fines of up to $250,000, or twice the gross gains or losses resulting from the offense, and three years' supervised release.

Hankins will be sentenced on January 5, 2023, by U.S. District Court Judge Michael J. McShane.

As part of her plea agreement, Hankins has agreed to pay restitution as identified by the government and ordered by the court.

This case was investigated by IRS:CI and the FBI, and is being prosecuted by Gavin W. Bruce, Assistant U.S. Attorney for the District of Oregon.

---

**Topic(s):**
Financial Fraud

**Component(s):**
USAO - Oregon

Updated September 28, 2022

**Exhibit 6**
**Page 2 of 2**

| From: | Janet Hoffman |
| --- | --- |
| To: | Gabriel, Craig (USAOR) |
| Cc: | Bruce, Gavin (USAOR); Katherine Marchant |
| Subject: | Re: I am very upset with the name calling in the press release. |
| Date: | Thursday, September 29, 2022 3:27:46 PM |

Are the two of you available to talk now?   Craig I want to discuss with you some of the fall out.   I spoke to Gavin about a potential remedy (I'm not sure it would solve anything ) of your office filing a retraction for its misstatements and those of the IRS.   An issue with withdrawing the plea is jury commination.  Moreover she through NO fault of her own loses the benefit of the bargain.   I am forwarding you samples of articles where you and or the IRS are quoted as the headline under the government seal
Janet

Get Outlook for iOS

---

**From:** Janet Hoffman <Janet@jhoffman.com>
**Sent:** Wednesday, September 28, 2022 9:46:33 PM
**To:** Gabriel, Craig (USAOR) <Craig.Gabriel@usdoj.gov>
**Cc:** Bruce, Gavin (USAOR) <Gavin.Bruce@usdoj.gov>; Katherine Marchant <katie@jhoffman.com>
**Subject:** Re: I am very upset with the name calling in the press release.

Thanks

Get Outlook for iOS

---

**From:** Gabriel, Craig (USAOR) <Craig.Gabriel@usdoj.gov>
**Sent:** Wednesday, September 28, 2022 8:45:58 PM
**To:** Janet Hoffman <Janet@jhoffman.com>
**Cc:** Bruce, Gavin (USAOR) <Gavin.Bruce@usdoj.gov>; Katherine Marchant <katie@jhoffman.com>
**Subject:** Re: I am very upset with the name calling in the press release.

External Sender: This email came from outside of the firm. Exercise caution with any attachments or links.

Janet- I intentionally left you on the email response, so that you would know that Gavin and I were going to talk.
Gavin and I did end up connecting, and he'll call you tomorrow. Thank you. CG

On Sep 28, 2022, at 8:33 PM, Janet Hoffman <Janet@jhoffman.com> wrote:

I assume I was an unintended recipient to this email.  Gavin I tried to call and could not reach you.  This is a serious matter.  Im traveling tomorrow but can be reached off and on.
Janet

**Exhibit 7**
**Page 1 of 2**

**From:** Gabriel, Craig (USAOR) <Craig.Gabriel@usdoj.gov>
**Sent:** 28 September 2022 17:03
**To:** Janet Hoffman <Janet@jhoffman.com>
**Cc:** Bruce, Gavin (USAOR) <Gavin.Bruce@usdoj.gov>; Katherine Marchant
<katie@jhoffman.com>
**Subject:** Re: I am very upset with the name calling in the press release.

External Sender: This email came from outside of the firm. Exercise caution with any attachments or links.

Gavin- I just talked to Janet. I'll call you now. CG

> On Sep 28, 2022, at 4:44 PM, Janet Hoffman <Janet@jhoffman.com>
> wrote:

Craig,

I am really surprised with the name calling "serial fraudster" , "Ms. Hankins is facing the music for her fraud" especially in light of the variance that Gavin believed was warranted.   Anne never stole from her company and Endeavor pushed every button starving her business.   The $1.5 million was paid for a company that Anne was also willing to purchase for the same amount.   It was not a case where Anne stole money that did not belong to her.   She sold a share of a company she helped build and loved.   Two wrongs don't make a right but there are equites that these statements don't capture.   The facts without your emotional floridness would have spoken for themselves.   I am very disappointed in the IRS and your statements.  Anne paid back 1.2 million before she was ever detected, she took on 5 million of debt that she spent on the business, this conduct that makes the case very unusual however, it is totally undercut by you or your agents.   Do you expect these emotional statements will help you with the Judge?   I don't understand your thinking.

Janet

"With today's guilty plea, Ms. Hankins has proven herself to be a serial fraudster," said Craig Gabriel, Criminal Chief for the U.S. Attorney's Office. "Falsifying bank statements and laundering money to fraudulently inflate the value of a company are serious federal crimes."

"Ms. Hankins blatantly deceived her business associate and stole money that never belonged to her. However, today the curtains have come down and Ms. Hankins is facing the music for her fraud," said Special Agent in Charge Bret Kressin, IRS Criminal Investigation (IRS:CI), Seattle Field Office.

**Exhibit 7**
**Page 2 of 2**

| From: | Janet Hoffman |
|---|---|
| To: | Gabriel, Craig (USAOR) |
| Cc: | Katherine Marchant; Bruce, Gavin (USAOR) |
| Subject: | Re:    e have now received a call from the    illamette    ee |
| Date: | riday, September 30, 2022   :42:  0 AM |

Also see ABA guidelines and due process clause. You all could have helped

Get Outlook for iOS

---

**From:** Gabriel, Craig (USAOR) <Craig.Gabriel@usdoj.gov>
**Sent:** Friday, September 30, 2022 9:41:13 AM
**To:** Janet Hoffman <Janet@jhoffman.com>
**Cc:** Katherine Marchant <katie@jhoffman.com>; Bruce, Gavin (USAOR) <Gavin.Bruce@usdoj.gov>
**Subject:** RE: We have now received a call from the Willamette Week

External Sender: This email came from outside of the firm. Exercise caution with any attachments or links.

Understood. We'll oppose.

---

**From:** Janet Hoffman <Janet@jhoffman.com>
**Sent:** Friday, September 30, 2022 8:40 AM
**To:** Gabriel, Craig (USAOR) <CGabriel@usa.doj.gov>
**Cc:** Katherine Marchant <katie@jhoffman.com>; Bruce, Gavin (USAOR) <gbruce@usa.doj.gov>
**Subject:** [EXTERNAL] Re: We have now received a call from the Willamette Week

We are moving to dismiss.  Please see todays Willamette week article.

Get Outlook for iOS

---

**From:** Gabriel, Craig (USAOR) <Craig.Gabriel@usdoj.gov>
**Sent:** Friday, September 30, 2022 9:38:05 AM
**To:** Janet Hoffman <Janet@jhoffman.com>
**Cc:** Katherine Marchant <katie@jhoffman.com>; Bruce, Gavin (USAOR) <Gavin.Bruce@usdoj.gov>
**Subject:** RE: We have now received a call from the Willamette Week

External Sender: This email came from outside of the firm. Exercise caution with any attachments or links.

Janet- I was at the FBI all afternoon yesterday. I'm in a court hearing for most of this morning.
I don't think we'd retract any statements, but I've asked Gavin to follow up with you and our
Public Affairs Officer (Kevin Sonoff). Thanks. CG

---

**From:** Janet Hoffman <Janet@jhoffman.com>
**Sent:** Thursday, September 29, 2022 9:07 PM
**To:** Gabriel, Craig (USAOR) <CGabriel@usa.doj.gov>

**Exhibit 8**
**Page 1 of 2**

**Cc:** Katherine Marchant <katie@jhoffman.com>; Bruce, Gavin (USAOR) <gbruce@usa.doj.gov>
**Subject:** [EXTERNAL] We have now received a call from the Willamette Week
**Importance:** High

Craig,
We did not hear back from either you or Gavin this afternoon.   The story has spread.   I sent you the local articles where you and the SEC are quoted as the by line.   I need to talk with you ASAP to figure out what if anything you will do as an office to retract the governments statements quoted in the articles or at a minimum negate the real detriment that was caused to annne.  At this point even if Anne vacates her guilty plea there is a serious question of where she can obtain a fair trial.
Janet

**Exhibit 8**
**Page 2 of 2**

| | |
|---|---|
| From: | Janet Hoffman |
| To: | Gabriel, Craig (USAOR); Bruce, Gavin (USAOR) |
| Cc: | Katherine Marchant |
| Subject: | follow up to our discussions re the Hankins press release. |
| Date: | Monday, October 3, 2022 3:34:16 PM |
| Attachments: | Country Music Festival Promoter Pleads Guilty to Fraud.pdf |
| | CBS TRA OR GO S.pdf |
| | KPIC T Article.pdf |
| | Koin6 Serial fraudster CMC president pleads guilty.pdf |
| | Letter to Gavin_Guidelines Analysis ( .22).pdf |
| | Hankins Plea Petition (signed).pdf |
| Importance: | High |

Craig and Gavin,

    The statements contained in the press release put out by the U.S. Attorney's Office for the District of Oregon were picked up by local papers, radio and television broadcasts, as well as the *Willamette Week* and even Yahoo! News.   I have attached for your review a sample of the articles we have seen so far, as well as copies of our settlement letter, which formed the structure of our plea negotiations, and Ms. Hankins' acceptance of the terms of the plea. Please review our initial letter proposing ways to settle the case that would allow Ms. Hankins to argue for probation, the final agreement, including the 3-point guideline reduction, and you will see the history of our negotiations that ultimately lead to the guilty plea.

