JANET LEE HOFFMAN, OSB No. 781145
E-mail:  janet@jhoffman.com
KATHERINE MARCHANT, OSB NO. 161147
E-mail:  katie@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone: (503) 222-1125

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| UNITED STATES OF AMERICA, | CASE NO. 6:22-cr-00317-MC |
|---|---|
| Plaintiff, | **DEFENDANT ANNE HANKINS' REPLY IN SUPPORT OF MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT** |
| v. | |
| ANNE HANKINS, | **EVIDENTIARY HEARING REQUESTED** |
| Defendant. | |

**I.    Introduction**

The issue before the Court is whether the prosecution's false statements to the press amounted to "flagrant misconduct," and whether that misconduct prejudiced Ms. Hankins. The Government's Response fails to address this. Instead, it claims that "serial fraudster" is an "accurate," albeit "harsh" description of Ms. Hankins. The Government's Response obscures the fact that Ms. Hankins' prior conviction occurred more than 20 years ago. Two isolated incidents separated by more than two decades is not "serial." The Government is flatly not allowed to engage in this type of name calling. Its Response is a smokescreen designed to obfuscate its own misconduct.

What is also notable is what the Response does not include. It does not, for example, offer any defense for its patently false claim that Ms. Hankins "'launder[ed] money to fraudulently inflate the value of [the] company[.]'" *See* Decl. of Counsel in Support of Motion to Dismiss, Ex. 6 (government's press release) (ECF 15). Nor does it offer any defense for its false implication that Ms. Hankins "'stole money.'" *See id.* The Government provides no evidence showing that its misconduct was not flagrant. The prosecution says nothing about the fact that the press release was in its possession for at least 24 hours prior to its publication, and its does not address why government agents continued to disseminate the false and inflammatory statements after defense counsel brought the issue to its attention. The government does not dispute that its misstatements were designed to grab headlines, and that they are capable of influencing potential mitigation witnesses.

As indicated in the Motion to Dismiss, Ms. Hankins has requested an evidentiary hearing. The hearing is necessary in order to establish the government's motive and intent in publishing the press release, as well as the harm it has caused with respect to Ms. Hankins' ability to present mitigation evidence at sentencing. Ms. Hankins intends to present witness testimony to demonstrate the impact of the government's statements and the loss of likely favorable evidence. In addition, Ms. Hankins intends to offer expert opinion as to how the language of the press release creates bias in the minds of those exposed to it.

**II.    The Government's Response incorrectly suggests that its legal and ethical obligations do not apply here and that the Court lacks the authority to dismiss the indictment**

The Government claims that the Court cannot dismiss the indictment because (1) the prosecution's false statements were made to the press, not to the Court; and (2) the Government's regulatory and ethical responsibilities with respect to the media ended when Ms. Hankins entered her guilty plea.  As to the former, it is well-established that a Court may

exercise its supervisory powers to remedy prosecutorial misconduct that jeopardizes the integrity of the criminal justice system. *See e.g., United States v. Lopez*, 4 F.3d 1455, 1463 (9th Cir. 1993) (recognizing that the district court could use its supervisory powers to remedy the prosecutor's violation of an ethical rule prohibiting contact with a represented party as such conduct subverted the attorney-client relationship). Misconduct manifests in myriad ways, and there is no rule requiring that the misconduct occur within the four walls of a courtroom before a court is empowered to act. The government's false and inflammatory statements have subverted Ms. Hankins' constitutional right to present mitigation evidence at sentencing, and, correspondingly, the Court's ability to assess it.

As to the latter, the Government relies on 28 C.F.R. § 50.2(b)(2), which states that the regulations "shall apply to the release of information to news media from the time a person is the subject of a criminal investigation until any proceeding resulting from such investigation has been terminated by trial or otherwise." *See* Gov't Resp. at 7 (so quoting). Nothing in this text suggests that the prosecution was relieved of its legal and ethical obligations when Ms. Hankins entered a guilty plea. The phrase "or otherwise" recognizes that not all proceedings terminate by trial. *See also United States v. Gonware*, 415 F.2d 82, 84 (9th Cir. 1969) ("Prosecution is not completed in a criminal case until the defendant begins to serve his sentence."). Ms. Hankins' plea agreement expressly contemplated a contested sentencing hearing. Such hearings are a crucial step in the criminal proceeding, one in which the defendant has a due process right to present evidence on her behalf, and the court has an interest in assessing all available evidence. *See* 18 U.S.C. § 3553(a) (requiring courts to consider a wide variety of factors and impose sentences in line with similarly situated defendants). In short, this case has not terminated, the prosecution is bound by its legal and ethical violations, and its prior violations impact the

REPLY IN SUPPORT OF MOTION TO DISMISS – 3
*UNITED STATES V. ANNE HANKINS*, Case No. 6:22-cr-00317-MC

integrity of these proceedings. Accordingly, the Court has the authority to exercise its supervisory powers to remedy the misconduct.

