JANET LEE HOFFMAN, OSB No. 781145
E-mail:  janet@jhoffman.com
KATHERINE MARCHANT, OSB NO. 161147
E-mail:  katie@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone: (503) 222-1125

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>  v.<br><br>ANNE HANKINS,<br><br>   Defendant. | CASE NO. 6:22-cr-00317-MC<br><br>**DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANT ANNE HANKINS' MOTION TO RECONSIDER DENIAL OF EVIDENTIARY HEARING ON DEFENDANT'S MOTION DISMISS** |

I, Janet Hoffman, for my declaration pursuant to 28 U.S.C. § 1746, state:

1. I am one of the attorneys representing Anne Hankins in the above-captioned case. I make this declaration in support of Defendant Anne Hankins' Motion to Reconsider the Denial of an Evidentiary Hearing on Defendant's Motion to Dismiss.

2. I have knowledge of the matters in this declaration based on (i) my own personal knowledge; (ii) what I have learned reviewing documents; and (iii) what has been related to me.

3. As part of the Motion to Dismiss, we requested an evidentiary hearing, so that we could present evidence to establish that Ms. Hankins was prejudiced by the Government's press release announcing her plea, and that the Government's conduct surrounding its

PAGE 1— DECLARATION OF COUNSEL IN SUPPORT OF MOTION TO RECONSIDER

publication amounted to flagrant misconduct. The Government published that press

release immediately following Ms. Hankins' change of plea hearing on September 28,

2022. A true and accurate copy of the press release was attached as an exhibit to Ms.

Hankins' Motion to Dismiss.

4. For ease of reference, this declaration refers to the relevant entities and parties as follows:

    a. During the relevant time period, Ms. Hankins was president of Willamette

        Country Music Concerts, LLC ("WCMC") and owned 49% of the entity.

    b. William Morris Endeavor, LLC and/or its related entities ("Endeavor") owned the

        other 51% of WCMC.  Each year, WCMC put on three country music festivals in

        Oregon and Idaho: the Willamette Country Music Festival, Country Crossings

        Music Festival (originally named the Cape Blanco Music Festival) and the

        Mountain Home Music Festival (collectively "the festivals").

5. By way of background, prior to our filing of the Motion to Dismiss, the defense had a

baseline of understanding of witness attitudes towards Ms. Hankins. This understanding

was based on interactions with some witnesses prior to Ms. Hankins' plea others after the

plea, as well as reviewing records and social media postings related to witnesses'

historical involvement in the festivals as sponsors, vendors, volunteers, employees or

attendees.

6. In order for Ms. Hankins to fully present evidence regarding her offense history and

mitigation grounds, pursuant to 18 U.S.C. § 3553 and U.S.S.G. §2B1.1 cmt. n.20(C). Ms.

Hankins needs to call witnesses who know her history with WCMC and the festivals,

what their success meant to her personally, and the positive impact the festivals had on

volunteer efforts and the local communities. It is within this context that her current criminal conduct can be explained.

7. During our negotiations with the prosecution, we advocated that Ms. Hankins was committed to the festivals, that she created a positive financial impact on the community and assisted philanthropic causes by creating fundraising opportunities for local schools and other non-profit organizations. Moreover, Ms. Hankins did not steal from WCMC. To the contrary, Ms. Hankins put her own money into WCMC to help cover operating costs. And she used approximately $1.2 million of the $1.5 million that she received from Endeavor to cover business-related expenses. She did this before any misconduct was identified. She also personally co-signed for millions of dollars of loans that were needed to fund the festivals when Endeavor would not provide additional funding. Simply stated, Ms. Hankins' position throughout these proceeding — was and is — that she did not steal or otherwise misappropriate money from WCMC.

8. We also advocated to the prosecution that although Ms. Hankins submitted false financials to Endeavor, they were not designed to obtain a financial benefit. Rather, they were her misguided efforts to run WCMC without Endeavor's hostile interference. Her conduct was motivated by her perception that Endeavor would not allow her to run WCMC in the best interest of WCMC and the community. Instead, Endeavor seemed interested in making sure that the artists that its agents represented, some of whom commanded nearly $1 million per performance, and its own partners were paid before local vendors and other service providers.

9. In addition, had the case been tried, or, ultimately, at a contested sentencing hearing, Ms. Hankins would present evidence that she did not try to deceive Endeavor as to the value

PAGE 3— DECLARATION OF COUNSEL IN SUPPORT OF MOTION TO RECONSIDER

of WCMC for the purpose of obtaining extra money from the sale. Indeed, Ms. Hankins wanted to purchase Endeavor's shares, too. When Endeavor first approached Ms. Hankins about selling her shares, Ms. Hankins offered to buy Endeavor out instead. Endeavor refused her offer.

10. The Government and Ms. Hankins ultimately reached an agreement that formed the basis of the plea. As part of the settlement discussions, and incorporated into the agreement, was the understanding by both parties that sentencing, instead of trial, would be the most appropriate forum for Ms. Hankins to present the above-described evidence. However, the Government agreed to provide Ms. Hankins with a three-level downward variance under 18 U.S.C. § 3553(a) in recognition of the fact the case was different than others.

11. On September 28, 2022, immediately after the Government published its press release, which presented false information to the public that Ms. Hankins stole money, laundered money to inflate the value of her shares and was a serial fraudster, I brought the issue to the Government's attention.  Over the next few days, as the amount of publicity and its intensity mounted, I unsuccessfully advocated that the Government should withdraw it and issue a statement to correct the factual record. Specifically, that Ms. Hankins was not a serial fraudster, that she did not launder money to inflate the value of her shares in WCMC, and that she did not steal money from WCMC.

12. Following the Government's press release, I asked our investigator to contact witnesses who she had spoken with before the press release was issued, as well as other potential witnesses who we would want to call at sentencing. We did this to understand the impact of the Government's press release on Ms. Hankins' ability to call witnesses on her behalf.

13. At an evidentiary hearing on the Motion to Dismiss, the defense will present the following evidence to establish that the Government's misconduct was flagrant and that it caused prejudice to Ms. Hankins:

  a. In order to establish flagrant prosecutorial misconduct, which can be established by evidence of the government's reckless disregard of its duties, counsel for the defense would call Government witnesses, including the individuals who prepared and authorized the press release, as well as those who were quoted and those who prosecuted Ms. Hankins. This testimony would help develop evidence regarding the prosecution's motives in drafting and publishing the press release.  This evidence is significant because it demonstrates the prosecution's motives and intent in publishing its inaccurate and prejudicial information following the plea and before sentencing

  b. After the Government published its press release, our investigator reached out to potential witnesses. We learned that multiple witnesses, who had been willing to speak with us before the press release, were no longer willing to speak with us after its release. We also found witnesses who reported that they were aware of negative community opinion of Ms. Hankins following the press release, as well as witnesses who indicated that their opinions of Ms. Hankins had been affected after being exposed to the Government's public statements. In addition, we identified witnesses who were previously boosters of Ms. Hankins but then seemed to distance themselves and to minimize the extent of their relationship with her after the press release was published.

14. In summary, at an evidentiary hearing in support of our Motion to Dismiss (or find an alternative remedy to repair the harm caused by the Government) we will present evidence from our investigator of the following facts:

    a. Multiple witnesses who had been willing to speak with our investigator before the press release was issued would no longer speak with her after it was published

    b. A high-profile sponsor of the festivals, who we understand was supportive of Ms. Hankins prior to the press release, stated that he could not be associated with her. This potential witness likely could have provided evidence regarding the positive impact the festivals had on the community and the fact that Ms. Hankins used her own money to repay company debts.

    c. Multiple people, who had historically posted online about their favorable experiences with Ms Hankins and the festivals, were called after the publication of the articles. Only one person returned the call, and her memory and positive descriptions of her experiences had changed.  She now recalled negative experiences with the festivals and minimized the extent of her contact with Ms. Hankins.

    d. Multiple witnesses spoke of a community awareness of the content of the articles, and its ensuing gossip against Ms. Hankins

    e. A favorable witness chose not to read the articles because she was worried that they would unfavorably impact her opinion of Ms. Hankins.

15. In addition, and in further support of the prejudice Ms. Hankins suffered, we will present expert testimony as to how the language of the press release creates bias in the minds of those exposed to it. This testimony was described in Ms. Hankins' Reply in Support of

Motion to Dismiss and the accompanying Declaration of Counsel in Support of the Reply. Accordingly, attached hereto as <u>Exhibit "1"</u> is a true and accurate copy of the expert report and the expert's CV. The report summarizes the testimony we intend to introduce and which the expert witness would elaborate upon at the evidentiary hearing.

16. If a hearing is granted, during oral argument in support of the Motion to Dismiss, we will argue that, based on the results of our efforts to obtain exculpatory sentencing evidence for Ms. Hankins, it appears that the Government's public statements have impaired her ability to present favorable evidence on her behalf.

///

**I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.**

DATED this 15th day of December 2022

Respectfully submitted,

 s/Janet Hoffman
JANET HOFFMAN, OSB No. 781145
KATHERINE MARCHANT, OSB No. 161147
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Phone: (503) 222-1125
Email:  janet@jhoffman.com
Attorneys for Defendant Anne Hankins

PAGE 7— DECLARATION OF COUNSEL IN SUPPORT OF MOTION TO RECONSIDER

**Expert Report**


*Prepared for:*
Janet Hoffman
Janet Hoffman & Associates


*Prepared by:*
Jeffrey W. Jarman, Ph.D.
Wichita State University

**Exhibit 1**
**Page 1 of 50**

I.      **Qualifications**

My name is Jeffrey W. Jarman, Ph.D. I am the Kansas Health Foundation Distinguished

Director of the Elliott School of Communication at Wichita State University. I have been a

faculty member at Wichita State since 1996. I have a B.A. in Political Science from Southwest

Missouri State University, an M.A. in Communication Studies from the University of Kansas, and

a Ph.D. in Communication Studies from the University of Kansas. My curriculum vita is provided.

I have extensive training and experience in qualitative and quantitative research

methods, including content analysis and rhetorical criticism. My training includes many courses

in research methods in qualitative research emphasizing textual analysis, rhetorical criticism

and content analysis. My academic research includes publications, conference presentations

and other contracted work analyzing media utilizing content analysis and close textual analysis.

The opinions expressed in this expert report are based on my personal and professional

knowledge, training and experience. This report is based on my review of the press release

from the U.S. Attorney's Office regarding the plea agreement with Anne Hankins, a

representative sample of press releases from other cases, all known print news stories related

to the case and court documents. For this report, I applied my knowledge of the field to the

documents in this case to render my opinions.


II.     **Introduction**

Anne Hankins petitioned to enter into a plea agreement with the United States in the

District of Oregon, Eugene Division, in connection with case 6:22-cr-00317-MC. The petition to

enter the guilty plea was accepted by the Court on September 28, 2022. Following the order of

**Exhibit 1**
**Page 2 of 50**

the Court, the U.S. Attorney's Office, District of Oregon, released a statement regarding the agreement (U.S. Attorney's Office, 2022). The following report details several conclusions regarding the inappropriateness of the press release and its use by media throughout Oregon and the United States.

