JANET LEE HOFFMAN, OSB No. 781145
E-mail: janet@jhoffman.com
KATHERINE MARCHANT, OSB NO. 161147
E-mail: katie@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone: (503) 222-1125

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> v.<br><br>ANNE HANKINS,<br><br>    Defendant. | Case No. 6:22-cr-00317-MC<br><br>**DEFENDANT ANNE HANKINS' REPLY TO NON-PARTIES (1) WCMC HOLDINGS, LLC; (2) WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC; (3) WME IME, LLC; AND (4) WCMC, LLC'S OPPOSITION TO MS. HANKINS' REQUEST FOR RULE 17(C) SUBPOENAS**<br><br>**ORAL ARGUMENT REQUESTED** |

Defendant Anne Hankins ("Ms. Hankins"), through counsel, submits the following response to Endeavor's[1] Opposition to her Motion for Authorization to Issue Rule 17(c) Subpoenas ("Opposition"). For the reasons set forth below, Ms. Hankins requests that the Court deny Endeavor's objections and authorize the issuance of her requested subpoenas.

---

[1] Unless otherwise specified, Ms. Hankins intends the term "Endeavor" to refer collectively to WCMC Holdings, LLC, William Morris Endeavor Entertainment, LLC, and WME IMG, LLC, as set forth in the Victim Impact Statement.

## I.    Introduction

Endeavor's Opposition is a remarkable example of misdirection. "A subpoena for documents may be quashed only if their production would be 'unreasonable or oppressive,' but not otherwise." *United States v. Nixon,* 418 U.S. 687, 698 (1974) (quoting Fed. R. Crim. P. 17(c)).  Endeavor makes neither assertion. Nor does Endeavor assert that the requested materials are privileged. *See United States v.* Heine, 2016 U.S. Dist. LEXIS 44397, *3 (D. Or. March 31, 2016) ("[A] Rule 17(c) subpoena should be quashed or modified if it calls for privileged matter."). Instead, Endeavor claims that the subpoena should be quashed because Ms. Hankins failed to disclose that she received 1,700,000 pages of documents from Endeavor in discovery in the arbitration proceeding against her. Ms. Hankins did receive that amount of discovery. But the materials she seeks here are not accessible in that prior production, as further described below and in the accompanying declaration of counsel.

Endeavor does not expressly argue otherwise. It does not, for example, identify where the requested documents are located within the previous productions. In fact, Endeavor concedes that it "cannot describe the universe of documents produced to Hankins." *See* Opposition at 13 (ECF No. 41). The specific documents that Endeavor identifies as having produced — the 2013 Transaction Agreement, the emails quoted in the Victim Impact Statement regarding deletion of documents, the altered bank statements relevant to the plea agreement — are not included in Ms. Hankins' subpoena request.

Endeavor sidesteps the issue by taking the tack with a sweepingly broad conclusionary assertion that Ms. Hankins "has what she needs for sentencing." *See id.* at 3. Endeavor claims this is so because she submitted a few exhibits for possible use at trial in arbitration, and these exhibits "include[] documents she now claims to need." *See id.* ("If Hankins has sufficient documents to begin trial in a much broader civil arbitration, it necessarily follows that she has what she needs for sentencing.").

PAGE 2 — REPLY TO NON-PARTIES OPPOSITION TO DEFENDANT' MOTION FOR ISSUANCE OF RULE 17(C) SUBPOENAS
*UNITED STATES V. ANNE HANKINS*, Case No. 6:22-cr-00317-MC

As a threshold matter, Ms. Hankins' submission was simply an effort to comply with a then-existing deadline imposed by the arbitrator. It was not an admission that she was trial ready. She is not. There are still unresolved discovery disputes. But more to the point, one of the exhibits that Ms. Hankins submitted that purportedly foreclose her subpoena request are comprised of three emails that Endeavor's in-house counsel exchanged with its investigator, Exiger LLC in the fall of 2018 —one of which asks Exiger to find evidence of embezzlement because it "would be helpful to establish criminality on [Ms. Hankins'] part, protect our [Endeavor's] reputation, change the PR narrative, substantiate our insurance claim and defend against claims." This plainly does not establish that Ms. Hankins has received the documents requested here, which include Exiger's final report, drafts, analysis, underlying documents and related communications.

As the email between Endeavor's in-house counsel and Exiger indicates, Endeavor was eager to find evidence that Ms. Hankins stole or misappropriated festival funds. Endeavor retained Exiger with this mandate in September 2018, and, according to Endeavor's Demand for Arbitration, paid Exiger more than $668,000 by July 2021 to do so. Thus, it should be very easy for Endeavor to produce the reports Exiger prepared, and the documents that led to them, that Endeavor claims supports the allegations set forth in the Victim Impact Statement.