    From our discussions, we understand that neither of you wrote the press release. However, it was signed by Craig and Gavin you had it in your possession the day before the plea and its distribution.   Someone in your office wrote the article and provided it to both of you for your review.    The news articles quote, under Craig's name, that Ms. Hankins is a "serial fraudster," and, under an IRS Special Agent in Charge's name, that Ms. Hankins "stole money "and that "the curtains have come down and Ms. Hankins is facing the music of her fraud."  The *Willamette Week*, playing the role of Sherlock Holmes, cited to Craig's comment as evidence that Ms. Hankins was at fault for the festivals being shut down and vendors left unpaid in late 2018. The article opens with this background then purports to solve the mystery as to why that happened: "Now, federal prosecutors are filing in the details of why. That promoter, Anne Hankins, 53, was a 'serial fraudster,' according to Craig Gabriel, criminal chief for the U.S. Attorney's Office." The full article is attached.

    We spoke last Thursday and Friday in my attempt to mitigate the harm of these false

**Exhibit 9**
**Page 1 of 14**

and inflammatory statements that were issued by your office. Specifically, we discussed advising the press that there were errors in your statement or withdrawing them as inaccurate. My efforts, however, came to nothing.

In the meantime, serious reputational harm has been done to Ms. Hankins over and above the basic facts of her plea.  Nowhere in the plea or charges is there the element of "theft," nor was her past criminal history included in the sentencing guideline calculation because of its age and unrelated nature.   Gavin, you even told Katie and me during our negotiations that Ms. Hankins' past conviction was not relevant to sentencing in this case and that you would not use it.

The statements in and of themselves impact Ms. Hankins' reputation, which is not an authorized punishment under the guidelines or any other statutory scheme.  Moreover, your office's press release, with its false and inflammatory statements, are in clear violation of ethical standards and the due process clause. DOJ regulations, for example, prohibit government personnel from disseminating information about a defendant's prior criminal record or making any observations about a defendant's character. The ABA ethical rules governing the prosecutorial function likewise advise against public comments that could heighten public condemnation of the accused. What makes the press release so damaging is that it is the US government personally vouching as to facts unsupported by the plea or charge  (Ms Hankins Stole money)  and Ms. Hankins' character. A senior IRS agent said that Ms. Hankins stole money. The head of the criminal division said that she is a serial fraudster.

In all of my years of experience, no press release has contained such personal vitriol. The apparent purpose of these gratuitous false and inflammatory statements is to rile up the public against Ms. Hankins. The statements have succeeded if that was the goal.   Potential third-party witnesses who we would have asked to testify on Ms. Hankins' behalf have been exposed to AUSA and IRS statements that she is a thief and "serial fraudster."  Her narrative as contained in our negotiations and correspondence was turned on its head. The key consideration in entering the plea was well known to your office, as was the need for a fair hearing where we could put on evidence that would support our argument that a sentence of

**Exhibit 9**
**Page 2 of 14**

probation was warranted. The false narrative put forward by your office was believed by the public and tainted Ms. Hankins' ability to obtain and present exculpatory evidence in support of her request for probation. Your statement violated the spirit and the letter of the plea bargain.

As a footnote, it is ironic that during our negotiations every effort was made by your office not to taint the civil proceeding for either party. Up to the day before the plea hearing, we were working with Gavin on the how the victim should be designated in the information, so as not to impact the arbitration. Unbeknownst to us, you were sitting on a press release that calls Anne a thief and serial fraudster, neither of which was relevant to the criminal case but both of which lined up with the civil complaint.

Withdrawing the plea does not put Ms. Hankins "back to where she would have been" but for the press release. The only way to restore her to where she would have been if you had not sought publication of the false and inflammatory statements is for your office to recommend a probationary sentence. In the absence of such a recommendation, the only remaining alternative would be dismissal of the indictment.

Please get back to me and we can discuss this matter further.

Janet

**Exhibit 9**
**Page 3 of 14**









# Country Music Festival Promoter Pleads Guilty to Fraud

**Three music festivals were shuttered in 2019 after vendors were never paid.**

⤢ Expand



**SOME OF THE BEST TIMES THAT YOU CAN'T REMEMBER:** Brad Paisley. (Debby Wong/Shutterstock)

**By Lucas Manfield**

**September 29, 2022 at 6:18 pm PDT**

Three country music festivals in Oregon and Idaho shut down in 2019—and it wasn't because of the pandemic.

Vendors at the Country Crossing Music Festival, last held at the Jackson County Fairgrounds in southeast

**Exhibit 9**
**Page 4 of 14**     1/13

Oregon, say they were stiffed. Lax security and excessive drinking at the Willamette Country Music Festival in Brownsville led Linn County officials to revoke its permit.

Sponsors and artists fled, and in late 2018, the festivals' promoter was fired. Both Oregon festivals announced they were ending their runs. Mountain Home Country Music Festival in southern Idaho went on "hiatus."





Now, federal prosecutors are filling in the details of why. That promoter, Anne Hankins, 53, was a "serial fraudster," according to Craig Gabriel, criminal chief for the U.S. Attorney's Office. She faces up to 30 years in prison after pleading guilty to wire fraud and money laundering on Wednesday.

According to court documents filed in U.S. District Court, Hankins forged bank documents to convince the majority owner of her promotional company, the talent agency formerly known as WME, to buy her out for $1.5 million.

She told WME in a monthly, emailed financial update that the company had $1.1 million in the bank. In reality, there was $16,000. That was wire fraud.



The money laundering occurred after, when Hankins paid $251,445 in restitution to the U.S. Circuit Court.

That was for a 2002 conviction for bank fraud, in which Hankins made a "false loan application." She was

Exhibit 9
Page 5 of 14

2/13

jailed for 30 days and ordered to return the $350,000 to U.S. Bank.

But for years, she struggled to make restitution payments, and even after a decade, she'd paid back only $13,044. She cut a deal with the bank, but prosecutors demanded she still pay the full amount into a federal fund for crime victims.






By 2018, her festivals were making headlines, but not because of the headliners. (Those included Kid Rock and Brad Paisley.) Instead, vendors complained they hadn't been paid. Bi-Mart eventually pulled its sponsorship, and the three festivals never returned.

Hankins will be sentenced in January.



**Lucas Manfield**

Lucas Manfield covers cops, courts and crime.



Do your part and support local, independent reporting

**SUPPORT WW**

**SPONSORED CONTENT**                                         Recommended by Outbrain



**Portland, Oregon Radon Map 2023 Update**

realestateagentpdx.com | Sponsored



**Older Men Are Using This For Their Manhood Here**

Tupi Tea | Sponsored



Central Oregon
**daily**
News

FACEBOOK | TWITTER | INSTAGRAM

Primary Menu

Search Something...

# Oregon music festival promoter pleads guilty, dubbed 'serial fraudster' by DOJ





LOCAL NEWS
*Delivered To Your Inbox*
daily | Good Morning
Central Oregon

**Morning Headlines**

SUBSCRIBE



TOP LOCAL STORIES

**BY CENTRAL OREGON DAILY NEWS SOURCES** |

Wednesday, September 28th 2022

The former president and co-owner of the company that planned, managed, and promoted the annual Willamette Country Music Festival in Linn County is facing possible prison time after pleading guilty Wednesday to wire fraud and money laundering, the Department of Justice said.

The DOJ describes Anne Hankins, 53, of Springfield a "serial fraudster." She faces up to 20 years in federal prison for wire fraud and 10 years for money laundering, plus up to $250,000 in fines for each count, when she is sentenced in January.

The Justice Department claims Hankins, a minority owner of Willamette



▶ 2 new roundabouts coming to Highway 20 in Tumalo

Country Music Concerts, LLC, fraudulently inflated the value of the company and falsified bank statements.

**RELATED:** <u>Feds: 47 exploited COVID pandemic to steal $250M from child food program</u>

**RELATED:** <u>Donald Trump accused of vast fraud in suit by NY attorney general</u>

Here is more from the DOJ's statement on the allegations:





'Unprecedentec Oregon Medicaid waiver brings more funds for food, housing

> Beginning in September 2016 and continuing until March 2018, Hankins provided altered banks statements and false financial summaries to the majority owner to conceal WCMC's true financial condition. In November 2017, the majority owner approached Hankins about purchasing her stake in the company and having Hankins continue to serve as the company's president.

> On or about February 7, 2018, Hankins sent an updated financial summary to the majority owner falsely reporting that the company had approximately $1.1 million in its operating account. In reality, there was only $16,000 in the company's account. Based on these false financial statements, on March 1, 2018, the majority owner purchased Hankins' stake in the company for $1.5 million.