### III. The Government's Response tries to distract from its own misconduct by doubling down on the false assertion that Ms. Hankins is a "serial fraudster"

The Government's core defense is that its branding of Ms. Hankins as a "serial fraudster," while "harsh," is nonetheless "accurate." *See* Gov't Resp. at 6 ("The press release's reference to Ms. Hankins as a 'serial fraudster,' although harsh, is accurate."). This is a red herring. It is also a cynical attempt to further malign Ms. Hankins' in an effort to justify its own misconduct. The Government offers no explanation as to how the two convictions — the underlying conduct of which occurred two decades apart —  qualify as "serial." Nor does the Government assert that the convictions represent a characteristic, predictable pattern. *See* Def. Motion to Dismiss at 10 (describing and citing to the dictionary definition of "serial" and "serial fraudster"). *Cf.* 18. U.S.C. § 540(b)(2) (defining "serial killings" as "a series of three or more killings" that share sufficiently common characteristics to suggest that the crimes were committed by the same actor).

The Government's only explanation as to why the prior conviction is relevant is "because [Ms. Hankins] used the proceeds from this fraud to pay the victims of her previous fraud." *See* Gov't Resp. at 6; *see also* Decl. in Support of Motion to Dismiss, Ex. 10 (government email to defense counsel making same point about the relevance of the prior conviction) (ECF No. 15). But, as further explained in the Motion to Dismiss, it is only by happenstance that the government could bring in her otherwise stale conviction. *See* Def. Motion to Dismiss at 8.  The question of whether Ms. Hankins had to make the restitution payment was not settled until January 2018, two years after the offense conduct began. *See id.* (judgment not final until the

REPLY IN SUPPORT OF MOTION TO DISMISS – 4
*UNITED STATES V. ANNE HANKINS*, Case No. 6:22-cr-00317-MC

Supreme Court denied certiorari). Accordingly, it cannot reasonably be said to serve as a motive for her conduct here.

In any event, the Government's explanation of relevance wholly fails to demonstrates that "serial fraudster" is an accurate description — much less a justification for the name calling. This is what makes the Response so troubling. The pleading opens with a gratuitous description of Ms. Hankins' prior conduct yet never claims that it establishes serial fraud. It is a needless (and misleading) attack on her character that serves only to distract from the misconduct at issue. And this tactic is echoed throughout the pleading. For example, in a footnote, the government misleadingly suggests that the $1.5 million agreed-upon loss is understated by approximately $6.5 million. That was not a concession by the government, as the prosecution well knows. During negotiations, Ms. Hankins presented the government with expert evidence demonstrating that she was authorized to make the loans. And it was undisputed that the proceeds of the loans were used for business purposes. Ms. Hankins even personally guaranteed the debt. This footnote is inappropriate and has no relevance to this motion.

In addition to distorting the facts, the Government's Response distorts the relevant legal inquiry. The question is not whether Ms. Hankins is in fact a "serial fraudster." Among their legal and ethical obligations, prosecutors, and their agents, are prohibited from "disseminat[ing] any information concerning a defendant's prior criminal record[,]" as well as making public "[o]bservations about a defendant's character[.]" *See* 50 C.F.R. 50.2(4)-(6). There is no carve out that permits name calling if it is deemed true. The policy animating this prohibition is that discussion of a defendant's history or character typically creates a danger of unfair prejudice, while serving no meaningful law enforcement function. *See* 50 C.F.R. 50.2(6). Thus, even if "serial fraudster" was an accurate description —which it is not —the prosecution is still barred

REPLY IN SUPPORT OF MOTION TO DISMISS – 5
United States v. Anne hankins, Case No. 6:22-cr-00317-MC

from making it, as it is plainly a comment on both Ms. Hankins' criminal history and her character.