The press release was inappropriate for multiple reasons, including the use of inflammatory language, lexical intensifiers, and information that was extraneous to the plea agreement, all of which carried the credibility of the government since it was embedded in attributed quotations. Moreover, the press release was not typical when compared to similar statements released by the U.S. Attorney's Office in other districts. The release was used by more than a dozen media outlets throughout Oregon where the inappropriate and inflammatory information was repeated. The information in the news stories likely would have been perceived as credible and would have influenced the readers' opinion of Anne Hankins.

This report will proceed by discussing the following topics:

1. First, the inappropriate nature of the press release is detailed, including a) the inaccurate and inflammatory use of the label "serial fraudster," b) the use of lexical intensifiers to sensationalize the news story, c) the inclusion of extraneous information which could lead to false inferences, d) the use of government officials as attribution to the inflammatory and intensified language, and e) the atypicality of the current press release when compared to other press releases from the Department of Justice on similar cases.

Exhibit 1
Page 3 of 50

2.      Second, a content analysis of regional press coverage of the case is documented, including an analysis of how the inappropriate content of the press release was used by the media.

3.      Finally, the influence of the press coverage is explored, including the role of sensationalized news media in attitude formation.

**III.    Analysis of Press Release**

A careful review of the press release revealed five significant problems when compared to the factual basis of the plea agreement: 1) the inflammatory description of the defendant as a "serial fraudster," 2) the use of lexical intensifiers to sensationalize the new story, 3) the inclusion of extraneous information which could lead to false inferences, 4) the use of government officials as source attribution as it relates to the inflammatory language, and 5) the atypicality of the press release when compared to other press releases on similar crimes.

**A.      Serial Fraudster is inflammatory**

1.      <u>Definition of serial</u>

The press release includes the following quote attributed to Craig Gabriel, Criminal Chief for the U.S. Attorney's Office: "With today's guilty plea, Ms. Hankins has proven herself to be a serial fraudster." The use of the phrase "serial fraudster" is improper for multiple reasons. The phrase suggests more than two acts, where the acts share very similar features or characteristics. Neither of these elements are present in the current case. First, the denotative definition of serial suggests it applies to more than two acts. The denotative meaning is the

4

**Exhibit 1**
**Page 4 of 50**

generally accepted meaning of a word, typically associated with the dictionary definition of term. Macmillian defines serial as "doing something or happening *several times* [emphasis added] in the same way." Merriam Webster defines it as "performing a *series* [emphasis added] of similar acts over a period of time." Cambridges defines it as "used to describe a person who *repeatedly* [emphasis added] commits a similar crime or carries out a similar bad act, or the crime or act itself." Collins Dictionary notes the word means "committing an act, usually a criminal act, *repeatedly* [emphasis added] and, typically, compulsively." As these definitions make clear, the denotative meaning of "serial" suggests engaging in a behavior that happens more than two times: it must be several, repeated, and in a series.

In addition, the denotative meaning of the word "serial" also suggests that the acts are sufficiently similar. The prior definitions include clear guidance. Collins notes that serial acts must be typical. Macmillian notes the act must be done "in the same way." Similarly, Merrian Webster included the acts must be "similar" and Cambridge added the act must be a "similar crime."

2.    <u>Definition of serial in the context of criminal acts</u>

Moreover, the connotative meaning of the word is highly charged and meant to cast the act in a very negatively light. Unlike the denotative meaning of a term, the connotative meaning goes beyond the dictionary definition and includes the emotional associations connected to the term. The examples provided for "serial" in a criminal context regularly suggests heinous acts with

**Exhibit 1**
**Page 5 of 50**

strong emotional connotations. Merriam Webster's example is "a serial killer." Collins and Macmillian included the example of "a serial murderer." Cambridge included many examples, including serial killer/murderer, serial adulterer/womanizer, serial abuser, serial abuse of children, serial bomber, serial sex offender, and serial murderer.

The use of "serial" in our vernacular is consistent with the denotative and connotative meaning of the word. For instance, "a serial crime is one that is repetitive—one that is committed by a habitual offender who usually commits the same type of crime and in the same manner" (Schroeder, 2022). In fact, as Schroeder (2022) noted, "Murders by serial killers are the category that most people think of when hearing the term 'serial' in regard to crime."

While the term "serial" is not common in law or statutes, when used, the clear implication is that it must be at least three acts. This is consistent with the denotative definition of the term. The U.S. Code (28 U.S. Code § 540B) uses the following definition: "the term 'serial killings' means a series of three or more killings, not less than one of which was committed in the United States, having common characteristics such as to suggest the reasonable possibility that the crimes were committed by the same actor or actors" (Investigation of serial killings).

Not all federal law enforcement agencies utilize a victim threshold of three when describing "serial" crimes. Participants at an FBI-sponsored symposium found consensus to lower the required number of victims from three

**Exhibit 1**
**Page 6 of 50**

to two, but the goal of the participants was to create a "broad definition" (Morton & Hilts, 2008, p. 8) to "allow law enforcement more flexibility in committing resources to potential serial murder investigations" (Morton & Hilts, 2008, p. 9). While the practical utility of this intentionally broad definition makes sense for law enforcement when investigating actual crimes, it is not meant to provide an authoritative definition of the phrase nor meant to document the likely public understanding of the term.

While the FBI definition is broader, other law enforcement groups utilize the higher victim threshold. For instance, the *Crime Classification Manual* notes, "The serial murderer kills more than two victims and involves more than one location or crime scene" (Douglas, Burgess, Burgess & Ressler, 2013, p. 471). In addition, while there is disagreement among academics and practitioners about the appropriate threshold, recent research suggests that the higher threshold of three victims is warranted. Friedel and Fox (2018) "recommend the use of three victims for the minimum threshold" (p. 510).

As the previous review of literature makes clear, there is a substantial body of work, based in the plain meaning of the word, its common usage in the vernacular, its usage in federal law, and among academics, that the most reasonable and well-established definition of "serial" is three or more acts.

3.    <u>Factual basis of the plea agreement</u>

Having established the minimum victim threshold for "serial" crimes is three, we can now turn to the press release in this case to ask: was the description of Anne

7

<b>Exhibit 1</b><br><b>Page 7 of 50</b>

Hankins as a serial fraudster warranted and appropriate? Based on Anne Hankins' criminal record, and codified in multiple documents related to this case, the crimes in the plea agreement do not warrant the label of "serial fraudster" as attributed to Craig Gabriel in the press release. Anne Hankins has one prior fraud conviction. Moreover, that conduct was nearly twenty years prior to the current plea agreement. As such, the use of the phrase "serial fraudster" is unwarranted and unjustified.

And, while the record confirms the defendant provided more than one false financial summary as a part of the scheme to defraud, the defendant pleaded to a single charge of fraud related to the sale of her share of Willamette Country Music Concerts. The denotative and connotative meaning of serial is not related to the number of acts in furtherance of the scheme, but rather to the number of victims. In this case, the one victim was William Morris Endeavor Entertainment. Moreover, the prior conviction also related to a single victim. As such, the total number of victims of fraud is two, not three or more as required by the term "serial."

The inappropriateness of the label "serial fraudster" is magnified by the amount of time between the acts and the distinguishing characteristics of the two charges. The plea agreement in the first case was submitted in October, 2001. The agreement in the second case was submitted nearly 21 years later in September, 2022. While a gap in time may be common in some serial crimes, such as a serial killer waiting months or years or decades between their crimes, serial acts of fraud are more likely to occur with a very short time between acts. A review of more than

**Exhibit 1**
**Page 8 of 50**

two dozen other DOJ press releases (detailed in a later section) found that serial

fraud was more commonly used to describe schemes with multiple victims within a

relatively short period of time. The substantial amount of time between the acts of

fraud is an additional reason why the defendant is inappropriately labeled a serial

fraudster. Moreover, the first conviction was the result of a false loan application

with U.S. Bank. The nature of that act was not similar to the current act. The label

"serial fraudster" suggests at least three acts that are similar. In this case, there are

two dissimilar acts separated by nearly 21 years.

**B.      Inappropriate linguistic intensifiers**

The media are an indispensable means for the public to gain knowledge related

to crime and the administration of justice. "Most members of society, fortunately, do

not have direct exposure to crime and justice. As a result, they rely on the media for

their crime and justice 'knowledge'" (Garcia & Arkerson, 2018, p. 133). According to

Garcia and Arkerson (2018), "96 percent of the average person's crime information is

obtained from the media" (p. 21). News stories related to crime, therefore, play an

essential role in creating and shaping the perception of the public when it comes to

crime.

Unfortunately, there has been a growing trend in the media to move from

information to infotainment, especially in the context of news about crime. Surette

(2003) explains, "the content of news and entertainment" has "become more and more

similar over the past decade" (p. 40). The move toward infotainment includes the

**Exhibit 1**
**Page 9 of 50**

increasing sensationalism in crime news. Fox, Van Sickel and Steiner (2007) refers to this as *tabloid justice*. As they explain:

> The United States has entered a sustained era of tabloid justice, in which the mass media, in both their traditional and emerging forms, focus predominantly on the sensationalistic, personal and lurid details of unusual and high-profile trials and investigations. In short, a great deal of legal news has become a vehicle for entertainment, rather than for public education or for the reporting of breaking events with real public meaning. (Fox, Van Sickel & Steiner, 2007, p. 6)

There are many ways to identify sensationalism in news stories. One valuable marker of sensationalism is the use of linguistic intensifiers. Language strategies used by reporters are a powerful means to enhance the sensationalism in a story. "Formal features of sensationalism in print news are related to the article's style" (Burgers & de Graaf, 2013, p. 6). We can identify the presence (or absence) of linguistic intensifiers by analyzing the word used by authors. As Shapiro (2010) suggests, this would include focusing our attention on the "style" used by the author. Linguistic intensifiers include, inter alia, specific language (as opposed to vague language), emotional/evaluative language (as opposed to objective/non-evaluative language), lexical intensifiers (as opposed to detensifiers) (see Burgers & De Graaf, 2013). Shapiro (2010), drawing on the work of Adam in a Poynter Institute monograph, suggests that writing should reflect "the plain style" (p. 154).

Exhibit 1
Page 10 of 50

There are several examples of linguistic intensifiers used in the press release. First, in a quote attributed to Special Agent in Charge Bret Kressin, Hankins is described to have "*blatantly* deceived her business associate." The word blatantly is a lexical intensifier (additional modifier words designed to increase intensity). There is no purpose for the inclusion of the word blatantly other than to add sensational value to the act of deception agreed to in the pleading. The criminal charge does not require that the deception was blatant, but simply that there was deception. The intentional choice to add the lexical intensifier serves no other purpose than to replicate the sensational style associated with tabloid justice.

In addition, the quote from Special Agent Bret Kressin includes two dramatic metaphors that also are intensifiers. The quote includes the phrases, "the *curtains* have come down" and "Hankins is *facing the music* for her fraud." The inclusion of these metaphors serves to heighten the emotional value of the sentence by sensationalizing her acts. Moreover, the metaphors invoke the entertainment industry and encourage readers to consider the act in the broader context of her business. In this way, readers (and reporters) may attempt to place the act of fraud against her business partner as outlined in the plea agreement in the broader context of her work as a music promoter, a linkage for which there is no connection.