Fundamentally, Ms. Hankins has asked for a discrete set of materials that should be readily available to Endeavor. These are the materials that Endeavor must have relied upon in formulating several of the factual allegations and conclusions set forth in its Victim Impact Statement – many of which are expressly referenced therein. Presumably these materials were used by the Statement's author(s) throughout the drafting process. Endeavor offers no credible reason why it cannot or should not produce them here. Endeavor's accusations that Ms. Hankins has acted in bad faith by failing to disclose that she received discovery from Endeavor in arbitration is simply a smokescreen intended to obscure its failure to set forth a reasonable basis for quashing Ms. Hankins' subpoena.

## II.    Factual Background

As the Court is aware, the two cornerstones of Ms. Hankins' position throughout negotiations and for sentencing are the facts that (1) she did not steal or misappropriate festival funds and that (2) she did not pocket any of the loan proceeds that she caused WCMC to take out in her capacity as president. Ms. Hankins readily admitted that she altered bank statements and financial documents over an 18-month period, between September 2016 and March 2018, and that her conduct was *a* factor in Endeavor's decision to purchase her remaining interest in the festivals. But she has been adamant that she never misused festival funds. So important was this point that Ms. Hankins was willing to go to trial if the Government were to allege any form of theft, as Ms. Hankins informed the Government during a meeting in the spring of 2022.[2]

And the Government has not refuted her position. Instead—during phone calls on May 20, 2022, and then again on September 29, 2022—the government affirmed to defense counsel that the case did not involve theft or misappropriation and limited the case to the admitted financial misstatements in the plea agreement.[3] From Ms. Hankins's perspective, the Government did not argue that she misappropriated loan proceeds or that she used festival funds for her personal benefit. Although the Government did provide the defense with two reports that indicated there was cash missing from the onsite festival proceeds, it was Ms. Hankins's understanding that the Government was unable to connect the unaccounted-for cash to misconduct by Ms. Hankins. Accordingly, Ms. Hankins accepted the plea offer, participated in the Probation Office's presentence investigation and began preparing for her sentencing hearing with the understanding that she would not have to disprove any allegations of theft or embezzlement — it was understood by the parties that no such proof had been found.

---

[2] As attested in the soon-to-be-filed Declaration of Katherine Marchant.
[3] *See* soon-to-be-filed Declaration of Katherine Marchant.

Endeavor's Victim Impact Statement thus came as a significant surprise to the defense. It marked the first introduction in the criminal case of allegations that Ms. Hankins personally misappropriated money from WCMC. It also marked the first introduction of allegations that Ms. Hankins's scheme extended beyond the March 2018 sale of her remaining interest, as the Victim Impact Statement claimed that Ms. Hankins misstated vendor and other festival obligations. Ms. Hankins was unprepared to refute these claims. Based on the Government's representations and the procedural history of the case, Ms. Hankins had no reason to believe that she would have to build a defense to Endeavor's claims of theft and embezzlement. Nor did she anticipate that she would have to respond to claims of fraud with respect to the payment of vendors.

Accordingly, Ms. Hankins filed a Motion for Authorization to Issue a Rule 17(c) Subpoena to obtain the materials that Endeavor relied upon in some of the factual allegations set forth in the Victim Impact Statement. Contrary to Endeavor's Opposition, Ms. Hankins did not request materials related to all of Endeavor's Victim Impact claims. She did not, for example, request documents related to her purported failure to disclose her prior conviction in 2013, nor did she request material related to the allegations that she deleted documents (which, as an aside, deals with a separate issue), or engaged in a "ticket sale" scheme — as she had previously received the materials that she needed to refute these claims.[4]

Instead, Ms. Hankins limited her requests to five categories of information:

1. Exiger's draft and final reports, as well as documents that Exiger relied upon in formulating its conclusions, and its communications with Endeavor related and the terms and scope of its engagement, as well as its ultimate findings including their limitations.

---

[4] Ms. Hankins' requested continuance did rely, in part, on the need for additional time in order to prepare a response to these claims, as she had no reason to anticipate that they would be brought in at sentencing, based on her communications with the Government and the draft presentence report.

2. Materials that Endeavor relied upon to support its assertion that Ms. Hankins caused WCMC to take out $7 million in loans from third parties, *$2.64 million of which Ms. Hankins is "assumed" to have taken "for her own purposes*."

3. Materials that Endeavor relied upon to support it allegation that Ms. Hankins misreported or misrepresented vendor obligations from July through September 2018 to Endeavor's financial detriment.

4. Materials that Endeavor relied upon in support of its allegation that between January 2017 and February 2018 Ms. Hankins paid herself $385,000 without authorization and also made payments for her and her family's personal cars without authorization.