Ochoco Preserve project is converting former farmland to wildlife habitat

> After receiving the majority owner's payment, Hankins directed her credit union to issue a cashier's check from her account to the Clerk of the Court for the District of Oregon to satisfy a restitution order on a previous bank fraud conviction from 2001. Hankins thereby laundered the proceeds from one crime to pay her restitution on another.

> On September 12, 2022, Hankins was charged by criminal information with one count each of wire fraud and money laundering.

> Wire fraud is punishable by up to 20 years in federal prison and money laundering by up to 10 years in federal prison. Both charges also may result in fines of up to $250,000, or twice the gross gains or losses resulting from the offense, and three years' supervised release.

> As part of her plea agreement, Hankins has agreed to pay restitution as identified by the government and ordered by the court.

  

LIVE                                    66°      72°      81°

ADVERTISEMENT

# Former president of Willamette Country Music Concerts found guilty of money laundering

by News Staff
Wednesday, September 28th 2022





*Search Site*

Springfield resident and former president of Willamette Country Music Concerts, Anne Hankins, plead guilty Wednesday after she falsified bank statements and financial summaries

Case 6:22-cr-00317-MC    Document 15    Filed 11/07/22    Page 46 of 80

pany.

66°        72°        81°

LIVE

66 *With today's guilty plea, Ms. Hankins has proven herself to be a serial fraudster,"* said Craig Gabriel, Criminal Chief for the U.S. Attorney's Office. *"Falsifying bank statements and laundering money to fraudulently inflate the value of a company are serious federal crimes.*

According to court documents, Hankins owned 49% of Willamette Country Music Concerts, LLC. As president of WCMC, Hankins was responsible for preparing monthly financial statements for the company. Starting back in September of 2016 and through March of 2018, in effort to conceal the company's true financial condition, Hankins provided altered bank statements and financial summaries, by email, to the company's majority owner, who was based in Beverly Hills, California.

In November 2017, the majority owner approached Hankins about purchasing her stake in the company and still have Hankins continue to serve as the company's president.

Around February 7, 2018, Hankins sent an updated, false financial summary to the majority owner, reporting the company had approximately $1.1-million in its operating account. In reality, there was only $16-thousand. Based on these false financial records, on March 1, 2018, the majority owner purchased Hankins' stake in the company for $1.5-million.

Sponsored Links

**Put This In Your Dirty Toilet And Wait 15 Seconds**

**Splash Cleaner**                                    [ Learn more ]

Upon receiving payment, Hankins directed her credit union to issue a cashier's check from her account to the Clerk of the Court for District of Oregon to satisfy a restitution order on a previous bank fraud conviction from 2001. Hankins thereby laundered the proceeds from one

*Search Site*                                    🔍

66 *"Ms. Hankins blatantly deceived her business associate and stole money that never belonged to her. However, today the curtains have come down and Ms. Hankins is facing the music for her fraud,"* said Special Agent in Charge Bret Kressin, IRS Criminal Investigation (IRS:CI), Seattle Field Office.

Exhibit 9
Page 10 of 14

Case 6:22-cr-00317-MC    Document 15    Filed 11/07/22    Page 47 of 80

ed by criminal i                                                        e fraud

LIVE                                    66°        72°        81°

> 66 *Wire fraud is punishable by up to 20 years in federal prison and money laundering by up to 10 years in federal prison. Both charges also may result in fines of up to $250,000, or twice the gross gains or losses resulting from the offense, and three years' supervised release.*

Hankins will be sentenced on January 5, 2023, by U.S. District Court Judge Michael J. McShane. As part of her plea agreement, Hankins has agreed to pay restitution as identified by the government and ordered by the court.

**Prime Is Now $139, But Few Know This Saving Trick**
Amazon Prime has millions of subscribers, but only few know about this amazing savings trick!
ExpertsInMoney.co | Sponsored                                    Learn more

**'Jugging' is among the fastest growing crimes in America, police say**
Police in Texas say they're noticing a new crime trend called "jugging."
KPIC

**MORE TO EXPLORE**

**Prosecutors to seek 8-year prison term for Shakira**

*Search Site*                    🔍

**Illegal marijuana operation in Myrtle Creek raided by authorities - again**

Exhibit 9
Page 11 of 14





**WEATHER ALERT**

64°

KOIN 6
WATCHING OUT FOR YOU



OREGON

## 'Serial fraudster': Willamette Country Music Concerts president pleads guilty

by: [Jashayla Pettigrew](#)
Posted: Sep 28, 2022 / 05:30 PM PDT
Updated: Sep 28, 2022 / 05:30 PM PDT

SHARE    • • •

Exhibit 9
Page 12 of 14

Case 6:22-cr-00317-MC    Document 15    Filed 11/07/22    Page 49 of 80

PORTLAND, Ore. (KOIN) — On Wednesday, the former president and minority owner of Willamette Country Music Concerts pleaded guilty to wire fraud and money laundering.

From Sept. 2016 to March 2018, Springfield resident Anne Hankins provided fraudulent bank statements and financial summaries to WCMC's majority owner so they wouldn't be aware of the business's actual financial status, according to a release from the U.S. Attorney for the District of Oregon's office.

The majority owner, who is based in Beverly Hills, Calif., reportedly asked Hankins if they could purchase her stake in the company in November 2017.

ADVERTISING



Around Feb. 7, 2018, Hankins sent new falsified financial records to the majority owner. The records indicated that WCMC had roughly $1.1 million in its operating account, although the actual amount was $16,000.

## | Suspect sought after hit-run leaves woman with life-threatening injuries ❯

On March 1, 2018, the majority owner officially bought Hankins' stake in the company for $1.5 million.

After receiving payment, Hankins asked her credit union to send out a cashier's check from her account to the Clerk of the Court for the District of Oregon to fulfill a restitution order from

**Exhibit 9**
**Page 13 of 14**

Case 6:22-cr-00317-MC   Document 15   Filed 11/07/22   Page 50 of 80

a prior bank fraud conviction in 2001. As a result, she laundered her money from one offense to pay for another.

ADVERTISEMENT



On Sept. 12 of this year, 53-year-old Hankins was charged by criminal information with counts of wire fraud and money laundering.

**Man charged with murder in twin brother's shooting death outside of Portland hotel** ❯

The maximum prison sentence for wire fraud is 20 years, while money laundering carries a maximum sentence of 10 years. Both charges could lead to fines of up to $250,000, or twice the gross gains or losses resulting from the offense, and three years of supervised release.

Hankins' sentencing will occur on Jan. 5, 2023. She agreed to pay restitution as part of her plea agreement.

"With today's guilty plea, Ms. Hankins has proven herself to be a serial fraudster," Criminal Chief for the U.S. Attorney's Office Craig Gabriel said. "Falsifying bank statements and laundering money to fraudulently inflate the value of a company are serious federal crimes."

———

Copyright 2022 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

| | |
|---|---|
| From: | Janet Hoffman |
| To: | Bruce, Gavin (USAOR) |
| Cc: | Katherine Marchant |
| Subject: | e need to contact McShane and continue the sentencing date. |
| Date: | ednesday, October  2, 2022  :44:  2 PM |
| m  orta  ce: | High |

Gavin,

I received your email response to my email.  Thank you.   However, we intend to file a motion to dismiss.  As far as your response to my email, it does not resolve our claim of improper prejudice.  There is a world of difference between calling Ms Hankins a "serial fraudster" and arguing to the court that Ms. Hankins had a criminal conviction in 2001, twenty one years before, in response  to our arguments based on 18 USC 3553.  One is a proper legal argument, the other is in violation of DOJ regulations, ABA Standards and the truth.   As far as the IRS claiming Ms Hankins stole money , theft is not an element of either the charge or the plea.   The official statement that she stole money was a false and inflammatory statement.   The prejudice of these statements is not the simply the destruction of her reputation, they influence her ability to call witnesses on her behalf at the sentencing hearing.   The statements, by their very nature,  influence testimony, interfere  with the judicial process and her ability to present evidence to prove relevant facts at the hearing.  Newspaper articles and radio broadcasts saturated the news cycle quoting your office that Ms Hankins was a thief, a serial fraudster and engaged in money laundering to hide criminal gains.   The same statements were used by the Willamette Week to report that Ms. Hankins theft was the cause of local vendors, who did business with the festivals,  to lose money when the events closed.

Ms. Hankins, bargained for a chance to put on evidence on her behalf during sentencing.   The next step of her case following the plea was a contested sentencing hearing.   At the time of the press release the case was in a litigation posture.   She has lost the benefit of the plea bargain.   For these reasons and others we plan to file a motion to dismiss the case.

We need to contact Judge Mc Shane's office and obtain  new dates.

Thanks
Janet

**Exhibit 10**
**Page 1 of 5**

| | |
|---|---|
| From: | Bruce, Gavin (USAOR) |
| To: | Janet Hoffman |
| Cc: | Katherine Marchant |
| Subject: | R : follow up to our discussions re the Han ins s press release. |
| Date: | Tuesday, October 4, 2022 3:32:36 PM |

> **External Sender:** This email came from outside of the firm. Exercise caution with any attachments or links.