### IV. Endeavor's reliance on the Government's misstatements demonstrates the power of the prosecutor's statements

As detailed in the Motion to Dismiss, Endeavor introduced the Criminal Chief's description of Ms. Hankins' as a "serial fraudster" as evidence in the related arbitration proceeding. Endeavor argued that because Ms. Hankins is a "serial fraudster," she should not be allowed to inspect evidence held at Endeavor's offices and that her representations to the arbitrator should not be trusted. The Government's Response asks the Court to dismiss this fact because it is not relevant to the prejudice inquiry. This misses the point. Endeavor's reliance on the Criminal Chief's statements is demonstrative evidence of the press release's power to influence the public's perception of Ms. Hankins. Endeavor seized upon this information, believing in its truth, and presented it in a legal proceeding to corroborate its claims that Ms. Hankins is likely to steal or manipulate documents and cannot be trusted to give honest answers. Endeavor's use of the government's statements, and the inferences it drew therefrom to persuade the arbitrator, is illustrative of the type of impact the press release likely had on other individuals similarly exposed to it, including potential mitigation witnesses.

### V. The government has forfeited its ability to participate in Ms. Hankins' sentencing

To the extent that the Government has claimed that dismissal is unwarranted and unprecedented (which the defense disputes), an alternative remedy, should the Court agree, would be to preclude the Government from introducing inculpatory evidence in support of a sentence of incarceration. Ms. Hankins should be permitted to provide a statement of the witness testimony that she would have otherwise been able to obtain.

Such a remedy is analogous to the types of remedies courts fashion in cases involving *Brady* violations. In *United States v. Valenzuela-Bernal*, for example, the defendant was charged with transporting undocumented immigrants into the United States. *Valenzuela-Bernal*, 458 U.S. 858, 860 (1982). Following their arrest, the prosecutor deported the passengers. *See id.* at 861. At trial, and on appeal, the defendant argued that the government's deportation of the witnesses deprived him of his due process right to present evidence on his behalf. *See id.* The Supreme Court held that, under the particular facts of the case, the defendant failed to demonstrate that the witnesses might have possessed favorable evidence. Nonetheless, the Court recognized that courts could impose sanctions when the government deported witnesses (and thereby rendered them unavailable), where the defendant made a threshold showing that the witness might have had helpful testimony. *See id.* at 873. The Court left it to the discretion of district courts to fashion appropriate remedies, including, for instance, the introduction of stipulated facts reasonably approximating the witness' likely testimony. *See id.*

In the context of *Brady* and discovery violations, courts have precluded the government from introducing at trial evidence that it timely failed to produce to the defense. *See e.g., United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020) (identifying various remedies courts have fashioned to address discovery-related misconduct pursuant to its supervisory powers). Courts have also excluded witnesses or limited their testimony in order to curb the harm to the defendant of the government's delayed disclosure — and, similarly, to ensure that the government did not reap the benefits of its transgressions. *See id.* Furthermore, such remedies can help send a message of deterrence, another important function of a court's supervisory powers. *See e.g., United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979) ("An important function of the supervisory power is to guarantee that federal prosecutors act with due regard for

REPLY IN SUPPORT OF MOTION TO DISMISS – 7
*United States v. Anne Hankins*, Case No. 6:22-cr-00317-MC

the integrity of the administration of justice."); *Cf. United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004) (explaining that a primary purpose in suppressing evidence seized in violation of a defendant's Fourth Amendment rights is to deter future government misconduct).

As in the above contexts, the Court here could remedy the government's misconduct, and deter future improper behavior, by limiting the government's ability to introduce inculpatory evidence. Such a remedy does not fully restore Ms. Hankins' ability (and constitutional right) to present mitigation evidence at sentencing, as it cannot replace the impact of favorable live testimony. Nonetheless, it would prevent the Government from capitalizing on its misconduct. And, it would help rectify Ms. Hankins' due process right to a fair hearing, where she can present exculpatory evidence.

## VI.   Conclusion

The Government's legal and ethical obligations with respect to extrajudicial statements are well-established. They are designed to protect a defendant's right to a fair hearing, which necessarily includes a fair sentencing. The Government has provided no justification — nor can it — that would excuse the misconduct of its experienced prosecutors. Ms. Hankins' due process rights have been violated, and it is well-within the Court's authority to rectify the harm.

DATED: December 9, 2022

Respectfully submitted,

 s/Janet Hoffman
JANET HOFFMAN, OSB No. 781145
KATHERINE MARCHANT, OSB No. 161147
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Phone: (503) 222-1125
Email:  janet@jhoffman.com
Attorneys for Defendant Anne Hankins