Third, the description of Hankins as a "*serial* fraudster" is another example of a lexical intensifier. As previously discussed, the use of "serial" is unjustified based on the facts and prior convictions. But, even if it were true, the use of the term is unnecessary. The intentional use of the word is meant to enhance the sensationalism of the moment.

**Exhibit 1**
**Page 11 of 50**

The criminal conduct in the plea agreement is the same independent of the number of times the defendant may have engaged in similar conduct in the past. But, in this case, by including the lexical intensifier "serial," prosecutors have not secured a plea agreement against just any defendant, but instead intend to make their own actions more important because she is a worse kind of criminal.

Finally, the attributed quote to Bret Kressin includes the statement that Hankins "*stole* money that *never belonged to her*." The phrase "never belonged to her" is redundant and unnecessary except that it otherwise adds dramatic value to the event.

**C.     Extraneous concert-related information in the press release**

The Plea Agreement Letter includes a clear and concise description of the defendant and the company. It reads: "Anne Hankins was president of Willamette Country Music Concerts, LLC ("WCMC") located in Eugene, Oregon. Hankins' sole-member limited liability company, WCMC, Inc., owned 49% of WCMC." The Plea Petition repeats the identical language. The Superseding Information contains these same points. The press release, however, includes additional information. The lead paragraph reads: "The former president and minority owner of Willamette Country Music Concerts, LLC, *who planned, managed, and promoted the annual Willamette Country Music Festival in Linn County, Oregon,* pleadeded guilty today after she falsified bank statements and financial summaries to influence the sale of her stake in the company." The inclusion of the information related to the festival was not a part of any prior

12

Exhibit 1
Page 12 of 50

document related to the plea agreement and is unnecessary and extraneous information regarding the case.

The inclusion of the information, highlighted for a reader by setting it off as a dependent clause in the lead sentence, unnecessarily links legitimate business activities of Willamette Country Music Concerts to the criminal acts contained in the plea agreement. By invoking the concert, readers are instantly reminded of the legitimate business activities, yet those are now placed in the frame of reference of the criminal conduct. This provides another example of the press release replicating the sensationalism of tabloid justice. Readers may inadvertently connect the financial problems associated with concerts promoted by WCMC with the financial crime agreed to in the plea agreement. While this connection is not made explicit in the press release, the dramatic connection is encouraged by adding extraneous information about the concerts to a press release related to a plea deal unrelated to the concerts. As I will show in a subsequent section, this connection was made by news outlets who covered the story.

**D. Source Attribution**

There is considerable academic research on the role of source attribution in news stories. One of the most consistent findings from decades of research is the heavy reliance on governmental and official sources of information. For example, in a study of front-page news stories in the *New York Times* and the *Washington Post*, Sigal (1973) found "numerically, the most important source of information are officials of the U.S.

13

**Exhibit 1**
**Page 13 of 50**

government. They account for nearly one-half of all the sources cited in the sample of Times and Post page-one stories (p. 123-4). As Johnson-Cartee (2005) explained, "journalists rely on elites who meet journalistic norms for source selection" (p. 220). This pattern has been found for crime stories as well. Welch (1997) found the majority of quotes in feature stories on crime came from state managers (law enforcement practitioners, prosecutors, politicians, etc.).

The reliance on governmental sources is detrimental for several reasons. Classic concerns regarding the use of governmental sources note that a limited range of voices in the news leads to a less educated public. As Page (1996) made clear, "citizens may be misled" and "public deliberation harmed" when a limited range of views are expressed (p. 9). The number of sources used in a story is a basic but meaningful measure of balance. "Often, a story based on a single source allows that source's view of events to be carried unchallenged, and reflects a passive orientation whereby news acts as a conveyor belt rather than a testing ground for what powerful figures are saying" (Tiffen et al., 2014, p. 378). This is especially relevant when the news story involves plea agreements for pending criminal conduct. Government sources are perceived as more legitimate. Our media environment is saturated with entertainment and news about crime. In those contexts, "the media tell us that prosecutors have the best interest of the people at heart as they work zealously to convict criminals" (Garcia & Arkerson, 2018, p. 117).

The press release in this case offers two government officials as attributed sources of material. Craig Gabriel is the Criminal Chief of the U.S. Attorney's Office. Bret

**Exhibit 1**
**Page 14 of 50**

Kressin is the Special Agent in Charge, IRS Criminal Investigation, Seattle Field Office. While there are two sources, they do not provide balance. While not unusual in a press release, the story presented is one-sided and contains two attributed sources, both highly qualified and carrying significant institutional authority. As will be shown in a later section, the media contributes to the one-sided nature of the story by utilizing the press release without any attempt to provide balance. They become a one-way "conveyor belt" in which the government's presentation is the sole perspective offered. This is problematic since, as previously discussed, the press release contains inflammatory and intensified language designed to sensationalize the event. That sensationalism is now given the stamp of authority from two respected government officials.

**E.    Comparison to other press releases**

A search of the Department of Justice website (justice.gov) was conducted using the search phrase "serial fraudster." The search produced 53 press releases. A random sample of 27 press releases were analyzed.[1] The press releases related to 25 defendants between 2013 and 2022 (not including the press release in this case). A review of the press releases revealed a consistent pattern: the typical press release was made public after sentencing (or at least a conviction) and the factual basis of the crimes involved numerous victims and/or more than one fraudulent scheme. The pattern revealed in other press releases provides additional confirmation that the current press release is inappropriate since it does not fit the standard in other cases.

---

[1] A list of the press releases that were analyzed is available in Appendix 1.

**Exhibit 1**
**Page 15 of 50**

First, the vast majority were released after sentencing (18) or conviction (2). Very few were released following a plea (6) and only 1 was released after a defendant was charged. Releasing a statement after sentencing reflects a commitment to reduce the influence of media coverage and encourages reporting to focus on the facts once a case is settled.

The cases where a press release was issued before conviction or sentencing were significantly different than the charges in the Hankins case. Vitaly Borker (2022), for instance, was charged but had two prior convictions by the same office for the same fraud-related offense. Ronald Coleman (2018) had four previous convictions and his plea involved identity theft from more than 10 victims. Michael Pizarro (2019) pleaded to defrauding multiple elderly victims. Jason Evans (2022) pleaded to his role in two separate schemes with multiple fraudulent financial transaction. Moreover, he was accused of committing additional acts immediately after he was released on bond. Finally, Daniel Broyles (2022) pleaded guilty in two schemes involving multiple investors who were defrauded. These facts in these cases are significantly different than the facts stipulated to in the Hankins agreement. Unlike the press release in the Hankins case, the facts surrounding the cases where a press release was shared following a plea agreement are consistent with the denotative and connotative definition of a serial criminal.

Second, when considering all the other press releases, the factual basis of the crimes that were the subject of the press release involved numerous victims and/or

Exhibit 1
Page 16 of 50

more than one fraudulent scheme.[2] Again, this is consistent with the denotative and connotative definition of "serial" criminal.

When press releases are produced surrounding federal fraud crimes, the phrase "serial fraudster" typically is used (1) following conviction or sentencing and (2) reserved for persons whose criminal conduct involved numerous victims and/or multiple fraudulent schemes. In other words, the Hankins press release stands out as unusual both because of the timing of its release and the stark differences in the facts of the case.

## IV. Content Analysis of Local Media Coverage

In addition to analyzing the nature of the press release in this case, I also analyzed the role of the press release in local media coverage. While the first part of the analysis was conducted to determine if the press release itself was improper, this second part of the analysis was conducted to determine if the inappropriate elements of the press release were a part of the coverage of the case.

---

[2] Consider the basic facts from these examples: Nicole Stevenson (2013). Between 2009 and 2013, her schemes "used the identities of between 10 and 50 financial institutions, businesses and individuals." Latasha Callens (2014). Defrauded banks and individuals on at least 58 occasions during a two-year period. Troy Murchison (2019). Defrauded at least 5 banks and deposited over 100 worthless checks. Curlee Smittee, Jr. (2019). Defrauded 15 banks and credit card companies. He obtained 53 credit cards and loads from 15 banks and companies. Chea Yarl (2020). Defrauded 20 banks, deposited over 300 checks. Nena Kochuga, (2019). The press release mentioned that her crimes involved numerous victims. This was confirmed in the statement of facts stipulated to by the parties regarding Count Four. It read, "Kochuga and conspirators fraudulently induced *numerous victims* [emphasis added] to send at least $50,000 to Kochuga and conspirators via the United States mail, MoneyGram, Ria Money Transfer and Western Union wire service." At least 7 victims were identified by their initials in the document. Jason Weigand (2022). The press release noted he was "convicted on *thirty counts* involving *multiple charges* [emphasis added] of fraud, money laundering and identity theft arising from his elaborate scheme to steal money from his own financial advisory clients."

**Exhibit 1**
**Page 17 of 50**

An Internet search was conducted to find news articles related to the plea agreement. Sixteen news stories were identified from unique websites. A complete list is available in Appendix 2. The websites included television stations in Eugene, Medford, Portland, Bend and Roseburg, and newspapers in Eugene, Portland, Corvallis, Albany, Medford, and Sweet Home. The sites also included a national radio/music news website, an international news site, as well as other news aggregators (not included in this analysis). These sites, and the news organizations they represent, include a substantial portion of Oregon.

A review of these articles confirmed the significant influence of the press release on news coverage of the plea deal. The content of the press release was directly related to the content of the coverage. Of the 16 news stories, 13 included a reference to Hankins as a serial fraudster. In every case, the reference was attributed to Craig Gabriel. Two of those stories went further and included the phrase "serial fraudster" in the headline, likely designed to serve as click-bait in an effort to drive people to the website (an additional hallmark of sensationalism and tabloid journalism). The *Central Oregon Daily News* headline read, "Oregon music festival promoter pleads guilty, dubbed 'serial fraudster' by DOJ." KOIN, the CBS affiliate in Portland, used the headline: "'Serial fraudster': Willamette Country Music Concerts president pleads guilty."

Several news outlets included the other inflammatory and lexical intensifying language in the press release. Six of the stories included the quotes from Special Agent in Charge Bret Kressin stating that Hankins "stole money" and that "the curtains have come down and Ms. Hankins is facing the music for her fraud."

Exhibit 1
Page 18 of 50

In addition, many of the news stories went further than the press release and included in their coverage information about concerts promoted by Hankins. Ten news stories included references to concerts promoted by Hankins. In all cases, the references connected financial problems with the concerts to the news about the plea agreement. Many stories referenced the "ill-fated Country Crossings Music Festival" where vendors were "unpaid." The most damaging connection, unsupported by facts but inferred from the quotes in the press release, was published in Willamette Week (2022). It read, in part:

> Three country music festivals in Oregon and Idaho shut down in 2019—and it wasn't because of the pandemic.
> Vendors at the Country Crossing Music Festival, last held at the Jackson County Fairgrounds in southeast Oregon, say they were stiffed. Lax security and excessive drinking at the Willamette Country Music Festival in Brownsville led Linn County officials to revoke its permit.
> Sponsors and artists fled, and in late 2018, the festivals' promoter was fired. Both Oregon festivals announced they were ending their runs. Mountain Home Country Music Festival in southern Idaho went on "hiatus."
> Now, federal prosecutors are filling in the details of why. That promoter, Anne Hankins, 53, was a "serial fraudster," according to Craig Gabriel, criminal chief for the U.S. Attorney's Office. She faces up to 30 years in prison after pleading guilty to wire fraud and money laundering on Wednesday.