5. Materials that Endeavor relied upon in support of its assertion that approximately $250,000 of the cash collected from the 2018 festivals was missing and its presumption that Ms. Hankins was at fault.

To the best of counsel's knowledge, the bulk of the materials requested here are not included in Endeavor's document productions in the arbitration (See Declaration of Howard M. Levine, ¶¶ 15, 24-25, 29-30). With respect to Exiger's reports and memoranda, it is counsel's understanding that at least based on the $668,885 in fees paid to "investigate Ms. Hankins's fraud,"  Exiger conducted a robust forensic accounting analysis over the course of at least one year. Matthew Kalmanson's Declaration of Counsel in Support of Victims' Opposition to Hankins' Request for Rule 17(c) Subpoenas ("Declaration of Kalmanson) refers to Exiger's "2019 investigation," and the Demand for Arbitration claims that Endeavor incurred $668,885 in expenses as of July 2021. Yet the only substantive findings from Exiger's investigation that counsel can locate within the trove of 1.7 million documents are preliminary summaries that appear to be dated around October 2018. These initial summaries — which contain markings such as "draft-subject to change" and "for discussion purposes only" —  identify incorrect accounting but find no "direct evidence that Anne Hankins or other WCMC employees

embezzled Endeavor's funds." These documents caveat that their assessments do not incorporate bank statements, general ledger data and other business records, and that further analysis is warranted to ensure "accurate analysis/reconciliation of expenses and revenues."

Presumably such further analysis was conducted, given Endeavor's reliance on Exiger's findings in its Victim Impact Statement and the costs that Endeavor claims it incurred as of July 2021. Endeavor, however, has not produced Exiger's subsequent analysis or any other drafts or status reports. Nor has it produced a final report. And it does not appear that it has produced any communications with Exiger after February 2019. Again, such documents must exist in light of the nature and length of Exiger's investigation, although Endeavor's counsel asserts the final report has not even been prepared. This limited production suggests Exiger may have found evidence Endeavor wants to keep from Ms. Hankins that contradicts Endeavor's allegations in the VIS and helps Ms. Hankins.

For the reasons set forth in Ms. Hankins' Motion to Continue (ECF No. 30), in order to refute Endeavor's allegations and conclusions, Ms. Hankins needs to be able to review Exiger's findings, as well as the communications between Endeavor and Exiger regarding the scope of investigation, factual support of the claims, assumptions Endeavor asked Exiger to make, and the status of Exiger's review.

Insight into Exiger's process and the documents on which it relied is particularly important in light of the facts in this case. Ms. Hankins pled guilty to falsifying financial records and overstating the amount of cash on hand. Cash may, therefore, appear to be missing, when, in fact, it never existed in the first place. The communications are further necessary to understand what assumptions Endeavor asked Exiger to draw. As indicated in the email quoted above, Endeavor could have injected into the investigation the idea that Ms. Hankins embezzled funds, which could explain why the Victim Impact Statement "assumed" that unaccounted-for cash was evidence of misappropriation by Ms. Hankins. But without further communications, Ms. Hankins is without the tools to meaningfully challenge that assumption.

In addition to Exiger's materials, Ms. Hankins cannot locate much of the raw materials underlying the other four categories of requests. For example, in support of its claims regarding undisclosed vendor obligations, Endeavor references a payment obligation of $460,000 that Ms. Hankins purportedly admitted to misrepresenting. But counsel has been unable to locate the supporting documents.

It is also important to note that the universe of documents ordered produced in the arbitration (many of which have apparently not been produced despite the 1.7 million pages of production) comprise a narrower universe of documents (both in substance and in time frame) than the documents Ms. Hankins needs produced to respond to the Victim Impact Statement. Again, significant disputes over document production in the arbitration are not resolved (Declaration of Howard M. Levine ¶¶ 15, 32).

But, even assuming for the moment that Endeavor did produce all of the documents that it relied upon in drafting its Victim Impact Statement, as claims that it has, Endeavor's method and manner of production demonstrate that the documents are not "otherwise procurable in advance [of sentencing] through the exercise of due diligence." *See United States v. Krane,* 625 F.3d 568, 574 (9th Cir. 2010) (explaining that where presentence subpoenas are sought, courts must apply the *Nixon* factors in the specific context of sentencing). Endeavor produced its million-plus pages in multiple, undifferentiated tranches. Endeavor did not produce an index or group the materials by category, nor did it specify which documents were responsive to which of the Respondent's requests. And Respondent's requests are meaningfully different, and encompass a broader range of allegations and claims, than the requests here. *Compare* Declaration of Matthew Kalmanson, Exs 3-4 (Respondents' First Request for Production of Documents filed in the arbitration) *with* Defendant's Memorandum in Support of Motion for Issuance of Rule 17(c) Subpoenas at 3-4 (list of materials requested in subpoenas) (ECF No. 34).