Janet,

Our office will not be agreeing to a probationary sentence, nor will we be dismissing the Information. I want to clear a few things up from your email below.

First, I agreed that the 2002 bank fraud conviction did not play into the guideline calculation. However, I never stated that I would not be bringing up Ms. Hankins' prior conviction at all during a sentencing stage. As you are well aware, the Money Laundering count relates directly to that previous bank fraud conviction. While it does not enhance the guidelines, it is relevant to the defendant's history and characteristics for purposes of sentencing under 18 USC 3553 and 18 USC 3661. I may well have said that my practice is not to dwell significantly on a 2002 conviction – because it isn't.  But the fact that she was previously convicted of fraud, and used the proceeds of her current, admitted fraud to pay restitution owed from that conviction, explains, from the government's perspective, one of her motivations in this case.

Second, I continually stated during our plea negotiations that we did not agree on some of the underlying facts and law you outlined in your letter or in our conversations on the phone. The disagreements were not, however, material to her guilty plea and her uncontested admission to the charged fraud.  We understood that your efforts to resolve the case were made to mitigate her exposure. The plea allows you to make the case to the court for a probationary sentence, but nothing in the plea or our discussions has ever indicated that the government agrees with your position. In my email from May 17 responding to your letter, I specifically stated that I disagreed with the reductions you outlined. It is why we did not agree to the guideline analysis in your May 15, 2022 letter, but instead allowed you to make that argument to the court.

Craig and I have both stated that language used in the press release was unfortunate. But the phrasing in the press release does not support an assertion that the only cure is either dismissal or a probationary sentence. You are well within your rights to argue to the court that the reputational damage you claim has been done by the release should be considered in the ultimate sentence imposed.

**Gavin W. Bruce**

**Assist Ant  United    S t Ates   Attorney**
United    State   S a ttorney     's O ffice
d iStrict    of  O regon
405 e . 8th a venue | Suite 2400 | e ugene, o regon 97401
**(541) 465-6839 | gavin.bruce@usdoj.gov**

**From:** Janet Hoffman <Janet@jhoffman.com>
**Sent:** Monday, October 3, 2022 3:35 PM
**To:** Gabriel, Craig (USAOR) <CGabriel@usa.doj.gov>; Bruce, Gavin (USAOR) <gbruce@usa.doj.gov>

**Exhibit 10**
**Page 2 of 5**

**Cc:** Katherine Marchant <katie@jhoffman.com>
**Subject:** [EXTERNAL] follow up to our discussions re the Hankins's press release.
**Importance:** High


c raig and g avin,

t he statements contained in the press release put out by the U.S. a ttorney's o ffice for the d istrict of o regon were picked up by local papers, radio and television broadcasts, as well as the *Willamette Week* and even y ahoo! n ews. i have attached for your review a sample of the articles we have seen so far, as well as copies of our settlement letter, which formed the structure of our plea negotiations, and Ms. Hankins' acceptance of the terms of the plea. Please review our initial letter proposing ways to settle the case that would allow Ms. Hankins to argue for probation, the final agreement, including the 3-point guideline reduction, and you will see the history of our negotiations that ultimately lead to the guilty plea.

f rom our discussions, we understand that neither of you wrote the press release. However, it was signed by c raig and g avin you had it in your possession the day before the plea and its distribution. Someone in your office wrote the article and provided it to both of you for your review. t he news articles quote, under c raig's name, that Ms. Hankins is a "serial fraudster," and, under an ir S Special a gent in c harge's name, that Ms. Hankins "stole money "and that "the curtains have come down and Ms. Hankins is facing the music of her fraud." t he *Willamette Week*, playing the role of Sherlock Holmes, cited to c raig's comment as evidence that Ms. Hankins was at fault for the festivals being shut down and vendors left unpaid in late 2018. t he article opens with this background then purports to solve the mystery as to why that happened: "n ow, federal prosecutors are filing in the details of why. t hat promoter, a nne Hankins, 53, was a 'serial fraudster,' according to c raig g abriel, criminal chief for the U.S. a ttorney's o ffice." t he full article is attached.

We spoke last t hursday and f riday in my attempt to mitigate the harm of these false and inflammatory statements that were issued by your office. Specifically, we discussed advising the press that there were errors in your statement or withdrawing them as inaccurate. My efforts, however, came to nothing.

**Exhibit 10**
**Page 3 of 5**

in the meantime, serious reputational harm has been done to Ms. Hankins over and above the basic facts of her plea. nowhere in the plea or charges is there the element of "theft," nor was her past criminal history included in the sentencing guideline calculation because of its age and unrelated nature. gavin, you even told Katie and me during our negotiations that Ms. Hankins' past conviction was not relevant to sentencing in this case and that you would not use it.

the statements in and of themselves impact Ms. Hankins' reputation, which is not an authorized punishment under the guidelines or any other statutory scheme. Moreover, your office's press release, with its false and inflammatory statements, are in clear violation of ethical standards and the due process clause. do J regulations, for example, prohibit government personnel from disseminating information about a defendant's prior criminal record or making any observations about a defendant's character. the Ba ethical rules governing the prosecutorial function likewise advise against public comments that could heighten public condemnation of the accused. What makes the press release so damaging is that it is the US government personally vouching as to facts unsupported by the plea or charge (Ms Hankins Stole money) and Ms. Hankins' character. a senior ir S agent said that Ms. Hankins stole money. the head of the criminal division said that she is a serial fraudster.

in all of my years of experience, no press release has contained such personal vitriol. the apparent purpose of these gratuitous false and inflammatory statements is to rile up the public against Ms. Hankins. the statements have succeeded if that was the goal. Potential third-party witnesses who we would have asked to testify on Ms. Hankins' behalf have been exposed to a USa and ir S statements that she is a thief and "serial fraudster." Her narrative as contained in our negotiations and correspondence was turned on its head. the key consideration in entering the plea was well known to your office, as was the need for a fair hearing where we could put on evidence that would support our argument that a sentence of probation was warranted. the false narrative put forward by your office was believed by the public and tainted Ms. Hankins' ability to obtain and present exculpatory evidence in support of her request for probation. y our statement violated the spirit and the letter of the plea

**Exhibit 10**
Page 4 of 5

bargain.

a s a footnote, it is ironic that during our negotiations every effort was made by your office not to taint the civil proceeding for either party. Up to the day before the plea hearing, we were working with g avin on the how the victim should be designated in the information, so as not to impact the arbitration. Unbeknownst to us, you were sitting on a press release that calls a nne a thief and serial fraudster, neither of which was relevant to the criminal case but both of which lined up with the civil complaint.

Withdrawing the plea does not put Ms. Hankins "back to where she would have been" but for the press release.  t he only way to restore her to where she would have been if you had not sought publication of the false and inflammatory statements is for your office to recommend a probationary sentence. in the absence of such a recommendation, the only remaining alternative would be dismissal of the indictment.

Please get back to me and we can discuss this matter further.

Janet

**Exhibit 10**
**Page 5 of 5**



**Exhibit 11**
**Page 1 of 1**

1 | JEREMIAH REYNOLDS (SBN 223554)
jreynolds@eisnerlaw.com
2 | EISNER, LLP
9601 Wilshire Blvd., 7th Floor
3 | Beverly Hills, California 90210
Telephone: (310) 855-3200
4 | Facsimile: (310) 855-3201

5 | MATTHEW J. KALMANSON (OSB No. 041280)
MJK@hartwagner.com
6 | HART WAGNER LLP
Trial Attorneys
7 | 1000 S.W. Broadway, 20th Floor
Portland, OR 97205
8 | Telephone: (503) 222-4499
Fax: (503) 222-2301

9

10 | Attorneys for Claimants
WCMC Holdings, LLC and WCMC, LLC and
Third-Parties William Morris Endeavor
11 | Entertainment, LLC, WME IMG, LLC, and
WME IMG Holdings, LLC

12

13 |                                 **JAMS ARBITRATION**

14

15

| 16 | WCMC HOLDINGS, LLC, a Delaware | **JAMS Arbitration No. 1220070904** |
limited liability company; and WCMC, LLC, a
| 17 | Delaware limited liability company, | **CLAIMANTS WCMC HOLDINGS, LLC** |
| | | **AND WCMC, LLC'S RESPONSE TO** |
| 18 | Claimants, | **RESPONDENTS ANNE HANKINS AND** |
| | | **WILLAMETTE COUNTRY MUSIC** |
| 19 | vs. | **CONCERTS, INC.'S STATEMENTS FOR** |
| | | **ORDERS TO COMPEL PRODUCTION** |
| 20 | ANNE HANKINS, an individual; and | **OF DOCUMENTS FROM CLAIMANTS** |
WILLAMETTE COUNTRY MUSIC | **AND (A)WILLIAM MORRIS ENDEAVOR** |
| 21 | CONCERTS, INC., an Oregon corporation, | **ENTERTAINMENT, LLC; (B) WME IMG,** |
| | | **LLC; AND (C) WME IMG HOLDINGS,** |
| 22 | Respondents. | **LLC** |