This story made explicit the connection between prior financial problems and Hankins current financial crime: vendors were unpaid and the festivals were shut down *because* of the fraud. Yet, the claim by the reporter, that "federal prosecutors are filling in the details of why," is not supported. But the inference is not surprising given the press release: inflammatory and intensified language carrying the authority of the government to sensationalize the event replicates tabloid journalism and encouraged a conclusion that was not in any stipulated facts.

**Exhibit 1**
**Page 19 of 50**

Beyond local media, the press release also made its way onto social media, though in a limited manner. The press release was tweeted by the FBI Portland (2022). The agency has a large following (52,700 followers). The tweet was liked 128 times and, more significantly, was retweeted 72 times. The replies furthered the inappropriate connection to the concerts. One reply characterized Hankins as "another swindler giving a bad name to concert promoters." Another noted, "No surprises here. I was at the last concert and it was a shitshow." A third commented, "Good riddance. We got enough issues here without this dirtbag." As these comments reveal, readers who saw the tweet also focused on the connection between Hankins plea and prior concerts she promoted.

It is important to compare the role of local media against the role of the press release in shaping coverage of the case. While it might be easy to blame the news outlets for the failure to engage in responsible journalism, the press release directly contributed to the coverage. But-for the existence of a press release it is highly unlikely that the plea agreement would have received any media coverage. Further, the repeated use of the phrase serial fraudster, the use of lexical intensifiers, and the attributions to two government officials were prominent in news coverage and those were the direct result of the press release.

**V. Influence of News on Public Opinion**

As previously discussed, the news plays a significant role in shaping public opinion, especially on an issue like crime. Most people have no direct knowledge of crime and must rely heavily (if not exclusively) on media reports to acquire information on crime. The influence of the news on shaping the public's understanding of federal criminal charges is even more

Exhibit 1
Page 20 of 50

pronounced. It is highly unlikely that most members of the public would have any knowledge of federal criminal cases without reporting by the news.

Not only does the news shape the public's awareness of the issue, it has a direct influence on public opinion. This is especially true when the information is one-sided (as it was in this case), supported by quotes attributed to government official (who are perceived as credible), and includes the use of sensationalism. Sensational news items are very influential. News stories utilizing sensationalism, especially the use of intensifiers, are positively associated with an increase in the perceived newsworthiness and attitude toward the article (Burgers & de Graaf, 2013).

The structure of our memory further increases the influence of the news stories in this case. Objects in our memory, including people and events, include not just facts but also affect. Our knowledge is more than just a collection of facts. It also includes an emotional component. That is, our knowledge is "affectively charged" (Lodge & Taber, 2013). In this case, not only does the news coverage build a negative affective association with Anne Hankins, but the association is stronger than normal because the information is sensationalized. Members of the public who were exposed to the material were not equipped to challenge the information because the stories were one-sided and included no information from the defendant's perspective. Members of the public also would be less motivated to challenge the information since it came from a source with a positive affective association. The influence of affect happens very quickly and often without conscious awareness as information moves from our long-term memory into working memory (see Lodge & Taber, 2013). The news coverage in this

**Exhibit 1**
**Page 21 of 50**

case has the ability to influence the attitude toward Anne Hankins by increasing the negative

association held of her in the memory of those who were exposed to the news stories.

**VI. Summary and Opinion**

This report analyzed the press release from the U.S. Attorney's Office, District of

Oregon, in connection with the plea agreement reached with Anne Hankins. I reviewed the

press release, related court filings, other press releases from the U.S. Attorney's Office on

similar crimes, and local media coverage of the plea agreement. Based on my review of these

documents, along with relevant academic research, several conclusions are warranted.

First, the use of "serial fraudster" to describe Anne Hankins is inappropriate and

inflammatory. The basic denotative and connotative definition of "serial" criminal conduct

requires a victim threshold of at least three. That threshold is codified in the federal code and

reaffirmed by academic research. Anne Hankins criminal background includes only one prior

conviction which means she should not be labeled a "serial" fraudster. The attributed quote to

Craig Gabriel, therefore, is inappropriate. Moreover, the prior conviction was nearly 21 years

ago, an amount of time unusual in fraud cases, providing additional confirmation that the label

of "serial" fraudster is improper.  In addition, the nature of the current act is not similar to her

prior act. The definition of serial fraudster suggests three acts that are similar. In this case,

there are two dissimilar acts separated by nearly 21 years. Not only is the description of "serial"

inappropriate, it also is inflammatory. The common usage of "serial" involves heinous crimes

such as serial murderer, serial rapist, and serial abuser. The intentional use of "serial" to

**Exhibit 1**
**Page 22 of 50**

describe criminal acts, especial when unwarranted and related to fraud, is meant to sensationalize the crime.

Second, the press release contains multiple lexical intensifiers designed to add emotional value, a rhetorical technique designed to sensationalize the new story. The press release includes a quote from Bret Kressin with two dramatic metaphors and an additional lexical intensifier designed to sensationalize the story. Hankins is described to have "blatantly deceived" her business partner. The attributed quote includes the phrases, "the *curtains* have come down" and "Hankins is *facing the music* for her fraud." The use of "serial" fraudster is an additional example of a lexical intensifier since prior convictions are not relevant to the crime or the proposed sentencing guidelines. The attributed quote to Kressin also includes the statement that Hankins "stole money that never belonged to hear." The information is redundant and enables a false inference by readers since the term "stole" is an umbrella term encompassing many acts, including fraud, but also larceny and embezzlement, among others. In all, the inclusion of these lexical intensifiers serves no informational purpose but instead merely increases the sensationalism of the press release.

Third, the press release includes extraneous information unrelated to the plea agreement. The inclusion is noticeable because it is not contained in any of the related court filings. The press release references a festival promoted by Hankins. While the inclusion of this information may seem innocuous, it directs readers to draw a connection from the current fraud case to her legitimate business activities. Based on a review of the news stories related to the plea agreement, many news organizations reported on the plea agreement and financial

**Exhibit 1**
**Page 23 of 50**

problems of prior concerts as if they were linked, even though no connection between the two is suggested in any court filing.

Fourth, the most objectional parts of the press release are embedded in attributed quotes to two government officials, Craig Gabriel and Bret Kressin. Government sources, and those representing the prosecution in criminal cases, carry significant authority. Not only does the press release contain inflammatory information, but it carries additional credibility because it comes from government sources involved in the case. The public is left with a one-side story where the most credible sources confirm the most inflammatory information.

Fifth, the press release is unusual when compared to other press releases on a similar subject. Nearly all other press releases that invoke "serial fraudster" do so after the conviction and when the defendant has engaged in numerous acts of fraud over a relatively short period of time. By contrast, the press release in this case is atypical: it invokes the phrase "serial fraudster" for two dissimilar actions separated by nearly 21 years.

The press release was not just inappropriate and inflammatory, but it was the basis for the local media coverage of the case. The news stories reviewed in this report regularly used all the inappropriate language, included the attributed quotes with inflammatory information, and drew connections to other financial problems that were unwarranted by the facts. While it would be easy to blame the reporters for failing to do their due diligence, the press release from the U.S. Attorney's Office is the primary source used by the news outlets and bears most of the blame. But-for the press release it is unlikely the plea agreement would have been covered by local media and the inflammatory information would not be readily available for the public to consume.

**Exhibit 1**
**Page 24 of 50**

Finally, the news stories of the plea agreement likely would be perceived as credible and would influence a reader to hold a negative opinion of Anne Hankins. The negative opinion is affectively charged and stronger than would be expected because of the style used in the press release. The press release includes elements of sensationalism characteristic of tabloid journalism which would increase the affective charge of the information now associated with Anne Hankins.

**Exhibit 1**
**Page 25 of 50**

Works Cited

Burgers, C. & de Graaf, A. (2013). Language intensity as a sensationalistic news feature: The

influence of style on sensationalism perceptions and effects. *Communications, 38*, 167-

188. Retrieved from https://www.researchgate.net/profile/Christian-

Burgers/publication/270498695_Language_intensity_as_a_sensationalistic_news_featu

re_The_influence_of_style_on_sensationalism_perceptions_and_effects/links/54ae76d

40cf2828b29fd9a76/Language-intensity-as-a-sensationalistic-news-feature-The-

influence-of-style-on-sensationalism-perceptions-and-effects.pdf

Cambridge (n.d.). Serial. In Cambridge dictionary. Retrieved November 28, 2022, from

https://dictionary.cambridge.org/us/dictionary/english/serial.

Collins (n.d.). Serial. In Collins dictionary. Retreived November 28, 2022, from

https://www.collinsdictionary.com/us/dictionary/english/serial.

Douglas, J. E., Burgess, A. W., Burgess, A. G., & Ressler, R. K. (2013). *Crime classification manual:

A standard system for investigating and classifying violent crime*. Hoboken, NJ: John

Wiley & Sons, Inc.

FBI Portland [@FBIPortland]. (2022, Oct. 4). Willamette Country Music Concerts President

Pleadeds Guilty to Wire Fraud and Money Laundering: Anne Hankins, the former

president of Willamette Country Music Concerts, pleadeded guilty to falsifying bank

statements and financial summaries. Twitter.

https://twitter.com/FBIPortland/status/1577297800303607809.

Fridel, E. E. & Fox, J. A. (2018). Too few victims: Finding the optimal minimum victim threshold

for defining serial murder. *Psychology of Violence, 8*, 505-514.

26

**Exhibit 1**
**Page 26 of 50**

Fox, R. L., Van Sickel, R. W., & Steiner, T. L. (2007). *Tabloid justice: Criminal media in an age of media frenzy*. Boulder, CO: Lynne Rienner Publishers.

Garcia, V. & Arkerson, S. G. (2018). *Crime, media and reality: Examining mixed messages about crime and justice in popular media*. Lanham, MD: Rowman & Littlefield.

Investigation of Serial Killings. 28 U.S. Code § 540B. Retrieved from https://www.law.cornell.edu/uscode/text/28/540B.

Johnson-Cartee, K. S. (2005). *News narratives and news framing: Constructing political reality*. Lanham, MD: Rowman & Littlefield Publishing Group.

Lodge, M. & Taber, C. S. (2013). *The rationalizing voter*. Cambridge: Cambridge University Press.

Macmillian. (n.d.). Serial. In Macmillian dictionary. Retrieved November 28, 2022 from https://www.macmillandictionary.com/us/dictionary/american/serial_2.

Merriam-Webster (n.d.). Serial. In Merriam-Webster.com dictionary. Retrieved November 28, 2022, from https://www.merriam-webster.com/dictionary/serial.

Morton, R. J. & Hilts, M. A. (2008). *Serial murder: Multi-disciplinary perspectives for investigators. National Center for the analysis of violent crime*. Washington, D.C.: Federal Bureau of Investigation. Retrieved from: https://www.fbi.gov/file-repository/stats-services-publications-serial-murder-serial-murder-july-2008-pdf.

Page, B. I. (1996). Who deliberates?: *Mass media in modern democracy*. Chicago: University of Chicago Press.

Schroder, P. (2022). What is a serial crime? Retrieved November 28, 2022 from https://www.mylawquestions.com/what-is-a-serial-crime.htm.