The Ninth Circuit has recognized that merely granting access to voluminous records can be insufficient to allow a defendant to prepare a defense. *See Milke v. Ryan*, 711 F.3d 998, 1018

(9th Cir. 2013) (defendant's access to public court records did not absolve prosecution of its burden to provide exculpatory evidence when "a team of approximately ten researchers in post-conviction proceedings spent nearly 7000 hours sifting through court records" to uncover the exculpatory material). In *Milke*, a post-conviction case, the court found that the state prosecution violated its *Brady* obligations when it failed to produce certain impeachment evidence in its possession that related to one of the law enforcement officers who investigated the case.

Although the impeachment evidence was contained in public records, which were technically available to the defendant-petitioner, the court nonetheless found that the state's failure to produce amounted to suppression. The court observed that sifting through the voluminous records to find the impeachment evidence was like trying to find the proverbial needle in the haystack: "A reasonably diligent lawyer couldn't possibly have found these records in time to use them at [defendant-petitioner's] trial." *See id.* at 1018.

The same principle applies here: Ms. Hankins has requested a discrete set of materials which, if actually produced, are buried within thousands of non-responsive documents. Ms. Hankins cannot reasonably sift through all 1,700,000 documents to find those she has requested before the March 7 deadline for producing sentencing materials. Moreover, she would be forced to guess which documents supported Endeavor's allegations with no guarantee that she has been provided the full set of relevant materials. Under the circumstances, it would be unreasonable to force Ms. Hankins to bear this burden, given the fact that the documents she has requested are those relied upon by Endeavor in the Victim Impact Statement. Presumably, Endeavor identified and compiled those documents when it was preparing its submission to the Court, and, therefore, the documents should be readily accessible for production.

Another challenge with respect to Endeavor's manner of production is that it is nearly impossible to determine which documents Endeavor actually reviewed, collated and relied upon with respect to each factual allegation. The Victim Impact Statement creates the impression that its allegations are supported by a set of documents that Endeavor (or Exiger) selected and

analyzed, and which, when considered together, supported the factual assertion or expert

conclusion. For example, the Victim Impact Statement claims that Ms. Hankins failed to disclose

more than $5 million in vendor obligations. In support of this claim, Endeavor writes,

"Endeavor, Exiger and WCMC worked together to investigate what had happened, and compile

a list of ***actual*** vendor obligations resulting from the 2018 festivals. They ultimately identified

over ***$5 million*** in obligations (across 600 invoices to approximately 250 vendors) ***that Hankins***

***never reported to Endeavor***." *See* Victim Impact Statement at 6 (Jan. 17, 2023) (emphasis in

original). In order for Ms. Hankins to be able to respond to this claim, she needs access to the

specific package of documents described. She cannot recreate this package herself, even if all of

the referenced documents were contained within the 1,7000,000 pages, as it would require her to

speculate as to what Endeavor actually did.

The same goes for the Victim Impact Statement's claim that Ms. Hankins paid herself

$385,000 between January 2017 and February 2018. The Victim Impact Statement asserts that

"[t]he real bank statements also showed payments from WCMC to Hankins and her family that

were unsupported by documentation." *See id.* at 7. Ms. Hankins cannot respond to this, however,

without insight into the "documentation" that purports to show that the payments were

unauthorized. There may be documents that Ms. Hankins views as demonstrating the opposite,

but she cannot build that response without knowing what Endeavor did and did not rely upon.

Endeavor's claim that Ms. Hankins "has everything she needs" is thus without merit.

Indeed, a district court in this Circuit rejected argument similar to that advanced by

Endeavor in *United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003). In *Bergonzi*, the

defendants were charged with multiple counts of securities and wire fraud in connection with a

fraud scheme that resulted in the intentional misstatement of the publicly reported financial

results of a large corporation. 216 F.R.D. at 490. Prior to trial, the defendants sought through

discovery a copy of an internal investigation report and its "back-up materials" that the

corporation's law firm prepared shortly after its auditors discovered the accounting irregularities

that later formed part of the basis of the indictment. *See id.* The corporation had produced the draft and underlying materials to the government, and the defendants argued that both the report and the related documents were subject to disclosure under *Brady*. The government objected, arguing, among other things, that the defendants were not entitled to the report because it contained nothing more than the law firm's interpretation of evidence that had already been produced, and that the defendants were not entitled to the underlying materials because there was "complete overlap" between the discovery provided and the back-up materials. *See id.* at 498-99.