23

24

25

26

27

28

EISNER, LLP

1

**Exhibit 12**
**Page 1 of 12**

1    Claimants WCMC Holdings, LLC ("Holdings") and WCMC, LLC ("WCMC" and together

2  with Holdings, "Claimants") and Third Parties William Morris Endeavor Entertainment, LLC,

3  WME IMG, LLC, and WME IMG Holdings, LLC (collectively, "Endeavor") submit this Opposition

4  to Respondents' Statement for Order to Compel Production of Documents ("Claimants Documents

5  Motion"), and Respondents' Statement for Order to Compel Production of Documents from (A)

6  William Morris Endeavor Entertainment, LLC; (B) WME IMG, LLC; and (C) WME IMG Holdings

7  LLC ("Endeavor Documents Motion" and together with Claimants' Documents Motion, the

8  "Motions"), each submitted by Respondents Anne Hankins ("Hankins") and Willamette Country

9  Music Concerts, Inc. (together with Hankins, "Respondents").

10  **I.    <u>INTRODUCTION</u>**

11    Having defrauded Claimants and caused the loss of millions of dollars, as evidenced by her

12  recent guilty plea and inability to articulate any defense ***whatsoever*** in this case, Hankins—who has

13  a prior criminal conviction for bank fraud and submitting a false loan application, and who the

14  Department of Justice has now appropriately publicly described as a "serial fraudster"[1]—has now

15  decided to utilize the arbitration and discovery process to continue to inflict more damage on

16  Claimants and Endeavor.  Her strategy is now absolutely clear: assert that she lacks sufficient assets

17  to ever satisfy any judgment, while refusing to pay ***any*** arbitration fees (even though she moved to

18  compel this arbitration), while at the same time force Claimants and Endeavor to spend hundreds

19  and hundreds of thousands of dollars responding to never-ending complaints about their

20  productions.  Hankins hopes to make it economically irrational for Claimants to pursue their civil

21  claims and, to make matters worse, argues that the victims of Hankins' admitted crimes must now

22  pay JAMS to allow Hankins to have her motions be heard!

23

---

24  [1] The DOJ's press release regarding the plea agreement included the following quotes: "With

25  today's guilty plea, Ms. Hankins has proven herself to be a serial fraudster," said Craig Gabriel, Criminal Chief for the U.S. Attorney's Office.  (Exhibit 2.)  "Falsifying bank statements and

26  laundering money to fraudulently inflate the value of a company are serious federal crimes." (*Id.*)  "Ms. Hankins blatantly deceived her business associate and stole money that never

27  belonged to her. However, today the curtains have come down and Ms. Hankins is facing the music for her fraud," said Special Agent in Charge Bret Kressin, IRS Criminal Investigation

28  (IRS:CI), Seattle Field Office.  (*Id.*)

1    Yet while claiming she lacks resource to pay fees to JAMS, Hankins describes in her

2  Motions how she had an E-Discovery vendor and team of lawyers/paralegals supposedly review

3  over 1.5 million pages of documents, and she now will pay them to review even more documents

4  depending on the outcome of these Motions.  The Arbitrator should not accept the representations

5  of the serial fraudster Hankins, and this outrageous abuse of what is supposed to be a cost-efficient

6  arbitration process should be put to an end.  Claimants and Endeavor have in good faith complied

7  with their discovery obligations.  Hankins should not be allowed to weaponize the discovery

8  process, and appropriate limits should be imposed on discovery, as consistent with the goals of

9  arbitration.

10    As the Arbitrator will see, the Motions are founded on speculation and innuendo.

11  Respondents are unwilling to precisely describe exactly ***what*** documents they are looking for that

12  might provide a "defense" to the ***narrow fraud claims*** set forth in this case.  It cannot be emphasized

13  enough that Hankins ran WCMC by herself and with her family members from 2013 to 2018 and

14  would certainly know what ***precise documents*** exist that would ***supposedly*** show her lack of

15  wrongdoing.  But while Claimants have already spent hundreds of thousands of dollars gathering

16  and producing over 1.5 million pages of documents to Hankins, Hankins herself has thus far not

17  produced a single document in this case and has refused to sit for deposition on the basis of the Fifth

18  Amendment despite at the same time having asserted frivolous counterclaims against Endeavor.[2]

19    The lack of specificity of Respondents' demands must be evaluated in light of the ***narrow***

20  claims in this case.  Beginning on September 17, 2018, the in-house legal department at Endeavor

21  began an investigation into Hankins' management of WCMC after Endeavor learned of Hankins'

22  prior conviction for bank fraud and suspicions arose regarding Hankins' handling of cash and credit

23  transactions at music festivals organized by WCMC.  On September 17, 2018, Endeavor's legal

24  department hired an outside fraud detection and auditing firm, Exiger LLC, to conduct an audit of

25  WCMC's books and records.  But Hankins ***destroyed the entire accounting system*** the day before

26  Exiger arrived.  Claimants have produced emails between Hankins and her IT consultant, Chuck

27

28  [2] Hankins' company produced approximately 900 pages of almost entirely irrelevant materials.

**Exhibit 12**
**Page 3 of 12**

1   Orton, on September 17, 2018, in which Hankins told Orton that she wanted the data to remain

2   "scrambled" and to not be "helpful" during the investigation.  (Exhibits 3, 4.)  Claimants have

3   produced emails, sent five months earlier in May 2018—shortly after the March 2018 transaction

4   with Holdings closed—where Hankins discusses deleting and wiping data from her computer with

5   Orton.  (Exhibit 5.)  Hankins was removed from her position at WCMC after Exiger's arrival and

6   investigation.

7           Despite Hankins' efforts to cover her tracks, Exiger was able to determine that from at least

8   2016 to September 2018, Hankins committed fraud and other acts of financial misconduct in her

9   role as President of WCMC, such as fraudulently manipulating bank statements and financial

10  summaries that were sent to Endeavor, secretly taking out millions of dollars of loans in the name

11  of WCMC without approval or disclosure, entering false financial entries into the accounting system

12  of WCMC, and using WCMC money to pay for the personal expenses of herself and her family.

13  Exiger also uncovered numerous unexplained discrepancies involving missing cash and other

14  anomalies in the records of WCMC.  Claimants will show that Hankins' fraudulent acts not only

15  destroyed WCMC but also left WCMC without funds needed to pay scores of vendors, artists, and

16  customers, and caused the loss of millions of dollars that was funded into the company.

17          The aforementioned claims were set forth in the Complaint filed in the Oregon Superior

18  Court and are all set forth in the Demand for Arbitration.  To date, Respondents have not offered

19  *any defense or explanation* of their misconduct.  Nor could they.  On September 27, 2022, Hankins

20  pled guilty to charges of wire fraud in violation of 18 U.S.C. § 1343 and money laundering in

21  violation 18 U.S.C. § 1957 in the case of *United States of America v. Anne Hankins*, case no. 6:22-

22  cr-00317-MC.  (Exhibit 1.)  The admissions in the guilty plea and the guilty plea itself are *conclusive*

23  as to the identical fraud claims alleged by Claimants concerning Hankins' fraudulent manipulation

24  and alteration of bank statements and financial summaries sent to Claimants.  *See Instituto Nacional*

25  *De Comercializacion Agricola (Indeca) v. Continental Illinois Nat. Bank and Trust Co.*, 858 F.2d

26  1264, 1271 (7th Cir. 1988) (defendant's conviction for wire fraud and submitting false statements

27  to a federally insured bank established all elements of defendant's fraud in a subsequent civil

28  proceeding).

1    Respondents' argument that they cannot defend this case without further discovery is simply

2  untrue.  There is no dispute that Hankins was previously convicted of bank fraud and submitting a

3  false loan application but misrepresented in April 2013 in the Transaction Agreement that she had

4  no legal actions against her.[3]  There is also no dispute—particularly given her plea—that Hankins

5  took bank statements from Columbia Bank, fraudulently manipulated them, and then sent them to

6  Holdings to induce the purchase of her remaining 49% of WCMC.  Claimants have produced the

7  fraudulent statements and authentic ones.  There is no dispute that Hankins took millions in loans

8  in the name of WCMC without any approval from Endeavor.  Claimants have produced the

9  unauthorized promissory notes entered into by Hankins.  There is no dispute that the accounting

10  system of WCMC was deleted the day before the auditors arrived.

11    Claimants have already produced over 1.5 million pages of documents from the WCMC

12  computers despite that the vast majority of the *170 document requests* served by Respondents were

13  overbroad and untethered to the actual claims or "defenses" in this case.  Tremendous expense and

14  burden have gone into responding to the requests for production and conducting a privilege

15  review—well into the six figures.

16    Claimants have been upfront and transparent from the day they served their Responses as to

17  how they searched for documents in the WCMC computer system—a list of search terms was

18  provided to Respondents—and what physical documents were available for inspection by

19  Respondents in the offices of Claimants' counsel.  Respondents have never provided any additional

20  search terms, despite repeated invitation to do so.  Respondents also have had every opportunity to

21

22  [3]  The Ninth Circuit described Hankins' prior convictions as follows:

23      In 2001, Anne Hankins pled guilty to bank fraud under 18 U.S.C. § 1344 after

24      submitting a false loan application for $350,000 to U.S. Bank Special Assets Group
       ("U.S. Bank").  The district court sentenced her to thirty days in jail and

25      entered a judgment under the MVRA ordering her to pay U.S. Bank $350,000 in
       restitution. The restitution, payable "in full immediately" or, if any unpaid balance

26      remained at the time of Hankins's release from custody, "at the maximum
       installment possible, and not less than $50 per month," was to be deposited with

27      the clerk of the court "for transfer to the payee."