Exhibit 1
Page 27 of 50

Shapiro, I. (2010). Evaluating journalism: Towards an assessment framework for the practice of

   journalism. *Journalism Practice, 4*, 143-162.

Sigal, L. V. (1973). *Reporters and officials: The organization and politics of newsmaking*.

   Lexington, MA: D.C. Heath and Company.

Surette, R. (2003). The media, the public, and criminal justice policy. *Journal of the Institute of

   Justice and International Studies, 2*, 39-51.

Tiffen, R. (2014). Sources in the news: A comparative study. *Journalism Studies, 15*, 374-391.

U.S. Attorney's Office, District of Oregon. (2022, Sept. 28). Willamette Country Music Concerts

   president pleadeds guilty to wire fraud and money laundering. Retrieved from

   https://www.justice.gov/usao-or/pr/willamette-country-music-concerts-president-

   pleadeds-guilty-wire-fraud-and-money-laundering.

Welch, M., Fenwick, M., & Roberts, M. (1997). Primary definitions of crime and moral panic: A

   content analysis of experts' quotes in feature newspaper articles on crime. *Journal of

   Research in Crime and Delinquency, 34*, 474-494.

**Exhibit 1**
**Page 28 of 50**

Appendix 1: DOJ Press Releases on Serial Fraudsters

Department of Justice, Office of Public Affairs. (2022, June 24). Serial fraudster previously

extradited from Mexico pleads guilty to multiple investment fraud scheme. Retrieved

from https://www.justice.gov/opa/pr/serial-fraudster-previously-extradited-mexico-

pleads-guilty-multiple-investment-fraud-schemes.

U.S. Attorney's Office, Central District of Illinois. (2019, Sept. 16). "Serial fraudster" sentenced

to 10 years in prison for bank fraud. Retrieved from https://www.justice.gov/usao-

cdil/pr/serial-fraudster-sentenced-10-years-prison-bank-fraud.

U.S. Attorney's Office, District of Maryland. (2013, June 14). Serial fraudster sentenced to 3

years in prison. Retrieved from https://www.justice.gov/usao-md/pr/serial-fraudster-

sentenced-3-years-prison.

U.S. Attorney's Office, District of Maryland. (2015, Nov. 5). Serial fraudster sentenced to eight

years in prison for business fraud scheme. Retrieved from

https://www.justice.gov/usao-md/pr/serial-fraudster-sentenced-eight-years-prison-

business-fraud-scheme.

U.S. Attorney's Office, District of Maryland. (2018, Aug. 22). Serial fraudster pleads guilty to

bank fraud and aggravated identity theft. Retrieved from https://www.justice.gov/usao-

md/pr/serial-fraudster-pleads-guilty-bank-fraud-and-aggravated-identity-theft.

U.S. Attorney's Office, District of Maryland. (2019, Oct. 11). Serial fraudster sentenced to 46

months in federal prison. Retrieved from https://www.justice.gov/usao-md/pr/serial-

fraudster-sentenced-46-months-federal-prison.

**Exhibit 1**
**Page 29 of 50**

U.S. Attorney's Office, District of Maryland. (2020, Dec. 1). Serial fraudster pleads guilty to

    federal charges for conspiring to steal mail, stealing benefits under the CARES Act, and

    aggravated identity theft. Retrieved from https://www.justice.gov/usao-md/pr/serial-

    fraudster-pleads-guilty-federal-charges-conspiring-steal-mail-stealing-benefits.

U.S. Attorney's Office, District of Maryland. (2020, Dec. 11). Serial fraudster, who was a fugitive

    for more than 14 years, sentenced to more than 12 years in federal prison in Maryland

    for bank fraud and conspiracy. Retrieved from https://www.justice.gov/usao-

    md/pr/serial-fraudster-who-was-fugitive-more-14-years-sentenced-more-12-years-

    federal-prison.

U.S. Attorney's Office, District of Maryland. (2021, Mar. 31). Serial fraudster sentenced to 8

    years in federal prison for conspiring to steal mail, stealing benefits under the Cares Act,

    and aggravated identity theft. Retrieved from https://www.justice.gov/usao-

    md/pr/serial-fraudster-sentenced-8-years-federal-prison-conspiring-steal-mail-stealing-

    benefits.

U.S. Attorney's Office, District of Maryland. (2021, Apr. 29). Serial fraudster sentenced to four

    years in federal prison for conspiracy to commit bank fraud and aggravated identity

    theft. Retrieved from https://www.justice.gov/usao-md/pr/serial-fraudster-sentenced-

    four-years-federal-prison-conspiracy-commit-bank-fraud-and.

U.S. Attorney's Office, District of Maryland. (2021, June 3). Serial fraudster sentenced to more

    than six years in federal prison for multiple fraud schemes resulting in losses of more

    than $1 million. Retrieved from https://www.justice.gov/usao-md/pr/serial-fraudster-

    sentenced-more-six-years-federal-prison-multiple-fraud-schemes-resulting.

Exhibit 1
Page 30 of 50

U.S. Attorney's Office, District of Maryland. (2022, Mar. 15). Serial fraudster pleads guilty in U.S. District Court in Maryland to two new fraud schemes and to violating his supervised release for a previous federal fraud conviction. Retrieved from https://www.justice.gov/usao-md/pr/serial-fraudster-pleads-guilty-us-district-court-maryland-two-new-fraud-schemes-and.

U.S. Attorney's Office, District of Minnesota. (2016, Sept. 9). Serial fraudster pleads guilty to investment advisor fraud and money laundering. Retrieved from https://www.justice.gov/usao-mn/pr/serial-fraudster-pleads-guilty-investment-advisor-fraud-and-money-laundering.

U.S. Attorney's Office, District of Minnesota. (2017, June 7). Serial fraudster sentenced to 90 months in prison for investment scam and money laundering. Retrieved from https://www.justice.gov/usao-mn/pr/serial-fraudster-sentenced-90-months-prison-investment-scam-and-money-laundering.

U.S. Attorney's Office, Eastern District of North Carolina. (2021, Mar. 15). Apex serial fraudster sent back to federal prison for investment scam involving impersonation of mayor, professor, and government agency. Retrieved from https://www.justice.gov/usao-ednc/pr/apex-serial-fraudster-sent-back-federal-prison-investment-scam-involving-impersonation.

U.S. Attorney's Office, Eastern District of Pennsylvania. (2022, May 26). Former financial advisor from Berks County convicted of fraud, money laundering scheme to steal from clients. Retrieved from https://www.justice.gov/usao-edpa/pr/former-financial-advisor-berks-county-convicted-fraud-money-laundering-scheme-steal.

Exhibit 1
Page 31 of 50

U.S. Attorney's Office, Eastern District of Virginia. (2019, May 23). Serial fraudster convicted of participating in lottery scam. Retrieved from https://www.justice.gov/usao-edva/pr/serial-fraudster-convicted-participating-lottery-scam.

U.S. Attorney's Office, Eastern District of Virginia. (2019, Sept. 27). Serial fraudster sentenced for card-cracking scheme. Retrieved from https://www.justice.gov/usao-edva/pr/serial-fraudster-sentenced-card-cracking-scheme.

U.S. Attorney's Office, Eastern District of Virginia. (2020, Sep. 22). Serial fraudster sentenced for multiple financial schemes. Retrieved from https://www.justice.gov/usao-edva/pr/serial-fraudster-sentenced-multiple-financial-schemes.

U.S. Attorney's Office, Eastern District of Virginia. (2020, Nov. 12). Serial fraudster sentenced for second operation homeless scheme. Retrieved from https://www.justice.gov/usao-edva/pr/serial-fraudster-sentenced-second-operation-homeless-scheme.

U.S. Attorney's Office, Eastern District of Virginia. (2020, Dec. 11). Serial fraudster sentenced for counterfeit check scheme. Retrieved from https://www.justice.gov/usao-edva/pr/serial-fraudster-sentenced-counterfeit-check-scheme.

U.S. Attorney's Office, Middle District of Florida. (2014, Mar. 27). Serial fraudster sentenced to more than 12 years in federal prison. Retrieved from https://www.justice.gov/usao-mdfl/pr/serial-fraudster-sentenced-more-12-years-federal-prison.

U.S. Attorney's Office, Middle District of Florida. (2021, Jan. 14). Serial fraudster from Orlando sentenced to more than six years in federal prison. Retrieved from https://www.justice.gov/usao-mdfl/pr/serial-fraudster-orlando-sentenced-more-six-years-federal-prison.

Exhibit 1
Page 32 of 50

U.S. Attorney's Office, Southern District of New York. (2019, Aug. 20). Serial fraudster pleads

    guilty to scamming elderly victims out of hundreds of thousands of dollars in fraudulent

    payment scheme. Retrieved from https://www.justice.gov/usao-sdny/pr/serial-

    fraudster-pleads-guilty-scamming-elderly-victims-out-hundreds-thousands-dollars.

U.S. Attorney's Office, Southern District of New York. (2022, Feb. 18). Recidivist defendant

    charged in connection with fraudulent eyewear website for the third time. Retrieved

    from https://www.justice.gov/usao-sdny/pr/recidivist-defendant-charged-connection-

    fraudulent-eyewear-website-third-time.

U.S. Attorney's Office, Western District of Michigan. (2021, Feb. 4). "Serial fraudster" sentenced

    to two years in prison for mail fraud conspiracy. Retrieved from

    https://www.justice.gov/usao-wdmi/pr/2021_0204_Shain.

U.S. Attorney's Office, Western District of Washington. (2017, Nov. 3). "Serial fraudster"

    sentenced to 61 months in prison for latest round of scams aimed at Internet and

    shipping businesses. Retrieved from https://www.justice.gov/usao-edva/pr/serial-

    fraudster-sentenced-counterfeit-check-scheme.

Exhibit 1
Page 33 of 50

Appendix 2. News articles related to Hankins' plea agreement

Central Oregon Daily News. (2022, Sept 28.) Oregon music festival promoter pleads guilty,

dubbed "serial fraudster" by DOJ. Retrieved from

https://centraloregondaily.com/willamette-country-music-concerts-anne-hankins-fraud-

scheme/.

Desaulniers, R. (2022, Sept. 28). Willamette Country Music Concerts president pleads guilty to

wire fraud, money laundering. Retrieved from https://www.kezi.com/news/willamette-

country-music-concerts-president-pleads-guilty-to-wire-fraud-money-

laundering/article_9dbe4b3e-3f87-11ed-8cc6-87dbd181c756.html.

Fox 12. (2022, Sept. 28). Former president of Willamette Country Music Fest pleads guilty to

fraud charges. Retrieved from https://www.kptv.com/2022/09/28/former-president-

willamette-country-music-fest-pleads-guilty-wire-fraud-money-laundering/.

Fox 26 KMVU. (2022, Sept. 28). Former 'Crounty Crossings' executive pleads guilty to financial

crimes. Retrieved from https://www.fox26medford.com/former-country-crossings-

executive-pleads-guilty-to-financial-crimes/.

Huston, P. (2022, Sept. 29). Ex-director of music festival enters a criminal conviction to money

laundering. Retrieved from https://www.bollyinside.com/news/ex-director-of-music-

festival-enters-a-criminal-conviction-to-money-laundering.

KOBI. (2022, Sept. 28). Former 'Country Crossings' executive pleads guilty to financial crimes.