The district court rejected the government's argument and found that *Brady* mandated disclosure of both the report and the related materials. The court explained that the "report details the magnitude of the accounting errors and places these errors in context for purposes of evaluation of potentially culpable parties[,]" which, together with the back-up materials, provided insight into the caliber of the investigation and the processes by which relevant conclusions were drawn and decisions made. *See id.* 499-500.

Similarly, here, Ms. Hankins needs the package of materials that underpin the Victim Impact Statement's factual allegations in order to prepare a meaningful response. Exiger's report and its related material, for example, are crucial to understanding not only the conclusions reached by Exiger (on which the Victim Impact Statement relies), but also the process by which Exiger reached its conclusions. Even if the approximately 1.7 million pages of documents produced in the arbitration contained the materials requested (which they do not), Ms. Hankins is not positioned to make use of them without the roadmap that Exiger's report and communications would provide.

## III.    The Crime Victim Rights Act does not prohibit defendants from serving subpoenas *duces tecum* on crime victims

The Crime Victims' Rights Act (CVRA) does not abrogate Ms. Hankins's constitutional right to obtain the materials necessary to challenge the factual allegations set forth in Endeavor's

Victim Impact Statement. Endeavor is correct that the CVRA gives victims the rights to be heard at sentencing and to be protected by the accused. Ms. Hankins' requests do not impermissibly infringe upon those rights. With regard to Endeavor's right to be heard, Endeavor has already filed its victim impact statement, and Ms. Hankins is not seeking (nor could she seek) to prevent the court from reading it. Endeavor's right to be heard has thus been realized and cannot be impacted by Ms. Hankins's requested subpoenas.

Nor do Ms. Hankins's requests threaten Endeavor's right to be "reasonably protected" from Ms. Hankins. The CVRA is not a blanket prohibition on defendants seeking to subpoena documents from victims prior to sentencing. Indeed, Endeavor does not even make this argument. Endeavor only asserts that a defendant does not have the right to cross examine a victim at sentencing. But Ms. Hankins is not seeking to cross-examine Endeavor. She is only seeking documents from Endeavor. And the only case that Endeavor cites that involves a defendant subpoenaing a victim — *United States v. Shrader*, No. 1:09-0270, 2010 U.S. Dist. LEXIS 121766, at *3 (S.D.W.V. Nov. 16, 2010) — is readily distinguishable.

In *Shrader*, the defendant sought authorization to issue a subpoena for "any and all medical, psychological, counseling and therapeutic records" of the victim. The defendant argued that he was entitled to these records because the victim sought in restitution reimbursement for counseling services she underwent as a result of defendant's conduct. The victim objected that the records were privileged and the court agreed. Ms. Hankins' requests, in contrast, do not involve privileged material, and Endeavor has not raised an objection on that basis.

Ms. Hankins has a constitutional right under the Due Process Clause to respond to Endeavor's factual allegations in the Victim Impact Statement. *See Rita v. United States*, 441 U.S. 338, 351 (2007) (observing that each defendant's sentence be subject to "thorough

adversarial testing") (citing *Burns v. United States*, 501 U.S. 129, 137-38 (recognizing importance of notice and meaningful opportunity to be heard at sentencing)); *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (stating that it is "a requirement of fair play that a criminal sentence is not predicated on misinformation"); *accord United States v. Mannino*, 212 F.3d 835, 845-46 (3d Cir. 200) ("Obviously, a criminal defendant must be afforded due process at sentencing"). This right includes the guarantee that she will be sentenced only the basis of accurate information. *See United States v. Tucker*, 404 U.S. 443, 447 (1972) (holding that the Due Process Clause requires that a defendant not be sentenced on the basis of "misinformation of constitutional magnitude"); *see also United States v. Ausburn*, 502 F.3d 313, 322-23 (3d Cir. 2007) (recognizing defendants' "due process right to be sentenced based upon accurate information"). It also includes an opportunity to offer a meaningful response to a victim's unsworn factual allegations. *See, e.g., United States v. Endsley*, 2009 WL 385864, *7 (D. Kan. Feb. 17, 2009) (rejecting the government's argument that the defendant lacked the right to counter information provided by a victim and observing that "the defendant certainly has the right to challenge the reliability of [the victim's] causation opinion by argument or evidence").

The CVRA does not trump these constitutional guarantees. Although the CVRA mandates that a victim be "reasonably heard" by the sentencing court and allows a court to take into account a victim's statements, "a victim impact statement is still evaluated against the same standards of reliability and reasonableness that apply to all matters introduced at sentencing hearings." *Id.* at *7-8. Therefore, a victim impact statement—like any information considered by a court at sentencing—must be supported by "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3; *see also United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001) (citing to *United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993), for the proposition

that "[d]ue process requires that some minimal indicia of reliability accompany a hearsay statement.").