28  *United States v. Hankins*, 858 F.3d 1273, 1275 (9th Cir. 2017).

**Exhibit 12**
**Page 5 of 12**

1    review and inspect the physical documents in the office of Claimants' counsel but after first agreeing

2    to this procedure, they changed their mind and brought the Motions instead, likely because they

3    know there is nothing in those documents that is relevant to this case.  The Motions simply provide

4    another means for Respondents to continue to victimize Claimants/Endeavor and run up costs.[4]

5        As to Endeavor, following receipt of draft subpoenas on September 3, 2022, Endeavor

6    proposed using search terms and time frames that would have required an expansive and costly

7    review of 25,000 to 30,000 documents.  (Exhibit 6.)  But even this incredibly fair proposal was

8    rejected by Respondents, who claimed "[y]our search terms are inadequate and ***will not even***

9    ***remotely*** cover the minimum search Respondents need to defend against your clients' claims and to

10   advance Respondents' defenses and counterclaims."  (Exhibit 7 (emphasis added).)  The search

11   terms and time frames proposed by Respondents would have expanded the universe to tens of

12   thousands more documents for little to no reason at all, other than burdening Endeavor.  At this

13   point it became clear to Claimants and Endeavor that Respondents are not legitimately interested in

14   the documents, but are instead attempting to impose maximum costs and burden on Claimants and

15   Endeavor as a strategy to attempt to get them to "drop" the case.

16       In deciding how to address discovery ***going forward***, Claimants and Endeavor ask the

17   Arbitrator to keep in mind the following key facts about the ***current state*** of this proceeding:

18   • Claimants have already produced an enormous universe of documents to Respondents at

19       tremendous cost and Respondents have still thus far offered no defense.

20

21   _____

22   [4] Claimants have now produced communications with Exiger despite those being protected by
     both work-product and attorney-client privilege.  Respondents are just seeking to prematurely

23   obtain an expert report and expert discovery prior to the timelines established in Procedural
     Order No. 3.  Claimants do intend to serve an expert report to Respondents detailing the results

24   of the investigation and damages, in compliance with the deadline established by the
     Arbitrator's Procedural Order No. 3.  Claimants have already produced a privilege log to

25   Respondents and will also complete any remaining productions from WCMC before the end of
     November 2022.[5] "Since it is generally accepted that a conviction for a crime where an element

26   of the crime required proving, or the witness admitting, a dishonest act or false statement is
     probative upon the issue of a witness' truthfulness, such convictions, regardless of punishment,

27   may be employed to impeach any witness, including a criminal defendant, without first

28   satisfying a balancing test, Rule 609(a)(2)."  5 Handbook of Fed. Evid. § 609:4 (9th ed.)

1      •    Respondents have been unwilling to provide ***precise descriptions*** of documents they

2         believe are material and relevant, instead drafting documents requests asking "All

3         Documents relating to" a particular topic.   These document requests are totally

4         inconsistent with arbitration discovery and in fact violate ***all*** of the discovery protocols

5         in arbitration suggested by JAMS.   Accordingly, there is no basis to enforce

6         Respondents' requests as they have been written.

7      •    The scope of this arbitration proceeding is now the extent of Claimants' damages given

8         the recent guilty plea by Hankins, her prior guilty plea for fraud,[5] her assertion of the

9         Fifth Amendment, her total inability to offer any plausible defense, and her

10        unwillingness to pay arbitration fees which should prevent assertion of any

11        counterclaims.

12      •    While contending she lacks resources to pay her arbitration fees—for the arbitration she

13        requested—Hankins at the same time asks for more documents to be produced and

14        claims she has a team of lawyers and an E-Discovery provider conducting the document

15        review.  The Arbitrator need not ignore the obvious games being played by Respondents

16        with the arbitration process itself.

17 **II.**    <u>**STATEMENT OF FACTS**</u>

18      **A.**     <u>**Production of Documents from WCMC**</u>

19      On June 13, 2022, Claimants made their initial Rule 17 production consisting of over 1,500

20 pages of documents.  (Exhibit 8.)  Also, on June 13, 2022, the parties exchanged requests for

21 production.  Respondents served a total of 170 requests for production ("RFPs") on Claimants

22 seeking, inter alia, essentially all documents relating to WCMC and/or Hankins.  As pointed out to

23 Respondents numerous times, a majority of the RFPs are completely unrelated to any claim that is

24 at issue in this arbitration.

25

---

26 [5] "Since it is generally accepted that a conviction for a crime where an element of the crime
required proving, or the witness admitting, a dishonest act or false statement is probative upon
27 the issue of a witness' truthfulness, such convictions, regardless of punishment, may be
employed to impeach any witness, including a criminal defendant, without first satisfying a
28 balancing test, Rule 609(a)(2)."  5 Handbook of Fed. Evid. § 609:4 (9th ed.)

EISNER, LLP

**Exhibit 12**
**Page 7 of 12**

1    Given the incredible breadth of the discovery requests, and the large amount of ESI,

2  Claimants recognized that it was impossible to produce documents without utilizing search terms to

3  try to identify potentially responsive documents in the WCMC computer system.  In a production

4  letter to Respondents dated July 5, 2022, Claimants provided Respondents access to a production of

5  nearly 1.3 million pages documents from WCMC's computers and a list of the 82 search terms that

6  Claimants had used to gather the set of documents they produced to Respondents.[6]  (Exhibit 9.)

7  Claimants subsequently produced another roughly 200,000 pages on August 5, 2022.  Claimants

8  expect there will be one final production, after the completion of a lengthy and expensive privilege

9  review.  Respondents have never provided nor demanded use of any additional search terms with

10  respect to the production of documents from WCMC's computers.

11    On July 26, 2022, in meet and confer correspondence, Claimants' counsel informed

12  Respondents that they had possession of boxes and computers from WCMC that were being stored

13  in their offices and invited Respondents to send a member of the Respondents' defense team to

14  conduct an inspection or simply have a vendor copy or scan the documents. (Exhibit 10.)  Claimants

15  further indicated that they had not reviewed the hard copy documents because they generally did

16  not appear relevant to the case and that Respondents should conduct the review themselves if they

17  believed potentially relevant documents were in the boxes.

18    On August 3, 2022, Claimants sent Respondents an inventory of the boxes and computers

19  being stored.  (Exhibit 11.)  Respondents insisted that Hankins herself—an admitted serial

20  fraudster—be physically present at Claimants' offices to conduct the inspection.  (*Id.*)  Claimants

21  refused on the basis that Hankins would be reviewing original documents and computers, including

22  personnel files and potentially sensitive documents, and that Respondents did not trust Hankins to

23  do so given her criminal history and concerns over her potential conversion, alteration, or

24  manipulation of original documents—to which she has now pled guilty.  (*Id.*)  Claimants again

25

26

27  _____

[6] Respondents appear to imply, without basis, that a virus existed on the hard drive they initially
received containing Claimants' document production.  (Claimants Document Mot. at 2.)  No
28  such virus was ever detected by Claimants.

**Exhibit 12**
**Page 8 of 12**

suggested that a representative of Respondents' defense team conduct the inspection themselves, as is the common practice, or have a vendor scan the documents.  (*Id.*)

On August 11, 2022, Respondents indicated that they would hire a third-party vendor to scan the documents and provide a copy of the scanned documents to Claimants.  (Exhibit 12.)  Claimants agreed to this proposal.  (*Id.*)  But thereafter, Respondents did not mention the boxes again until September 19, 2022, when they switched positions and insisted that Claimants were somehow responsible for reviewing and scanning the boxes of documents, which Claimants have no responsibility to do.

**B.   Subpoenas to Third Parties**

Claimants' July 5, 2022 production letter states:

> [I]t appears from the improper definitions in the RFPs that you intended the RFPs to require William Morris Endeavor Entertainment, LLC, WME IMG LLC, and its employees to produce internal communications and documents in response to the RFPs. As you know, these entities are not parties to this arbitration and are not required to respond to the RFPs. We are willing to accept a subpoena to these entities and respond to narrowly tailored requests to these entities.

(Exhibit 9.)  Thus, Respondents have known since July 5 that Claimants insisted that Respondents serve subpoenas to obtain documents from WCMC affiliates and corporate parents WME IMG, LLC, WME IMG Holdings, LLC, and William Morris Endeavor Entertainment, LLC.