Retrieved from https://kobi5.com/news/former-country-crossings-executive-pleads-

guilty-to-financial-crimes-196414/.

Exhibit 1
Page 34 of 50

KPIC. (2022, Sept. 28). Former president of Willamette Country Music Concerts found guilty of

    money laundering. Retrieved from https://kpic.com/news/local/former-president-of-

    willamette-country-music-concerts-found-guilty-of-money-laundering.

KTVL. (2022, Sept. 28). Former president of Willamette Country Music Concerts found guilty of

    money laundering. Retrieved from https://ktvl.com/newsletter-daily/former-president-

    of-willamette-country-music-concerts-found-guilty-of-money-laundering.

Lynn, J. (2022, Sept. 30). Willamette Country Concerts president pleads guilty to wire fraud and

    money laundering. Retrieved from https://www.allaccess.com/net-

    news/archive/story/222013/willamette-country-concerts-president-pleads-guilt.

Mansfield, L. (2022, Sept. 29). Country music festival promoter pleads guilty to fraud. Retrieved

    from https://www.wweek.com/news/courts/2022/09/29/country-festival-promoter-

    pleads-guilty-to-fraud/.

Pettigrew, J. (2022, Sept. 28). "Serial fraudster": Willamette Country Music Concerts president

    pleads guilty. Retrieved from https://www.koin.com/news/oregon/serial-fraudster-

    willamette-country-music-concerts-president-pleads-guilty-wire-fraud-money-

    laundering/.

Pfeifer, M. (2022, Sept. 28). Former pres of Willamette Country Music Concerts pleads guilty to

    wire fraud. Retrieved from https://www.gazettetimes.com/corvallis/news/local/crime-

    and-courts/former-pres-of-willamette-country-music-concerts-pleads-guilty-to-wire-

    fraud/article_ee3f4147-eae1-5d8d-9e9d-b0ef8963fa11.html.

Pfeifer, M. (2022, Sept. 28). Former pres of Willamette Country Music Concerts pleads guilty to

    wire fraud Retrieved from https://democratherald.com/corvallis/news/local/crime-and-

Exhibit 1
Page 35 of 50

courts/former-pres-of-willamette-country-music-concerts-pleads-guilty-to-wire-

fraud/article_e2bfb30a-3f85-11ed-af34-831a48153b2b.html.

Rogue Valley Magazine. (2022, Sept. 29). Willamette Country Music Concerts president pleads

guilty to wire fraud and money laundering. Retrieved from

https://roguevalleymagazine.com/2022/09/29/rogue-valley-news-thursday-9-29-

structure-fire-in-illinois-valley-jacksonville-and-applegate-area-phone-service-under-

state-investigation/.

Sweet Home News. (2022, Oct. 5). Ex-festival head pleads guilty to money laundering, wire

fraud. Retrieved from https://www.sweethomenews.com/story/2022/10/05/news/ex-

festival-head-pleads-guilty-to-money-laundering-wire-fraud/26391.html.

36

Exhibit 1
Page 36 of 50

# Jeffrey W. Jarman

Home Address:
1826 Valleyview
Wichita, KS  67212
(316)  644-0213
jeffreywjarman@gmail.com

Office Address:
1845 N. Fairmount
Elliott School of Communication
Wichita, KS  67260-0031
(316)  978-6075
jeffrey.jarman@wichita.edu

## EDUCATION

Ph.D.       Communication Studies, University of Kansas, May 1998
            Major areas of study:  Rhetorical Criticism and Argumentation
            Dissertation Title: *Pat Buchanan and the Rhetoric of Authoritarianism*

M.A.        Communication Studies, University of Kansas, December 1995
            Major areas of study:  Rhetorical Criticism and Argumentation
            Thesis Title:  *Rhetoric of decline: Paul Kennedy and the rhetoric of history*

B.S.        Southwest Missouri State University, August 1993
            Major:  Political Science
            Minor:  Communication

## ADMINISTRATIVE EXPERIENCE

2017 -      Kansas Health Foundation Distinguished Director of the Elliott School of
            Communication, Wichita State University
            Responsibilities include overseeing state and foundation budgets, supporting faculty
            and staff, annual evaluations of faculty and staff, annual assessment and program
            review, providing direction for departmental initiatives, goal setting and
            implementation, scheduling courses, and building strong connections with area
            employers and alumni. Served as Interim Director beginning in Fall 2016.

2008 - 2016  Associate Director, Elliott School of Communication
            Responsibilities include course scheduling, hiring and evaluating adjunct instructors,
            completing senior transcript evaluations, evaluating transfer courses, producing
            annual assessment report, annual review of non-tenure track faculty, and chairing
            departmental curriculum committee.

2018 -      Co-Director, The Research Partnership, Wichita State University
            The Research Partnership is a full-service marketing research and consulting agency.
            The business was gifted to WSU and is administered out of the School. Services
            offered include focus group facility rental, participant recruitment (including in-house
            call center), community attitude surveys, and other market research. Staff includes

**Exhibit 1**
**Page 37 of 50**

one full-time operations coordinator, part-time call center employees, and part-time student workers. Responsibilities include review of all contracts, oversight of budget, review of staff, client development, and consulting services.

1996 - 2018   <u>Director of Debate and Forensics</u>, Wichita State University
Responsibilities include travel and coaching of nationally competitive collegiate debate and individual events team.  Duties include budget preparation, recruiting undergraduate and graduate students, oversight of practice and preparation of the team, and director of summer debate workshop.

2007, 2015   <u>Interim Graduate Coordinator</u>, Elliott School of Communication.
Served during the Spring semester each year while grad coordinator was on sabbatical. Responsibilities included reviewing applications for new graduate students, chairing committee to select new GTAs, answering questions from prospective students, and supporting current students.

2002 - 2008   <u>Assistant Director of the Basic Course</u>, Elliott School of Communication.
Responsibilities include assist Director with issues related to the Basic Course, planning the end of the semester speaking competition (Shocker Speak Out), attending staff meetings with graduate teaching assistants, and providing assistance to GTAs.

1998 - 2015   <u>Director</u>, Wichita State University Summer Debate Workshop.
Responsibilities include organization of one week workshop on the new high school debate topic.  This includes publicizing the event, organizing registration, reserving facilities, hiring staff, producing a starter packet, providing daily lectures on the new topic, and listening to practice speeches and debates.

1994 - 1996   <u>Associate Director</u>, University of Kansas Summer Debate Camp.
Responsibilities include organization of 4-week summer high school debate workshop with 20 staff members and a budget in excess of $100,000.

1993 - 1996   <u>Assistant Debate Coach</u>, University of Kansas.
Responsibilities include travel and coaching of nationally competitive collegiate debate team.  In addition, I was one of two people responsible for oversight of budgetary and travel paperwork.

## TEACHING EXPERIENCE

1996 -        Elliott School of Communication, Wichita State University.
              Courses taught:        Quantitative Research Methods *
                                     Qualitative Research Methods *
                                     Communication Theory *
                                     Rhetorical criticism *
                                     Communication Analysis and Criticism **

**Exhibit 1**
**Page 38 of 50**

Political communication **
Politics, campaigns and communication **
Persuasion **
Communication & Persuasion in the Courtroom **
Strategic Communication in Organizations **
Directing the High School Forensics Program **
Special event planning **
Argumentation and Advocacy
Debate and Forensics
Introduction to Human Communication
Senior Portfolio
Debate Workshop

\*        Course only for graduate students
\*\*      Course for graduate and undergraduate students

1993 - 1996    <u>Graduate Teaching Assistant</u>, Communication Studies, University of Kansas.
                        Courses taught:        Speaker-Audience Communication
                                                        Persuasive Speaking
                                                        Introduction to Rhetoric and Social Influence

## **PUBLICATIONS**

Munday, M. & Jarman, J. W. (2022). Annual discussion and debate sourcebook [Monograph].
        *Policy Debate Quarterly, 96 (3)*, 1-78.

Jarman, J. W. (2021). Large and small: Motivated interpretations of statistical evidence. In D.
        Hample (Ed.), *Local Theories of Argument* (pp. 524-531). New York: Routledge.

Munday, M. & Jarman, J. W. (2021). Annual discussion and debate sourcebook [Monograph].
        *Policy Debate Quarterly, 95 (3)*, 1-78.

Munday, M. & Jarman, J. W. (2020). Annual discussion and debate sourcebook [Monograph].
        *Policy Debate Quarterly, 94 (3)*, 1-78.

Munday, M. & Jarman, J. W. (2019). Annual discussion and debate sourcebook [Monograph].
        *Policy Debate Quarterly, 93 (3)*, 1-78.

Jarman, J. W. (2019). Is fact-checking biased? A computerized content analysis. In C. Winkler (Ed.),
        *Networking Argument* (pp. 459-465). New York: Routledge

Jarman, J. W. (2019). It wasn't even close: Viewers' thoughts about the first 2012 presidential
        debate. In E. A. Hinck (Ed.), *Televised Presidential Debates in a Changing Media
        Environment, Volume 1: The candidates make their case* (pp. 165-184). Santa Barbara, CA:
        Praeger.

**Exhibit 1**
**Page 39 of 50**

Jarman, J. W. (2018). Fact-checking and the liberal public sphere: Can argument be recovered? In R. Lake (Ed.), *Recovering Argument* (pp. 125-130). New York: Routledge.

Munday, M. & Jarman, J. W. (2018). Annual discussion and debate sourcebook [Monograph]. *Forensic Quarterly, 92 (3)*, 1-78.

Munday, M. & Jarman, J. W. (2017). Annual discussion and debate sourcebook [Monograph]. *Forensic Quarterly, 91 (3)*, 1-78.

Jarman, J. W. (2016). Motivated to ignore the facts: The inability of fact-checking to promote truth in the public sphere. In J. Hannan (Ed.), *Truth in the Public Sphere* (pp. 115-134). Lanham, MD: Lexington Books.

Jarman, J. W. (2016). Motivated reasoning and viewers' reactions to the first 2012 presidential debate. *Speaker & Gavel, 53,* 83-101.

Jarman, J. W. (2016). Influence of political affiliation and criticism on the effectiveness of political fact-checking. *Communication Research Reports, 33, 9-15.*

Jarman, J. W. & Munday, M. (2016). Annual discussion and debate sourcebook [Monograph]. *Forensic Quarterly, 90 (3)*, 1-78.

Jarman, J. W. (2015). The failure of fact-checking. In B. Garssen, D. Gooden, G. Mitchell, & A. Snoeck Henkemans (Eds.), *Proceedings of the 8th International Conference of the International Society for the Study of Argumentation* (pp. 657-667). Amsterdam: Sic Sat.

Jarman, J. W. & Munday, M. (2015). Annual discussion and debate sourcebook [Monograph]. *Forensic Quarterly, 89 (3)*, 1-78.

Dominic, C., Jarman, J., & Lytle, J. (2015). Evaluations of witness credibility during video deposition. *Jury Expert, 27 (2)*, 1-5.

Jarman, J. W. (2014). Annual discussion and debate sourcebook [Monograph]. *Forensic Quarterly, 88 (3)*, 1-78.