Endeavor's reliance on a statement taken out-of-context from *United States v. Eyraud* — that defendants are not entitled to "full disclosure of all the information relied on by a court at sentencing" — has no bearing on the analysis above. In *Eyraud,* the defendant was convicted of bank fraud for embezzling more than $200,000 from her employer. *See United States v. Eyraud*, 809 F.3d 462, 465 (9th Cir. 2015). During a hearing on restitution, the victim-employer sought compensation for the amount of money it spent on attorney's fees in connection with the investigation and prosecution of the case. *See id.* (describing victim's restitution request). In support of its request, the employer produced redacted attorney invoices, sworn declarations regarding billing policies and the extent of legal work performed and resumes of the attorneys who performed the work, among other pieces of evidence.  Following a contested hearing, the court ordered the victim to submit the original invoices, which the victim claimed contained attorney-work product, for in camera review. *See id.* at 466. The court denied the defendant's request to produce the original invoices and included the attorney fees in its restitution order. *See id.*

On appeal, the defendant argued that the district court denied her constitutional due process by refusing her access to the original billing invoices submitted in camera. *See id.* In the context of considering whether the defendant had a due process right to review the original invoices, the court observed (as Endeavor paraphrased) that "no circuit to consider the argument has concluded that the Due Process Clause requires full disclosure of all the information relied on by a court at sentencing." *See id.* at 471. But what Endeavor omitted was the court's subsequent observation that due process still requires that "a defendant is appraised of the factual

information underlying the recommendation." *See id.* (internal quotation omitted). The court held that due process was met in this case because the defendant had access to significant material provided by the victim, including sworn declarations describing the work performed and invoice summaries that listed the amount of time that the work took. *See id.* Thus, the court ruled, the defendant had sufficient information to challenge the reasonableness of the attorney's fees as part of the restitution order. *See id.*

Ms. Hankins's case is distinguishable. Unlike the victim in *Eyraud*, who produced significant material to support its attorney fee calculation, Endeavor has not provided any material in support of its factual allegations.[5] And while the victim in *Eyraud* produced sworn statements, Endeavor's Victim Impact Statement was not provided under oath. Moreover, the materials withheld from the defendant in *Eyraud* contained privileged information, which the court found was largely duplicative of information the defendant already had. That is not the case here. In this case, due process does requires disclosure of the information sought by Ms. Hankins, so that she can be "apprised of the factual information underlying" the Victim Impact Statement and meaningfully challenge its reliability.

Finally, there is no merit to Endeavor's claim that service of a subpoena *duces tecum* here amounts to harassment. In fact, case law from this Circuit directly contravenes Endeavor's assertion. In *United States v. Lester*, No. 1:14-cr-00236-DAD-BAM-1, 2016 U.S. Dist. LEXIS 127570, at *4 (E.D. Cal. Sep. 17, 2016), the defendant sought authorization to serve a subpoena for business records on the victim prior to sentencing. The government moved to quash the

---

[5] Endeavor also claims that Ms. Hankins "has cited no authority that might allow her discovery" on restitution. ECF No. 41 at 13. This claim is unmerited, especially in light of Endeavor's own refusal to provide support for its aspersions against Ms. Hankins. Ms. Hankins is not seeking "discovery" on this issue, but rather simply support for Endeavor's factual allegations underlying its claimed loss figure, which Endeavor has affirmatively put forward and to which Ms. Hankins is entitled to offer a meaningful response.

subpoena on the grounds that the document request amounted to harassment of the victim. Although the court held that the government lacked standing to do so, it expressly found that a defendant's presentence subpoena for documents in the possession of the corporate victim *did not* "amount[] to undue harassment[,]" and that the defendant's "right to offer evidence in support of factors that might warrant a reduced sentence" outweighed any burden that document production would impose on the victim. *See id.* (internal citation omitted).

To summarize, Ms. Hankins has a due process right to the requested materials to ensure that she is not sentenced on the basis of unreliable assertions or unconstitutionally inaccurate information. Endeavor's rights under the CVRA have been realized and in no way override or overrule Ms. Hankins's right to due process at sentencing.