On September 3, 2022, Respondents finally sent draft subpoenas that again included 34 grossly overbroad requests for production to each third-party entity.  (Exhibit 6.)  On September 13, Claimants provided a list of proposed search terms to Respondents' counsel.  (*Id.*)  The search terms and time periods proposed by Endeavor are set forth below:

| Request Nos. | Search Terms | Time Period |
|---|---|---|
| 1 | Hire /20 (Anne or Hankins) | 2/1/13 – 6/1/13 [hired in April 2013] |
| 2 | Suspen! /20 (Anne or Hankins) | 7/1/18 – 11/30/18 |
| 3 | (Fire! or terminat!) /20 (Anne or Hankins) | 8/1/18 – 12/31/18 |
| 4, 22-24 | "Membership interest" and WCMC | 5/1/14 – 1/1/19 |
| 5-8 | (Loan or advance or "short-term funding") and WCMC | 1/1/16 – 1/1/19 |
| 11 | "Board of Directors" and WCMC | 1/1/16 – 1/1/19 |
| 13 | Investigat! and (Anne or Hankins) | 1/1/16 – 1/1/19 |

# EXHIBIT 2

Exhibit 12
Page 10 of 12

10/31/22, 1:40 PM     Willamette Country Music Concerts President Pleads Guilty to Wire Fraud and Money Laundering | USAO-OR | Department of J...

Case 6:22-cr-00817-MC   Document 15   Filed 11/07/22   Page 67 of 80


**United States Department of Justice**

---

## THE UNITED STATES ATTORNEY'S OFFICE
## DISTRICT *of* OREGON

<u>U.S. Attorneys</u> » <u>District of Oregon</u> » <u>News</u>

**Department of Justice**

U.S. Attorney's Office

District of Oregon

FOR IMMEDIATE RELEASE                             Wednesday, September 28, 2022

# Willamette Country Music Concerts President Pleads Guilty to Wire Fraud and Money Laundering

EUGENE, Ore.—The former president and minority owner of Willamette Country Music Concerts, LLC, who planned, managed, and promoted the annual Willamette Country Music Festival in Linn County, Oregon, pleaded guilty today after she falsified bank statements and financial summaries to influence the sale of her stake in the company.

Anne Hankins, 53, a resident of Springfield, Oregon, pleaded guilty to one count each of wire fraud and money laundering.

"With today's guilty plea, Ms. Hankins has proven herself to be a serial fraudster," said Craig Gabriel, Criminal Chief for the U.S. Attorney's Office. "Falsifying bank statements and laundering money to fraudulently inflate the value of a company are serious federal crimes."

"Ms. Hankins blatantly deceived her business associate and stole money that never belonged to her. However, today the curtains have come down and Ms. Hankins is facing the music for her fraud," said Special Agent in Charge Bret Kressin, IRS Criminal Investigation (IRS:CI), Seattle Field Office.

According to court documents, as former minority owner of Willamette Country Music Concerts (WCMC), Hankins owned 49% of the company. As president of WCMC, Hankins was responsible for preparing monthly financial statements which she provided by email to the company's majority owner who was based in Beverley Hills, California.

Beginning in September 2016 and continuing until March 2018, Hankins provided altered banks statements and false financial summaries to the majority owner to conceal WCMC's true financial condition. In November 2017, the majority owner approached Hankins about purchasing her stake in the company and having Hankins continue to serve as the company's president.

On or about February 7, 2018, Hankins sent an updated financial summary to the majority owner falsely reporting that the company had approximately $1.1 million in its operating account. In reality, there was only $16,000 in the company's account. Based on these false financial statements, on March 1, 2018, the majority owner purchased Hankins' stake in the company for $1.5 million.

**Exhibit 12**
**Page 11 of 12**

10/31/22, 1:40 PM                Willamette Country Music Concerts President Pleads Guilty to Wire Fraud and Money Laundering | USAO-OR | Department of J...

Case 6:22-cr-00817-MC  Document 15  Filed 11/07/22  Page 68 of 80

After receiving the majority owner's payment, Hankins directed her credit union to issue a cashier's check from her account to the Clerk of the Court for the District of Oregon to satisfy a restitution order on a previous bank fraud conviction from 2001. Hankins thereby laundered the proceeds from one crime to pay her restitution on another.

On September 12, 2022, Hankins was charged by criminal information with one count each of wire fraud and money laundering.

Wire fraud is punishable by up to 20 years in federal prison and money laundering by up to 10 years in federal prison. Both charges also may result in fines of up to $250,000, or twice the gross gains or losses resulting from the offense, and three years' supervised release.

Hankins will be sentenced on January 5, 2023, by U.S. District Court Judge Michael J. McShane.

As part of her plea agreement, Hankins has agreed to pay restitution as identified by the government and ordered by the court.

This case was investigated by IRS:CI and the FBI, and is being prosecuted by Gavin W. Bruce, Assistant U.S. Attorney for the District of Oregon.

---

**Topic(s):**
Financial Fraud

**Component(s):**
USAO - Oregon

Updated September 28, 2022

**Exhibit 12**
**Page 12 of 12**

**PORTLAND MAIN OFFICE**
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1000
*www.usdoj.gov/usao/or*

Gavin W. Bruce
Assistant U.S. Attorney
Gavin.Bruce@usdoj.gov
(541) 465-6771
*Reply to Eugene Office*



**EUGENE BRANCH**
405 E 8th Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771

**U.S. DEPARTMENT OF JUSTICE**
United States Attorney's Office
District of Oregon
Billy J. Williams, United States Attorney

**MEDFORD BRANCH**
310 West Sixth Street
Medford, Oregon 97501
(541) 776-3564

June 24, 2021

Janet Hoffman
Janet Hoffman & Associates, LLC
1000 S.W. Broadway, Suite 1500
Portland, OR 97205

     Re:     Pre-Indictment Disclosure of Materials

Dear Counsel:

     In order to assist you in evaluating the government's case against your client Anne Hankins, early, pre-indictment case materials will be provided to you. As we have discussed, the materials contain personally identifying information of witnesses or other third parties unrelated to this action, in addition to financial information of individuals and businesses. In an effort to expedite disclosure, the parties have agreed to enter into a pre-indictment protective order agreement. Please sign this pre-indictment protective order agreement and return a copy to me.

     <u>You agree to the following</u>:

     Counsel for Anne Hankins and their employees, agents, or designees, shall not provide defendant with unsupervised access to or copies of any materials produced by the government, including all materials produced in conjunction with this letter of June 24, 2021.

     Further, Counsel for Anne Hankins and their employees, agents or designees shall not provide any material produced by the government to any other person without the government's express written permission, except that defense counsel may provide discovery material to those persons employed by defense counsel who are necessary to assist counsel of record in the pre-indictment evaluation of this case. Materials produced shall be used by the defense solely for purposes of evaluating and defending this criminal action.

/ / /

/ / /

/ / /

**Exhibit 13**
**Page 1 of 2**

Janet Hoffman
Page 2
June 24, 2021

_____

       At the time of case filing and discovery, the government and defense will agree to the entry of a similarly worded protective order from the court.

                         Sincerely,

                         SCOTT ERIK ASPHAUG
                         Acting United States Attorney

                         _s/ *Gavin W. Bruce*_
                          GAVIN W. BRUCE
                         Assistant United States Attorney

       I represent Anne Hankins as legal counsel.  I have carefully reviewed every part of this letter agreement.  We consent to the terms of the pre-indictment protective order as detailed above.

_____        _____
Date                           Janet Hoffman
                              Attorney for Anne Hankins

**Exhibit 13**
**Page 2 of 2**

Case 6:22-cr-00317-MC Document 15 Filed 11/07/22 Page 71 of 80

https://democratherald.com/news/local/central-linn-students-earn-100-000-at-bi-mart-willamette-country-music-festival/article_36ec3fd4-5eca-11e4-9cdf-7376b9b7c5f5.html

# Central Linn students earn $100,000 at Bi-Mart Willamette Country Music Festival

**Alex Paul**

Oct 29, 2014



Payton Holt, 12, and her parents, Lacie and Danny Holt, grab some pizza slices before Monday evening's annual Con Mart Willamette Country Music Festival held at Central Linn High School. (Alex Paul/Democrat-Herald)

Alex Paul

Alex Paul

ALSEY — Central Linn students would have to pick up and process 2 million pop

**H**   bottles or cans to equal the amount of money they earned working at the three-day 2014 Bi-Mart Willamette Country Music Festival.

Anne Hankins, president of BootsNBeach LLC and Don Leber of Bi-Mart presented a $100,000 check to Rick Morrow, outgoing president of the Central Linn Booster Club Monday night during an annual pizza party for volunteers held at the high school.

Hankins believes no other school in the state earns as much money from a festival or community event.

"This was a special year," Hankins said. "We feel so humbled and blessed, so the only thing to say is thank you."

Hankins said the funds are earned by the work of not only students, but their parents and aunts and uncles.

## People are also reading...

1   **Two drivers transported via air ambulance after Highway 20 crash**

2   **'World's dirtiest man' dies at 94, months after his first wash**

3   **Corvallis man accused of multiple sex crimes**

4   **When a truck stop becomes a home for the unhoused in Albany**

Leber noted that "seven years ago, a lot of people thought Anne and I were crazy. We never dreamed it could be this good. We could not do it without the school and the city and of course, Reed and Robin Anderson. This is a testament to all of you."