Jarman, J. W. (2014). A disturbing conclusion: the irrelevant of argument.  In C. Palczewski (Ed.), *Disturbing Argument: Selected papers from the 18th biennial conference on argumentation*. New York: Routledge.

Jarman, J. W. (2013/2014).  Intercollegiate policy debate:  staffing, resources, responsibilities and competitive success. *Contemporary Argumentation & Debate*, 34, 24-50.

Jarman, J. W. (2013).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 87 (3)*, 1-78.

**Exhibit 1**
**Page 40 of 50**

Jarman, J. W. (2012).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 86 (3),* 1-78.

Jarman, J. W. (2011).  A neuroscientific approach to argumentation.  In R. Rowland (Ed.), *Reasoned argument and social change*.  Washington: National Communication Association.

Jarman, J. W. (2011).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 85 (3),* 1-78.

Jarman, J. W. (2010).  The effects of format changes on viewers' perceptions of arguments made by Obama and McCain in the 2008 Presidential Debates.  In D. Gouran (Ed.), *The functions of argument and social context*.  Washington:  National Communication Association.

Jarman, J. W. (2010).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 84 (3),* 1-78.

Jarman, J. W. (2009).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 83 (3),* 1-78.

Jarman, J. W. (2009).  It's the economy, stupid!  Public sphere discussion of the minimum wage increase.  In S. Jacobs (Ed.), *Concerning argument*.  Washington: National Communication Association.

Jarman, J. W. (2008).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 82 (3),* 1-78.

Jarman, J. W. (2007).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 81 (3),* 1-78.

Jarman, J. W. (2006).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 80 (3),* 1-78.

Jarman, J. W. (2005).  Political affiliation and presidential debates: A real-time analysis of the effects of the arguments used in presidential debates.  *American Behavioral Scientist, 49 (2),* 229-242.

Jarman, J. W. (2005).  Cheap talk about drugs or talk about cheap drugs? Public sphere deliberation on a prescription drug benefit.  In C. A. Willard (Ed.), *Critical problems in argumentation* (pp. 296-302).  Washington, D.C.:  National Communication Association.

Jarman, J. W. & Fritch, J.  (2005).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 79 (3),* 1-78.

Jarman, J. W. & Fritch, J.  (2004).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 78* (3), 1-78.

**Exhibit 1**
**Page 41 of 50**

Fritch, J. & Jarman, J. W. (2003).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 77* (3), 1-78.

Jarman, J. W. & McDonald, K.  (2002).  Invitation declined:  a response to intercollegiate debate as invitational rhetoric.  In G. T. Goodnight (Ed.),  *Arguing Communication and Culture: selected papers from the twelfth NCA/AFA conference on argumentation* (pp. 205-211).  Washington:  National Communication Association

Jarman, J. W. & Fritch, J.  (2002).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 76* (3), 1-78.

Fritch, J. & Jarman, J. W. (2001).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 75* (3), 1-78.

McDonald, K. & Jarman, J. W. (2000).  A quantitative analysis of eight versus six rounds of preliminary competition.  *Contemporary Argumentation and Debate, 21,* 22-32.

Jarman, J. W. & Fritch, J.  (2000).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 74* (3), 1-78.

Jarman, J. W. (2000).  *Negative Strategy*.  St. Louis, MO:  Alan Company.

Fritch, J. & Jarman, J. W. (1999).  Annual discussion and debate sourcebook [Monograph].  *Forensic Quarterly, 73* (3), 1-78.

Jarman, J. W. (1999).  *Negative Strategy*.  St. Louis, MO:  Alan Company.

Jarman, J. W. (1999).  *Master Evidence File*.  St. Louis, MO:  Alan Company.

Jarman, J. W. (1998).  First negative strategies.  In R. Edwards (Ed.), *The key issue:  U.S. policy toward Russia* (pp. 27-35).  St. Louis, MO:  Alan Company.

McDonald, K.M. & Jarman, J. W. (1998, January).  Getting the story right: The role of narrative in academic debate.  *Rostrum, 72* (5), 5-8+.

Jarman, J. W. (1998/1999).  Less Experienced students and the traditional summer institute:  pedagogical conflicts and remedies.  *Forensic Educator, 13* (1), 21-24.

Jarman, J. W. & McDonald, K.M.  (1995, August).  Arguing across spheres:  The impact of electronic LISTSERV's on public sphere argument.  In S. Jackson (Ed.), *Argumentation and values:  proceedings of the Ninth SCA/AFA Conference on Argumentation* (pp. 133-138).  Annandale, VA:  Speech Communication Association.

**Exhibit 1**
**Page 42 of 50**

Applied & Policy Research

Jarman, J. W. & Parcell, L. M. (2022). *Registrants' attitudes toward current and expanded programming by the Securities division of the Kansas Insurance Department.* Provided to the Office of the Commissioner, Securities Division, Kansas Insurance Department.

Jarman, J. W. (2022). *Direct testimony.* Provided to the Kansas Corporation Commission, 22-EKME-254-TAR-KEEIA Evidentiary Hearing.

Jarman, J. W. & Parcell, L. M. (2021). *Residential attitudes toward utility-sponsored energy efficiency programs in Kansas.* Provided to Kansas Corporation Commission.

Knutson, A. & Jarman, J.W. (2020, Aug. 4). How federal patent tutorial video influences jurors. *Law360.com.* Available at https://www.law360.com/articles/1290074/how-federal-patent-tutorial-video-influences-jurors.

Kuper, G. & Jarman, J. W. (2020, June 12). Will companies' COVID-19 efforts sway juries? *Law360.com.* Available at https://www.law360.com/productliability/articles/1281887/will-companies-covid-19-efforts-sway-juries-.

Jarman, J. W. & Parcell, L. M. (2019). *Quantity and quality of local news: A content analysis of news produced by outlets in the Wichita area.* Report on local media coverage. Provided to Wichita Community Foundation.

Parcell, L. M. & Jarman, J. W. (2018). *Report on veterans' opinions of Dole VA Center.* Provided to Robert Dole VA Center.

Parcell, L. M. & Jarman, J. W. (2017). *Report on effectiveness of campaign strategies for non-profit giving.* Provided to United Way of the Plains.

Jarman, J. W. & Parcell, L. M. (2016). *Report on effectiveness of car advertisements.* Provided to Wichita-area car dealership.

Parcell, L. M. & Jarman, J. W. (2015). *Report on community interest in non-credit programming.* Provided to WSU Office for Workforce, Professional and Community Education.


Book Reviews

Jarman, J. W. (2005).  Review of Fatherhood politics in the United States: Masculinity, sexuality, race and marriage.  *Argumentation & Advocacy, 41,* 185-188.

**Exhibit 1**
**Page 43 of 50**

<u>In Progress / Under Review</u>

Jarman, J. W. (in progress). Motivated interpretation of authority-based evidence. Research in
    progress.

Jarman, J. W. (in progress). No debating it: Effect of participating in debate on reducing motivated
    reasoning in the evaluation of political messages. Research completed.

Jarman, J. W. (in progress). Strategies for debiasing political fact-checking. Research in progress.


## **CONVENTION PRESENTATIONS**

Jarman, J. W. (2019, August). Large and small: Motivated interpretations of statistical evidence.
    Paper presented at the twenty first NCA/AFA conference on argumentation, Alta, UT.

Jarman, J. W. (2017, July). Is fact-checking biased? A computerized content analysis. Paper
    presented at the twentieth NCA/AFA conference on argumentation, Alta, UT.

Jarman, J. W. (2015, August). Fact-checking and the liberal public sphere: Can argument be
    recovered? Paper presented at the nineteenth NCA/AFA conference on argumentation, Alta,
    UT.

Jarman, J. W. (2014, July). Failure of fact-checking. Paper presented at 8th International Society for
    the Study of Argumentation conference, July 2014, Amsterdam, The Netherlands.

Jarman, J. W. (2013, August).  A disturbing conclusion: the irrelevance of argument.  Paper
    presented at the eighteenth NCA/AFA conference on argumentation, Alta, UT.

Jarman, J. W. (2011, August).  A neuroscientific approach to argumentation.  Paper presented at the
    seventeenth NCA/AFA conference on argumentation, Alta, UT.

Jarman, J. W. (2009, August). The effects of format changes on viewers' perceptions of arguments
    made by Obama and McCain in the 2008 presidential debates.  Paper presented at sixteenth
    NCA/AFA conference on argumentation, Alta, UT.

Jarman, J. W. (2008, November).  Stating it differently:  Kathleen Sebelius' unconventional response
    to the 2008 State of the Union.  Paper presented at the National Communication Association
    annual conference, San Diego, CA.

Jarman, J. W. (2008, May).  Tournament size and competition:  an analysis of tournament debating
    in the 21st century.  Paper presented at the Summer Meeting of the Cross Examination
    Debate Association, Dallas, TX.

**Exhibit 1**
**Page 44 of 50**

Jarman, J. W. (2007, November). *Faith, Intellect and Reason in the Newspaper Coverage of Stem Cell Research*.  Paper presented at the National Communication Association annual conference, Chicago, IL.

Jarman, J. W. (2007, August). *It's the economy, stupid!  Public sphere discussion of the minimum wage increase*.  Paper presented at the fifteenth NCA/AFA conference on argumentation, Alta, UT.

Jarman, J. W. (2007, May). *Birds of a feather:  allowing schools to self select into new CEDA conferences*.  Paper presented at the Summer Meeting of the Cross Examination Debate Association, Harrisonburg, VA.

Jarman, J. W. (2006, November). *Twilight for the public sphere? A content analysis of major newspaper coverage of renewing the sunset provisions of the PATRIOT Act*.  Paper presented at the National Communication Association annual conference, San Antonio, TX.

Jarman, J. W. & Armstrong, R.  (2005, November).  *Assessing student perceptions toward and appreciation for the basic public speaking course*.  Paper presented at the National Communication Association annual conference, Boston, MA.

Jarman, J. W. (2005, August).  *Legal ethics, rhetoric and argument in the case of Kobe Bryant*.  Paper presented at the fourteenth NCA/AFA conference on argumentation, Alta, UT.

Jarman, J. W. (2004, November).  *Evidence, argumentation, persuasion and debates: a real-time analysis of persuasive appeals used in Presidential debates*.  Paper presented at the National Communication Association annual conference, Chicago, IL.

Jarman, J. W. (2004, November).  *You did what at debate camp? An analysis of the expectations of high school debate coaches for summer debate workshops*.  Paper presented at the National Communication Association annual conference, Chicago, IL.

Jarman, J. W. (2003, August).  *Cheap talk about drugs or talk about cheap drugs? Public sphere deliberation on a prescription drug benefit*.  Paper presented at the thirteenth NCA/AFA conference on argumentation, Alta, UT.

McDonald, K. & Jarman, J. W. (2002, November).  *Moving on:  speeches by losing candidates at national conventions*.  Paper presented at the National Communication Association annual conference, New Orleans, LA.

Jarman, J. W. (2002, May).  *Rhetoric of authoritarianism:  Pat Buchanan and the creation of the other*.  Paper presented at the Biennial Rhetoric Society of America conference, Las Vegas, NV.

Jarman, J. W. (2001, November).  *Political talk shows as transcendent anecdote for public argument*.  Paper presented at the National Communication Association annual conference, Atlanta, GA.