## IV.    **Ms. Hankins' has satisfied the *Nixon* standard**

Contrary to Endeavor's insinuation otherwise, Rule 17(c) subpoenas are permissible in preparation for sentencing, as explicitly provided by the Ninth Circuit in *United States v. Krane*: "Indeed, a 'pretrial' criminal subpoena can be issued for a sentencing proceeding." 625 F.3d 568, 574 (9th Cir. 2010) (citing *United States v. Winner*, 641 F.2d 825, 833 (10th Cir. 1981)). As with any subpoena sought under Rule 17(c), "if a presentencing subpoena is sought, the trial court must apply the *Nixon* factors in the specific context of sentencing." *Id.*

Endeavor argues that Ms. Hankins' subpoena requests do not satisfy *Nixon* because they lack specificity. As a threshold matter, Endeavor's claim that Rule 17(c) requires a party to describe in definitive terms particular evidentiary items demands too much. Rule 17(c)'s "specificity" hurdle is not that high. Indeed, "the proponent of a subpoena cannot be expected to identify the materials he seeks in exacting detail, when (as demonstrated by the fact that he must employ a subpoena) he does not have access to them." *See Heine,* 2016 U.S. Dist. LEXIS at *9-

10. Instead, Rule 17(c) only requires that a party provide "details sufficient to establish that the proponent has made a good-faith effort to obtain evidentiary material and is not on a proverbial fishing expedition." *See id.* While the Ninth Circuit has observed that a request for an "entire file," such as entire investigative file *may* indicate a fishing expedition, there is no case law supporting Endeavor's contention that a request for a specific category of material automatically signals an overbroad request.[6] And defendants are under no obligation to designate each particular paper desired. *See id.*

Here, Ms. Hankins' requests satisfy the specificity standard. Her requests are neither overbroad nor speculative. The information sought is the discrete set of materials that Endeavor relied upon in preparing its Victim Impact Statement. Ms. Hankins tied her requests to the

---

[6] The cases Endeavor cites are readily distinguishable from Ms. Hankins' requests here:

*United States v. Kipp*, No. 3:15-CR-244-MOC-DSC, 2016 U.S. Dist. LEXIS 170789 (W.D.N.C. Dec. 9, 2016) (quashing subpoenas requesting, without limitation, "[a]ll documents and communications related to [defendants]", "[a]ll instant messages" related to "wrongdoing", and "all documents and communications concerning any alleged accounting or financial errors or wrongdoing"); *United States v. Morris*, 287 F.3d 985, 991 (10 Cir. 2002) (affirming order to quashing defendant's subpoena for "all records, documents, reports, telephone logs, etc., surrounding the investigation into the FBI undercover agent's shooting of [defendant] and the agent's entire personnel file"); *United States v. Hang*, 75 F.3d 1275, 1283-84 (8th Cir. 1996) (affirming denial of subpoena authorization where defendant requested documents related to his accusers, "even though the defense was admittedly 'hard-pressed' to describe the information it hoped to discover in the materials"); *United States v. Heine*, No. 3:15-cr-00238-SI-2, 2016 U.S. Dist. LEXIS 44397 (D. Or. Mar. 31, 2016) (denying in part and granting in part third party bank's motion to quash subpoena seeking, *inter alia*, "all documents" pertaining to several issues from 2004-2016, but narrowing some requests to a smaller time period); *United States v. RW Prof'l Leasing Servs. Corp.*, 228 F.R.D. 158, 162 (E.D.N.Y. 2005) (granting some and denying some requests for "all documents relating to [defendant's] customers; all documents relating to [alleged victim's] losses that were attributable to [defendant's] customers; all documents relating to [defendant's] reserve accounts; and all documents relating to any communications between [alleged victim] and the Government"); *United States v. Reed*, 726 F.2d 570, 576-77 (9th Cir. 1984) (affirming denial of subpoena for "investigative reports concerning incidents of alleged arson that occurred in the same general period as the fires" at issue in the criminal case); *United States v. Mason*, 2008 U.S. Dist. LEXIS 34537, at *4-9 (D. Or. Apr. 25, 2008) (quashing subpoenas requesting, from informants', personal tax and financial records, and from police bureau, all pawn tickets, property receipts, and incident reports ever submitted to police by defendant's pawn shop business); *United States v. Ail*, No. CR 05-325-RE, 2007 U.S. Dist. LEXIS 30786, at *15-19 (D. Or. Apr. 24, 2007) (quashing subpoenas requesting personal tax and financial information from informants); *United States v. Caro*, 597 F.3d 608, 616-20 (4th Cir. 2010) (affirming denial of Rule 17(c) subpoenas for Bureau of Prisons (BOP) records relating to "how inmates like defendant were housed, prevention of violence, and transfer policies because defendant could "only speculate as to what the requested information would have shown"); *United States v. Arditti*, 955 F.2d 331, 345-46 (5th Cir. 1992) (affirming quash order where defendant had requested, without explaining what categories of documents he was looking for, IRS documents related to its operation because they might have shown lack of predisposition for entrapment defense).

factual allegations and conclusions made by Endeavor in its Victim Impact Statement. *See* ECF No. 34 at 3-6. Endeavor created the Victim Impact Statement and should, therefore, be able to readily ascertain which documents it used to support each of its factual allegations and produce them. Indeed, as described above, the Victim Impact Statement references a variety of documents that it either reviewed or helped create. There can be no merit to its contention that it cannot identify which materials in its possession are responsive. Moreover, Ms. Hankins has not been able to obtain the requested documents elsewhere. As described above, the documents cannot reasonably be accessed within the 1,700,000-page production.