He added that Bi-Mart sponsors numerous community activities in the Pacific Northwest, "but you are special people. We are excited and honored to help raise this kind of money for your groups."

The Andersons own the farm on which the festival is held each year.

**Exhibit 14**
**Page 2 of 6**

Morrow said 514 Central Linn kids and their parents volunteered.

"It actually takes all year and it's certainly a team effort," Morrow said.

Of the $100,000, the clean up crews earned $17,000, water sales brought in almost $14,000, ice sales totaled more than $30,000 and ticket sale proceeds brought in a whopping $38,840.

Bi-Mart donates $40 for every ticket sold by the students.

"Of the ticket sale total, $10,000 went directly to clubs and teams without passing through the booster club," Morrow said. "We could not do enough bottle drives and car washes to come close to what we earn in partnership with the festival."

Proceeds benefit all extracurricular activities and clubs, not just sports, Morrow said.

In the past, funds have been used to help purchase new curtains for the drama room, buy new sports teams uniforms, as stipends for participation fees for all programs and as financial support for teams and clubs traveling to out-of-town tournaments and events.

"This year, we are going to spend $16,000 to purchase a new electronic reader board for the high school," Morrow said.

Seventh-grader Payton Holt, 12, and her parents, Lacie and Danny Holt, worked on the festival's water truck and with dispatch.

"We brought water to the campers and also filled pools," Payton said. "It was fun and we got to meet a lot of people."

Payton, who plays volleyball and softball, said Eric Church was her favorite performer.

She enjoyed volunteering and the fact that the school benefits greatly from the effort was an added bonus.

**Exhibit 14**
**Page 3 of 6**

"It helps us get new jerseys and to travel to tournaments," Payton said, as she picked up a couple slices of pizza.

Kristina Kaczmarek, 16, picked up trash and delivered ice to raise funds for the volleyball, basketball, softball and track teams. She's also an FFA member.

"We get to enjoy the music while we work," the Central Linn junior said. "It's never boring. I did enjoy Blake Shelton a lot."

The school district is not the only organization to benefit from the festival, Hankins said.

The Brownsville Fire Department and Sharing Hands also benefit from more than $70,000 in support the festival through direct donations, ticket sales and events like the Firemen's Breakfast and Sharing Hands' Holiday Food Baskets.

Other non-profit groups also received more than $90,000 of valued support through fundraisers such as tickets for auctions.

More than $500,000 was paid to area businesses and agencies that provided services to the event.

"This is the result we had hoped for, helping the local economy and contributing to the economic health of area business, schools and supporting agencies," Leber said. "We're very pleased."

Tickets for 2015 are on sale.

Headliners include Luke Bryan and Rascal Flatts with more than 20 artists performing from Aug. 14-16.

For more information and background on the festival visit **www.bwcmf.com**.

Alex Paul is the Linn County reporter for the Democrat-Herald. He can be contacted at 541-812-6114 or **alex.paul@lee.net**.

**Exhibit 14**
**Page 4 of 6**

## ▮ Around The Web





### Top Heart Surgeon: This Simple Trick Helps Empty Your Bowels Every Morning

Guthealthwellness



### 3 Toxic Foods For Dogs: The One Meat You Should Never Feed Your Dog

DogFoodDiscovery.com



### Prime Is Now $139, But Few Know This Saving Trick

ExpertsInMoney.co



### Here Is What Full Mouth Dental Implants Should Cost You In 2022

Branded Links



### Doctors Can't Explain But This Makes Toenail Fungus Vanish (Watch)

Leading Reports



### Dr Rosenberg: Throw Out Your Moisturizers! Try This Instead...

Reactivateskin.com

**Exhibit 14**
**Page 5 of 6**



### 7 Mistakes You'll Make Hiring a Financial Advisor

SmartAsset



### Sneaky Way Portland Seniors Are Getting Walk-in Tubs For A Fraction Of The Price

Smart Consumer Update



### Add This To Your Toothpaste To Help Regrow Gums.

Dental Hacks

By Alex Paul

Reporter

Exhibit 14
Page 6 of 6

Case 6:22-cr-00317-MC    Document 15    Filed 11/07/22    Page 77 of 80
Willamette Country Music Festival may be canceled

# statesman journal

## ENVIRONMENT

# Willamette Country Music Festival may be canceled following unpaid bills, 'ridiculous' alcohol consumption

 **Tracy Loew**
Statesman Journal

Published 7:45 a.m. PT Oct. 12, 2018 | **Updated 4:59 p.m. PT Oct. 15, 2018**

A huge country music festival rejected by Marion County earlier this year has turned disastrous for neighboring Linn County, where the event has been held for a decade.

Vendors and volunteer groups who worked at the Willamette Country Music Festival say they have yet to get paid, nearly two months after the event, Linn County Commissioner Roger Nyquist said.

That includes the Linn County Sheriff's Office, which is owed $78,000 for providing additional security.

Festival president and event manager Anne Hankins was removed in early September, Nyquist said.

Retailer Bi-Mart has dropped its sponsorship of the festival, as well as two other festivals run by the same company.

And Linn County Sheriff Jim Yon has said he won't provide security at the festival in the future because of an increase in fights, assaults and criminal activity during the 2018 festival held over four days in Brownsville.

That almost guarantees the festival won't be held again in Linn County, Nyquist said.

"Things are a mess," Nyquist said. "I think Marion County dodged a bullet."

Hankins declined an interview request. In an email, she said she sold her share in the concert company in March.

"When I owned it, the bills were paid," she wrote.

**Exhibit 15**
**Page 1 of 4**

## Organizers wanted to move location, double attendance size

The festival was the subject of controversy over the past year, as organizers attempted to move it from Brownsville to a 692-acre farm bordering Ankeny National Wildlife Refuge, 12 miles south of Salem.

They first applied to hold the four-day event there in 2018 and more than double its size, to 60,000 attendees per day.

In response to opposition that included concerns about traffic, interference with farming operations, theft, vandalism and negative impacts on the refuge's wildlife, that application was revised to 30,000 attendees per day, starting in 2019.

But in June, Marion County Commissioners denied the necessary permits to move the festival to the property.

"That farmer who was proposing to put this on his site probably ought to send the neighbors who objected a Christmas card," Nyquist said.

WCMC, a Delaware-registered company, operates Willamette Country Music Festival, as well as Country Crossings Music Festival in Central Point, near Medford, and Mountain Home Country Music Festival in Idaho.

The ownership structure eventually leads to California-based IMG, one of the world's largest event marketers.

IMG spokeswoman Maura McGreevy declined to speak on the record. In an email, she said WCMC has not decided whether the Linn County or Central Point festivals will be held next year.

The Idaho event already has been canceled.

## Fraud complaints filed by vendors

Vendors at the Central Point festival say they also were not paid this year.

Mike Cunningham owns Heavenly Nutz and was a vendor at both festivals. He's owed about $800, he said.

Vendors kept the proceeds of their cash sales, Cunningham said. But they were required to use a company-owned system for credit card and bracelet sales and were supposed to get

Exhibit 15
Page 2 of 4

their payments after the festival.

"There's a lot of vendors that are out thousands and thousands of dollars," he said.

Cunningham and other vendors have filed fraud complaints with the Oregon Department of Justice. DOJ officials were unable to say exactly how many complaints have been filed because they take several weeks to process.

The Linn County Sheriff's Office also has opened an investigation into five complaints it received, Lt. Michelle Duncan said.

And three-dozen unpaid vendors from both the Central Point and Brownsville festivals have formed a closed Facebook group to share information. Site administrator Marissa Lopez did not respond to an interview request.

Don Leber, Bi-Mart's vice president of marketing and advertising, said the company made the decision to pull its sponsorship shortly after the Brownsville festival ended.

"We've been opening more stores throughout the Northwest," Leber said. "We're looking for other opportunities and ways we can partner with those communities."

Leber said he also has been receiving complaints about non-payment, and has been forwarding them to IMG.

## Law enforcement service requests increased

Duncan said the Brownsville event put a strain on the Linn County Sheriff's Office.

Calls for law enforcement services at the festival have grown each year, she said, from 55 calls in 2013 to 136 calls this year.

They included 28 criminal reports, and 23 calls for fights, assaults and disturbances. That compares with 12 criminal reports and three fights, assaults and disturbances in 2017.

An additional 150 calls throughout the county over the festival weekend were attributed to additional people and problems from the festival, Duncan said.

"The biggest difference we saw this year was a lack of security presence in the camping areas," Duncan said. "Security's role is to enforce the rules of the festival, including no alcohol in the camping area. Without this, the parties get out of control, alcohol consumption gets to a ridiculous level, which leads to the assaults and disturbances we saw

Exhibit 15
Page 3 of 4

Case 6:22-cr-00317-MC    Document 15    Filed 11/07/22    Page 80 of 80

The festival has two years left on its contract to operate in Brownsville, and has applied to move the concert to property near Harrisburg.

Nyquist said both of those options are subject to county review, and are unlikely to be approved.

*Contact the reporter at tloew@statesmanjournal.com, 503-399-6779 or follow at Twitter.com/Tracy_Loew*

**Exhibit 15**
**Page 4 of 4**