**Exhibit 1**
**Page 45 of 50**

Jarman, J. W. (2000, October).  *The importance of research and evidence in teaching new debaters*.  Paper presented at International Debate Education Association annual conference, Budapest, Hungary.

Jarman, J. W. & McDonald, K.M.  (1999, November).  *Tournament format and competition:  A review of the evidence*.  Paper presented at the annual meeting of the National Communication Association, Chicago, IL.

Jarman, J. W. & McDonald, K.M.  (1996, November).  *Where there's smoke there's fire:  an analysis of the anti-government advocacy of tobacco industry advertising*.  Paper presented at the annual meeting of the Speech Communication Association, San Diego, CA.

McDonald, K.M. & Jarman, J. W. (1995, November).  *Getting the story right:  The role of narrative in academic debate*.  Paper presented at the annual meeting of the Speech Communication Association, San Antonio, TX.

Jarman, J. W. (1995, April).  *Place for myth in rational argument*.  Paper presented at the annual meeting of the Central States Speech Communication Association, Indianapolis, IN.

Jarman, J. W. & McDonald, K.M.  (1994, November).  *Is more better?  A longitudinal analysis of judge and competitor reaction to additional in-round preparation time*.  Paper presented at the annual meeting of the Speech Communication Association, New Orleans, LA.

Jarman, J. W. (1994, April).  *Rhetorical strategy of religious fundamentalists*.  Paper presented at the annual meeting of the Central States Speech Communication Association, Oklahoma City, OK.


## INVITED LECTURES

2021.  Motivated to ignore the facts: the difficulty of evidence, argument and rationality in reestablishing reality. Reestablishing Reality lecture series sponsored by Fairmount College of Liberal Arts & Sciences, Wichita State University.

2020.  Public Health information and misinformation in the wake of COVID-19. Lecture series sponsored by University Libraries, Wichita State University.

2020.  Potential impact of COVID-19 on juror decision-making, Faegre Drinker LLC, Continuing Legal Education.

2018.  Political persuasion. Lecture at annual convention, Women for Kansas.

2017.  Law Enforcement Training Series. Full-day training on communication for area law enforcement officers.

2017.  KDHE crisis communication lectures (continued).

2016.  Kansas Department of Health and Environment. Grant awarded for crisis communication. 8 full-day seminars on crisis communication to regional health directors and public information officers.

2016.  ICT-Engage panel for "Democracy on Tap" series.

2016.  Participant on expert panel on presidential debates for Newswise.

**Exhibit 1**
**Page 46 of 50**

2016.   Kansas Bar Association. Continuing Legal Education Lecture: Legal Persuasion.
2015.   Kansas Women's Attorneys Conference. Continuing Legal Education Lecture: Legal Persuasion.
2015.   City Clerks and Municipal Finance Officers Association. Improving Public Speaking.
2014.   Kansas Women's Attorneys Conference. Continuing Legal Education Lecture: Legal Persuasion.
2014.   League of Kansas Municipalities.  Effective Public Communication.


## SELECTED OTHER PRESENTATIONS AND MEDIA APPEARANCES

2022. TV interviews for local NBC affiliate on a range of political topics.
2021. TV interviews for local NBC affiliate on a range of political topics.
2020.   TV interviews for local NBC affiliate on a range of political topics.
2019.   TV interviews for local NBC affiliate on a range of political topics.
2019.   Quoted in *Inside Higher Education* for story on artificial intelligence and debate.
2019.   Live interview with KMBZ regarding presidential primary debate.
2018.   Moderated forum involving candidates for Kansas Governor and Secretary of State.
2018.   TV interviews for local NBC affiliate on range of political topics.
2017.   TV interviews for local NBC affiliate on range of political topics.
2016.   TV interviews for local NBC affiliate on range of political topics.
2016.   Radio interviews for KMUW on range of political topics.
2015.   TV interviews for local NBC affiliate on range of political topics.
2014.   TV interview on Rachel Maddow, MSNBC.
2014.   Radio interview on NPR.
2014.   Newspaper interview with USA Today.
2014.   TV interviews for local NBC affiliate on range of political topics.
2013.   TV interviews for local NBC affiliate on range of political topics.
2012.   TV interviews for local NBC affiliate, KPTS, and WPR on range of political topics.
2011.   TV interviews for local NBC affiliate on range of political topics.
2010.   TV interviews for local NBC affiliate on range of political topics.
2009.   TV interviews for local NBC affiliate on range of political topics.
2008.   TV interviews for local NBC affiliate on a range of topics including presidential campaign, Kathleen Sebelius, political advertising, etc.
2008.   Invited lectures on civility in politics, political advertising, new media in politics, and get-out-the-vote efforts.
2008.   Moderated two-night televised forum involving finalists for Wichita City Manager position.
2007.   TV interviews for local NBC affiliate on topics including mayoral election, vote on casino, Brownback in Republican presidential debates, and Bush fundraising.
2007.   Invited lectures at University of Kansas on current high school debate topic for students and high school teachers.
2007.   Moderated debate on drug legalization for political science class.
2006.   TV interviews for local NBC affiliate on topics including negative campaigning, last minute campaigning, young voters, post-election commentary, and political reaction to Attorney General controversies.

**Exhibit 1**
**Page 47 of 50**

Jarman  12

2006. Invited lectures at University of Kansas on current high school debate topic for students and high school teachers.
2006. Effective strategies for presentations.  Lecture to Model UN Class, WSU.
2005. Television interview for local NBC affiliate on nomination of John Roberts to the Supreme Court.
2004. TV interviews for local NBC affiliate on election results, debate analysis, war imagery, and negative campaigning.
2004. Moderated discussion of media coverage of the 2004 election, Communication Week, Wichita State University.
2004. 30-minute commentary for local PBS affiliate on the results of our study on the 2nd Presidential debate.
2004. Lecture to local community group on "Propaganda and elections."
2004. Lecture to local community group on "Media bias and Fox News Network."
2004. Moderated campus debate on gay marriage sponsored by Political Science Club.
2003. Speech on the rhetoric of Dr. Martin Luther King, Jr. at annual MLK event sponsored by Student Activities Council, Wichita State University.
2002. Moderator, debate by candidates for President of the Student Government Association, Wichita State University.
2001. Lecture to area high school on the current topic and advanced debate theory.
2002. Television interview for local NBC affiliate on the gubernatorial election.
2000. Television interview for local NBC affiliate on the Presidential debates.
2000. Moderator, debate by candidates for President of the Student Government Association, Wichita State University.
2000. Lecture to area high school on the current topic and advanced debate theory.
1999. Lecture to area high school on the current topic and advanced debate theory.


## SERVICE TO DEPARTMENT, COLLEGE & UNIVERSITY

2018 -        Program review committee (university committee)
2020 - 2021   Shared governance policy review committee (university committee)
2020 - 2021   LAS college requirement revision committee (college committee)
2020 -        Faculty Senate, past president
2019 - 2020   Faculty Senate, president
2019 - 2020   LAS college curriculum committee
2018 -        Faculty Senate, president-elect
2018 -        General education revision ad hoc committee (university committee, chair)
2018 - 2019   Rules committee, chair (university committee)
2017 -        Faculty Senate, senator at large
2017 - 2019   Academic affairs committee (university committee)
2017 - 2018   Academic honesty/integrity committee (university committee)
2014          Chair, search committee, Assistant Director of Debate
2013 - 2018   Designed, built, and administered in-house online survey research site
2012          Search committee, IMC assistant professor
2011          Search committee, ESC Director
2008 - 2017   Curriculum Committee (chair)

**Exhibit 1**
**Page 48 of 50**

| | |
|---|---|
| 2006 - 2007 | Search committee, KHF Distinguished Chair |
| 2006 - 2016 | Library committee |
| 2004 - 2016 | Technology committee |
| 2003 - 2004 | Search committee, Director of ESC |
| 2002, 2003 | ESC Communication Week Planning Committee |
| 2001 - 2003 | Scholarship Committee |
| 2001 - 2004 | College Curriculum Committee |
| 2000 - 2016 | Undergraduate Admissions Committee |
| 1996 - 2016 | Basic Course Committee |
| 1996 - 2016 | GTA Selection Committee |
| 1996 - | Graduate Faculty Committee |

## SERVICE TO PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 2018 | Host, National Debate Tournament. |
| 2012 - | Webmaster.  NCA/AFA biennial conference on argumentation submission platform. |
| 2012 - | Member.  American Forensics Association, Publications Committee. |
| 2010 - 2017 | Webmaster.  Argumentation and Advocacy online submission platform. |
| 2010 - | Webmaster.  Contemporary Argumentation and Debate online submission and publication platform. |
| 2010 - 2015 | Editorial Board Member, Contemporary Argumentation and Debate, Gordon Stables and Jennifer Bevan (Eds.) |
| 2007 - 2010 | Editorial Board Member, Contemporary Argumentation and Debate, Allan Louden (Ed.) |
| 2006 - | Webmaster.  Cross Examination Debate Association. |
| 2003 | NDT Tournament Director Selection Committee. |
| 2001 - 2017 | Executive Secretary.  Cross Examination Debate Association. |
| 1998 - 2000 | Regional Representative.  Cross Examination Debate Association. |
| 1997 - 1999 | District Representative.  Kansas Speech Communication Association. |
| 1997, 2008 | Tournament Host.   Cross Examination Debate Association National Tournament. |

## OTHER PROFESSIONAL SERVICE

| | |
|---|---|
| 2020 | Ad Hoc Reviewer. *Western Journal of Communication*. |
| 2019 | Editorial Review Board. NCA/AFA conference on argumentation. |
| 2017 - | Ad Hoc Reviewer. *Western Journal of Communication.* |
| 2015 | Ad Hoc Reviewer. *American Behavioral Scientist.* |
| 2014 - 2015 | Ad Hoc Reviewer. *Public Opinion Quarterly.* |
| 2014 - 2017 | Co-editor, *Contemporary Argumentation and Debate.* |
| 2013 | Editorial Review Board.  NCA/AFA conference on argumentation. |
| 2013 | Rowman & Littlefield.  Book proposal reviewer. |
| 2011 - 2013 | Ad Hoc Reviewer.  *Argumentation and Advocacy*. |
| 2011 - 2013 | Editorial Review Board.  NCA/AFA conference on argumentation. |
| 1999 | Editorial Review Board.  Alan Company Mentor Series. |

**Exhibit 1**
**Page 49 of 50**

1998        Ad Hoc Reviewer.  National Federation of State High School Associations.
1997        Ad Hoc Reviewer.  *Argumentation and Advocacy*.


## COMMUNITY SERVICE

2015 -        At-large member, USD 266 Maize Board of Education


## TEACHING AWARDS

2022        Kansas Speech Communication Collegiate Hall of Fame

Nominee, Academy for effective teaching award.
        1997, 2000, 2001, 2002, 2003, 2004, 2007, 2008, 2009, 2010

Nominee, Board of Trustees excellence in teaching award.
        1999, 2000, 2003, 2004.


## DEBATE AWARDS

1992        National Tournament Champion, Cross Examination Debate Association
2000        Young Educator of the Year, University of Kansas Debate Tournament
2001        Top Critic, Mid West Region, Cross Examination Debate Association
2004        Dr. Amy Fugate Leadership Award, Kansas City Community College

**Exhibit 1**
**Page 50 of 50**