Ms. Hankins requested the materials from the Government through discovery, and the Government agreed to provide what it could.[7]  However, it is Ms. Hankins' understanding from her conferral with the Government that the Government cannot confirm whether the materials it has produced satisfy Ms. Hankins' subpoena requests in full because the Government has not been provided with that specific information and it cannot readily discern from the materials it does have which ones formed the basis of Endeavor's analysis.

## V.      Endeavor's offer to withdraw its victim impact statement should not preclude issuance of the subpoenas here

In footnote 3 of the Opposition, Endeavor offers to withdraw its victim impact statement because it would rather withdraw it than engage in "protracted litigation." However, this offer is meaningless when Endeavor is still requesting that Ms. Hankins be sentenced at the top of the Guideline range. Endeavor's request for an enhanced sentence cannot be separated from the context in which it was made. Endeavor has made numerous factual allegations that cut directly against Ms. Hankins's plea agreement with the Government and representations made by the Government to counsel for Ms. Hankins. Counsel for Endeavor cannot have made these

---

[7] The Government notified counsel for Ms. Hankins on Monday, February 6, 2023, that it had mailed a volume of discovery. As of the date of this filing, counsel has not yet received it.

assertions unless it believed that some support existed for them. However, Endeavor now seeks to backtrack from its aspersions when Ms. Hankins makes a simple request for the conclusions and underlying documents on which its Victim Impact Statement was based. The attempted thus cuts sharply against the reliability of Endeavor's factual allegations and the enhanced sentence that Endeavor claims they support.

Endeavor cannot do the damage its aspersions have caused by simply withdrawing them. Ms. Hankins's theory of defense at sentencing has always been premised in large part on the fact that her actions—however misguided—were always aimed at benefitting the festivals and the company that she had created. As further described in response to the draft presentence report, Ms. Hankins has marshalled material regarding the good works that she has performed over the past two decades, including her significant efforts building the festivals into nationally recognized events and the positive impact that they have had on local communities. Her unwavering commitment to the festivals is demonstrated by the sacrifices she made on their behalf, including by putting her own personal funds into them and making herself personally liable on millions of dollars of loans, the proceeds of which were used for the benefit of the festivals. For Endeavor to now level unsupported accusations of theft and misallocation of festival funds cuts to the heart of a position from which Ms. Hankins has never wavered and that the Government's own investigation did not controvert. The only way to dispel the poison is to give Ms. Hankins an opportunity to challenge the allegations by showing that they are speculative, biased, or otherwise unreliable.

## VI.    Conclusion

Ms. Hankins is entitled to the materials she has requested. Her requests are for materials that are admissible, specific, and relevant, and the documents should be readily available for production. Further, Ms. Hankins has a due process right to receive them to ensure that Endeavor's factual allegations are supported by sufficient indicia of reliability and to avoid being

sentenced on the basis of unconstitutional misinformation. As discussed above, Endeavor has not already produced the bulk of the requested materials to Ms. Hankins, and Ms. Hankins cannot make meaningful use of the limited substantive documents produced in the arbitration to challenge Endeavor's factual allegations in the Victim Impact Statement. For the foregoing reasons, therefore, Ms. Hankins respectfully requests that the Court authorize, in full, her requested Rule 17(c) subpoenas.

DATED this 9th day of February, 2023.

Respectfully submitted,

s/*Janet Hoffman*
JANET HOFFMAN, OSB No. 781145
KATHERINE MARCHANT, No. 161147
ETHAN HAZEL, OSB No. 215406
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Phone: (503) 222-1125
Email: janet@jhoffman.com
Attorneys for Defendant Anne Hankins

**CERTIFCATE OF SERVICE**

I, Janet Hoffman, undersigned counsel hereby certifies that a copy of this REPLY TO NON-PARTIES OPPOSITION TO DEFENDANT MOTION FOR ISSUANCE OF RULE 17 (C) SUBPOENAS was filed electronically on February 9, 2023, through the CM/ECF service for the United States District Court, District of Oregon and thereby served on all parties of record in this matter.

*/s/ Janet Hoffman*
_____

Janet Hoffman, OSB No. 781145
Janet Hoffman & Associates LLC
1000 SW Broadway, Suite 1500
Portland, OR 97205
janet@jhoffman.com
(503) 222-1125