JANET LEE HOFFMAN, OSB No. 781145
E-mail: janet@jhoffman.com
KATHERINE MARCHANT, OSB NO. 161147
E-mail: katie@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone: (503) 222-1125

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 6:22-cr-00317-MC |
| Plaintiff, | **DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR BAIL PENDING APPEAL, AND, IN THE ALTERNATIVE, MOTION TO EXTEND SELF-SURRENDER DATE** |
| v. | |
| ANNE HANKINS, | |
| Defendant. | |

I, Katherine Marchant, for my declaration pursuant to 28 U.S.C. § 1746, state:

1. I am one of the attorneys representing Ms. Hankins in the above-captioned case, and I
make this declaration in support of Ms. Hankins' Motion for Bail Pending Appeal, and,
in the alternative, Motion to Extend Self-Surrender Date.

2. I have knowledge of the matters in this declaration based on (i) my own personal
information; (ii) what I have learned reviewing documents; and (iii) what has been
related to me.

3. On or around March 15, 2021, Ms. Hankins received a letter from the United States
Attorney's Office for the District of Oregon notifying her that she was a target of a grand
jury investigation and that there was sufficient evidence to charge her with Wire Fraud in

violation of 18 U.S.C. § 1343. Shortly thereafter, Ms. Hankins retained counsel to engage with the Government and, ultimately, to negotiate a pre-indictment resolution.

4. On September 28, 2022, Ms. Hankins entered a guilty plea to one count of Wire Fraud and one count of Money Laundering, in violation of 18 U.S.C. § 1957.  The same day, the U.S. Attorney's Office issued a press release regarding Ms. Hankins' convictions.

5. Based on the false and inflammatory statements contained in that press release, which were picked up and amplified by state and local press, Ms. Hankins filed a Motion to Dismiss on November 4, 2022 (ECF No. 14). In support of the Motion, Ms. Hankins also filed a Declaration of Counsel that contained a number of exhibits, including the press release, a sample of the media coverage and relevant correspondence with the Government (ECF No. 15). The Government filed its Response on November 18, 2022 (ECF No. 17). Ms. Hankins filed her Reply (ECF No. 18) and a supporting Declaration of Counsel (ECF No. 19) on December 9, 2022.

6. In her pleadings, Ms. Hankins requested an evidentiary hearing. The Court denied her request.

7. On December 14, 2022, the Court issued its Opinion and Order denying Ms. Hankins' Motion to Dismiss (ECF No. 20).

8. On December 15, Ms. Hankins filed a Motion for Reconsideration of the Denial of an Evidentiary Hearing on the Motion to Dismiss (ECF No. 21), along with supporting exhibits (ECF No. 22). Ms. Hankins requested oral argument.

9. On December 19, 2022, the Court denied the Motion for Reconsideration in a minute order (ECF No. 24) without a hearing or oral argument.

10. On March 30, 2023, the Court held a sentencing hearing in this matter. Prior the hearing,

Ms. Hankins submitted a sentencing memorandum with 25 supporting exhibits. The

materials were filed confidentially. At the sentencing hearing, Ms. Hankins also

submitted as exhibits the above-described pleadings and other documents filed by the

defense in connection with the Motion to Dismiss.

11. Attached hereto as Exhibit "1" is a true and accurate copy of the transcript of the March

30 sentencing hearing prepared by the Court Reporter.

**I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.**

DATED this 26th day of May 2023

Respectfully submitted,

s/*Katherine Marchant*
KATHERINE MARCHANT, No. 161147
JANET HOFFMAN, OSB No. 781145
ETHAN HAZEL, OSB No. 215406
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Phone: (503) 222-1125
Email: katie@jhoffman.com
Attorneys for Defendant Anne Hankins

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF OREGON

3                  EUGENE DIVISION

4

5  UNITED STATES OF AMERICA,     )
                             )

6           Plaintiff,   )  Case No. 6:22-cr-00317-MC
                             )

7              v.       )
                             )  March 30, 2023, 2:05 PM

8  ANNE HANKINS,             )
                             )

9          Defendant.   )
  _____)

10

11

12

13                 SENTENCING HEARING

14            TRANSCRIPT OF PROCEEDINGS

15       BEFORE THE HONORABLE MICHAEL J. MCSHANE

16        UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

**Exhibit 1**
**Page 1 of 70**

```
 1                          APPEARANCES

 2   FOR THE PLAINTIFF:
                         GAVIN W. BRUCE
 3                       United States Attorney's Office
                         405 E 8th Avenue
 4                       Room 2400
                         Eugene, OR 97401
 5

 6   FOR THE DEFENDANT:
                         JANET L. HOFFMAN
 7                       Janet Hoffman & Associates LLC
                         1000 SW Broadway
 8                       Suite 1500
                         Portland, OR 97205
 9

10   FOR THE DEFENDANT:
                         KATHERINE MARCHANT
11                       Janet Hoffman & Associates LLC
                         1000 SW Broadway
12                       Suite 1500
                         Portland, OR 97205
13

14

15

16

17

18

19   COURT REPORTER:     Kendra A. Steppler, RPR, CRR
                         United States District Courthouse
20                       District of Oregon
                         405 E. 8th Avenue, Room 2100
21                       Eugene, OR 97401

22

23                           *   *   *

24

25
```

**Exhibit 1**
**Page 2 of 70**

1          THE COURT:  Okay.  Let's go on the record.  I'm going

2    to have Ms. Pew call the case.

3          THE COURTROOM DEPUTY:  Now is the time set for

4    Criminal Case 22-00317, United States of America v. Anne

5    Hankins, sentencing hearing.

6          THE COURT:  All right.  Starting with the Government,

7    if you could introduce yourself and anyone else who may be

8    appearing or testifying today.

9          MR. BRUCE:  Good afternoon, Your Honor.  Gavin Bruce

10   on behalf of the United States.  There is a representative from

11   the victim in the courtroom.  They're not -- they do not intend

12   to allocute at this time.  There is also a representative for

13   the victim that's on the public line, as well.  They will not

14   be allocuting.  The Government does not intend to offer any

15   further testimony, other than its sentencing arguments, in this

16   case today.

17         THE COURT:  Okay.  Thank you, Mr. Bruce.

18     And for Defense?

19         MS. HOFFMAN:  Your Honor, there will be no witnesses

20   testifying.  We have a presentation for you, and we'd like to

21   move, at this time, for the exhibits that we provided ahead of

22   time to be entered into the record.  Those that are previously

23   filed under seal, we still request that the under seal status

24   be maintained.  And we have a binder for you so that you can

25   follow along.

Exhibit 1
Page 3 of 70

```
 1              THE COURT:  Okay.  Those will be admitted into the
 2    record under seal.
 3         All right.  And, Ms. Hankins, good afternoon.
 4              THE DEFENDANT:  Good afternoon, Your Honor.
 5              MS. HOFFMAN:  Oh, I'm sorry, Your Honor.  I don't
 6    mean -- there's two binders you get.
 7              THE COURT:  Okay.
 8              MS. HOFFMAN:  You also get similar -- we're entering
 9    these as exhibits.  And it's the motion to dismiss, et al.,
10    exhibits.  Everyone's seen them before.
11              THE COURT:  All right.  Ms. Hankins, how are you
12    feeling today?
13              THE DEFENDANT:  I'm okay.  Thank you.
14              THE COURT:  Okay.  Have you had an opportunity to
15    review the presentence report that was prepared by the
16    Probation Office with your attorney?
17              THE DEFENDANT:  Yes, Your Honor.
18              THE COURT:  Do you need any additional time to speak
19    with your attorney before we proceed?
20              THE DEFENDANT:  No, Your Honor.
21              THE COURT:  Are you satisfied with the advice and
22    representation of your attorney?
23              THE DEFENDANT:  Yes, Your Honor.
24              THE COURT:  Okay.
25         All right.  Ms. Hoffman, would you like to then go
```

Exhibit 1
Page 4 of 70

1    ahead -- and I have, you know, reviewed everything that's been

2    submitted.  But would you like to go ahead and give your

3    presentation?

4            MS. HOFFMAN:  Yes, Your Honor.  One brief thing for

5    you is Mr. Howard Levine is present in the courtroom.  Mr. Josh

6    Flood is present.  And they're civil counsel.  And there's been

7    enough comments back and forth as to what civil counsel knew --

8    or had in previous pleadings -- that they've appeared in case

9    there are any questions, or something should come up, they can

10   address those issues.

11       Present next to me is Ms. Marchant, and she is cocounsel,

12   with Ms. Hankins, on this particular case.  So I wanted to

13   introduce.

14           THE COURT:  Thank you.

15           MR. BRUCE:  And, Your Honor, I'd also note that I

16   don't believe the public line is open.  They notified that it's

17   still on hold.

18           THE COURTROOM DEPUTY:  It shouldn't be.

19           THE COURT:  We have been having some tech issues

20   today.  But let's make sure the public line is open, or we will

21   not be able to proceed.

22       Sounds like we're dialing into AOL or something.

23       All right.  I think the public line is now open.  Thank

24   you.

25       So if we could go ahead then with the --

Exhibit 1
Page 5 of 70

1          MS. HOFFMAN:  Thank you, Your Honor.  And Deric is --

2    in case all computer systems don't work, he's here to help me

3    out.

4          THE COURT:  Okay.

5          MS. HOFFMAN:  Thank you.

6      Your Honor, as you're aware from our pleadings that we

7    provided regarding sentences and our recommendation, what we

8    would like to address today is the 3553 factors.  And the

9    reason why we have this presentation is we became aware of the

10   fact that simply using words are not really a substitute

11   sometimes for what you can see and experience.  So part of this

12   presentation is to allow that.  It is not intended to be a

13   substitute for live testimony.

14     And as I will address at the end of our presentation, and

15   as you've left open for this hearing, due to the press release

16   that was submitted by the U.S. Attorney's Office in this case,

17   we have lost witnesses.  And we've provided to you affidavits,

18   declarations, and information as to what we've lost.  But I

19   will deal with that at that time.

20     Another caveat that I want to tell you about is that we

21   are using the generic word "Endeavor," not intending for the

22   victim necessarily to be Endeavor, the person who was made

23   representations to was Endeavor, but more as an overview word

24   to describe the multiple different companies that come under

25   the Endeavor label.  So I wanted that to be clear by my use of

Exhibit 1
Page 6 of 70

1   the word in this presentation.

2       Okay.  All right.  So the factors that we would like to be

3   dealing with today are basically the 3553 and that the sentence

4   should be no greater than necessary.  And you're aware of this

5   standard.

6           THE COURT:  Yes.

7           MS. HOFFMAN:  I'd like to set the scene to 2011, Your

8   Honor, 2012, the period of time before Endeavor and Ms. Hankins

9   entered their partnership in this, that is the subject matter

10  of this case, because, under the relevant factors, it's the

11  history of the case and putting the conduct in some kind of

12  framework.

13      Ms. Hankins had grown successful festivals that had

14  brought herself to the attention of the Endeavor Group.  She

15  had substantially contributed to the community with this work.

16      I'm going to cover that she had long-term mental health

17  problems, and how the long-term mental health problems,

18  including the significant abuse that she suffered, Your Honor,

19  from early childhood on, through her marriage with Mark

20  Hankins, has created permanent injury to her and is being

21  treated to this day.

22      Then the background of the indicted conduct; the infusions

23  that she put in herself, into the festivals, over time, and

24  especially after she sold the festivals, Your Honor, in

25  March 2018, significant contributions of her own money went

Exhibit 1
Page 7 of 70

into the festivals; and the Government misconduct, Your Honor,

and how that impacts the factors that you can apply at

sentencing, both to the extent that she has already suffered a

significant deprivation of reputation over and above the guilty

plea, and that the misconduct itself can be addressed as a

sentencing factor before this Court; our sentencing

recommendations; and then concluding.

One sec.  All right.

First of all, it's important to note what was involved in

running these festivals.  So one of the main jobs that

Ms. Hankins had was she had to apply for and obtain what are

called "mass permits."  So to do that, she had to have a

medical plan, create fire safety plans, create public safety

plans that had to be approved by a sheriff's office, create an

alcohol control plan by the OLCC, create sanitation.

Because, basically, Your Honor, she was creating a village

for 20,000 people.  And part of that effort is that you have to

have fire safety, medical -- you build it up, and then you tear

it down, and you have it removed -- traffic control, and create

emergency responses for crowd control, security threat, weather

evacuation, misplaced children.

On-site, she managed this city.  She had 900 -- as many as

900 people -- volunteers -- who reported to her, Your Honor,

during these festivals.  There was an average of 35 vendors.

She built -- or supervised -- she obviously didn't build

Exhibit 1
Page 8 of 70

1    herself.  But she supervised the building of the staging, the
2    lighting, the seating, the parking lots.  There was camping
3    on-site for 10,000 people.

4        Managing artists in compliance with their contracts;
5    setting up stage artists' equipment; and building offices and
6    dressing rooms; providing vans; providing catering; and,
7    generally, an infrastructure.

8        And then the day-to-day operations, Your Honor.  She
9    prepared for pending festivals, had to arrange talent, booked
10   artists, scouted new talent, developed relationships with
11   managers, was responsible for community relations.  Working
12   together, for example, with Don Leber of Bi-Mart.

13       She had to maintain relationships with county officials,
14   because if they weren't pleased with her work, they could pull
15   the permit; had to get sponsors; marketing; promotion;
16   budgeting; and scouting and contracting for changes of venue
17   location.  So this, Your Honor, was what Anne Hankins did in
18   her job running these festivals.

19       I'd like to show you, Your Honor, a video of one of the
20   festivals that Ms. Hankins maintained prior to selling to
21   Endeavor.

22       Wait a minute.

23       All right.  Now we will ask for tech support to turn this
24   on, please.

25

Exhibit 1
Page 9 of 70

1              (Video is played.)

2

3         MS. HOFFMAN:  So she was, in a way, the mayor of this

4    city that would exist the length of this festival, and was

5    responsible for everything that took place during it.

6         It gives you a sense of it.

7         And so the issue, Your Honor, is not only -- on top of

8    that, Ms. Hankins was a full-time mother.  She was a single

9    mother who had left an abusive relationship.  You saw the

10   letter from Mark Hankins.  Due to the stress of that

11   relationship, the abuse of that relationship is documented by

12   her daughter in a letter that was sent to you.

13        She moved forward as an adult as a half-shattered person

14   who refused to allow her children to live in the kind of

15   environment that she lived in.  And they were her number one

16   priority.  But because of her talent -- how many of us could

17   really build a city for 20,000 people that you build, tear

18   town, deal with the infrastructure?  But she did it.  And she

19   came home to a thriving family.

20        And she did it despite a deprivation of education and a

21   fragile, fragile personality.  But in this area she was able to

22   flourish.  And she came to the attention of the Endeavor Group,

23   because it was their ambition to control live media and talent

24   in the United States.  Because they had an express synergy that

25   they were looking for, which was to unite different parts of

Exhibit 1
Page 10 of 70

1  the Endeavor enterprise under one roof -- talent agents,

2  talents, live performances, recordings, venue changes -- and

3  they had the money to be able to pull all of this together.

4  And they saw talent, and a remarkable talent, in Ms. Hankins.

5       But, Your Honor, despite any motions or pleadings that

6  you've read to the contrary, that have since been withdrawn,

7  Ms. Hankins was reluctant to join forces with them.  She'd

8  built a small, successful operation and had tremendous love and

9  joy in it.  And here were the super -- corporation in the world

10 wanting to partner with her.

11      So you'll get a sense of this when you look at this email.

12 Patrick Whitesell, who is like at the top of the pyramid of

13 this company, is engaged in communication with Ms. Hankins.  He

14 says, "First, thank you for this email.  I wasn't aware of the

15 frustrations in getting the rest of this deal done until today.

16 Sorry for any part of my team."

17      But now he's encouraging her to trust them.  "I think you

18 kicked ass.  I have loved watching you work these last couple

19 of weeks and the emails you have sent me.  You're an exact

20 partner" -- and I think the word "partner" is critical to what

21 went wrong in this situation -- "I want."

22      Ms. Hankins writes back, "It was a rough day.  You need to

23 know that my deciding factor to join WME was based a lot on the

24 conversation you and I had and the vision you shared with me.

25 If I felt for one minute that you were not sincere about this

Exhibit 1
Page 11 of 70

partnership, we would never be at this point."  So Ms. Hankins

believed that she and Endeavor were entering a partnership.

Throughout her festivals, Your Honor -- and it was a

question posed in one of your minute orders -- what has she

been doing with her time?  She made major contributions to the

community.

Here's some newspaper coverage about it.  But the music

attendance doubled from -- over 2010.

"Brownsville Festival is a major fundraiser for the

school's athletic programs.  Instead of having to sell candy

bars door-to-door, we now have one big fundraiser and support

all of our programs."

Willamette Country Music Festival: "'This is something

that is dear to our hearts,' said Festival Director Anne

Hankins.  'We will bring out 257 foster kids and their families

on Saturday to enjoy the day with us.  They'll be admitted free

and get Bi-Mart bucks to spend with the vendors.'"

Central Athletics:  Over $279,950 was raised.

If you look at this, Your Honor, we broke down the figures

for you based on her work.  2008, $15,000 went to charitable

groups.  By 2018, $353,000 were spun off, in dollars, to help

local communities here in this area.  And they came in doing

all kinds of things.

They helped clean up.  They helped park.  They helped be

greeters.  And these kids and these programs, and the fire

Exhibit 1
Page 12 of 70

1  departments who did pancake sales and got to keep the proceeds,

2  all benefited from her work.  She raised money for fire

3  departments, school programs, school athletics, charity, foster

4  kids, military, FFA, 4-H.  In total, $1,585,146 were raised due

5  to her work.  Not just hers, you know, but the programs that

6  she ran.

7        I'd like you to listen to a video that was actually

8  prepared by Bi-Mart, in 2013, where Ms. Hankins shares her

9  vision.  And what's great about it is it doesn't require a

10  witness to explain it.  It was then and there.

11        Okay.  You'll have to do it again.

12

13                    (Video is played.)

14

15        MS. HOFFMAN:  This just gives you an aerial view of

16  how many people are there.

17        Unfortunately, as I mentioned in my introductory comments

18  to you, Your Honor, Ms. Hankins is a sexual abuse victim, a

19  parental abuse victim, developed lifelong problems that she's

20  dealing with today.  And part of the issue with that is that

21  she had no internal resilience when she felt attacked.  And it

22  triggered her mental illness.  Her judgment was skewed.  Her

23  reactions aren't what hopefully our reactions would be.  But

24  I'd like to delve into this so that you can better understand

25  the crisis that occurred.

Exhibit 1
Page 13 of 70

1      This is from the psychological evaluation that you have

2   with you from Doctor Hamel.  You've read this; correct?

3          THE COURT:  Yes, I've read it.

4          MS. HOFFMAN:  And as you can tell by this, it's

5   resulted in hospitalization, attempts at suicide.  I mean, this

6   isn't minor things.  She's been in ongoing treatment since --

7          THE COURT:  Right.  But --

8          MS. HOFFMAN:  -- 1998.

9          THE COURT:  Ms. Hoffman, as you know, almost

10  everybody who comes before me, comes before me with a

11  remarkable amount of childhood trauma, some so unspeakable you

12  wonder how they're alive at this stage.  I mean, those people

13  still go to prison.  There are lots of people out there with

14  unbelievable childhood trauma who do not make criminal

15  decisions.  So I'm not always sure how to weigh that.

16         MS. HOFFMAN:  And I understand that, Your Honor.  But

17  what's unique about this case -- and we'll get there -- and it

18  was admittedly unique in our negotiations with Mr. Bruce -- is

19  this is a situation where Ms. Hankins deprived Endeavor of

20  information.  But she deprived Endeavor of the information for

21  the right to run the company, or WCMC, without their

22  interference.  And I'll get to that.

23     This is not a case, despite anything that's been withdrawn

24  or presented to you, of theft.

25         THE COURT:  Well, except she did use a chunk of it to

Exhibit 1
Page 14 of 70

1    pay off her personal debt.

2            MS. HOFFMAN:  She used some of it.  But she sold

3    something of high value, Your Honor.  She sold 49 percent of a

4    festival that she, in turn, wanted to buy at the exact same

5    time.  So for the amount of money that they paid her -- 1.5 --

6    she was willing to buy the festivals.

7        And had the Government not published their article that

8    got picked up all over -- and we'll deal with that later -- you

9    would have heard Don Leber here, the representative of Bi-Mart.

10   But he has lost his opportunity to come because of this

11   publicity.  And he would have explained to you that it was

12   Ms. Hankins' plan to buy the festivals.

13       So if Ms. Hankins sells something of value, which is equal

14   to the amount that she received, then that is not taking a hunk

15   of money.

16           THE COURT:  Well, it is.  Because you're defrauding

17   someone to get that hunk of money.  I mean, come on.  I mean,

18   this approach that she's being beaten down by an evil

19   corporation -- she sold it under a completely false pretense.

20   She's admitted to that.  She took some of the money and paid

21   off a personal obligation.  And what you're telling me is she

22   had the right to do that.

23           MS. HOFFMAN:  No, I'm actually not telling you that.

24           THE COURT:  It sounds like that though.

25           MS. HOFFMAN:  Well, I'm not telling you that.  I

Exhibit 1
Page 15 of 70

 1   think I'd like to clarify what I am telling you.

 2            THE COURT:  Okay.

 3            MS. HOFFMAN:  She did not -- and I'm going to deal

 4   with what you're asking in this slide.  Because she did not

 5   sell it under totally false pretense.  That statement "totally

 6   false pretense" is not an accurate representation.  She did not

 7   accurately disclose to them the true financial condition of the

 8   company.  Note, I agree with that completely.  But that is not

 9   a totally false pretense.  Because --

10            THE COURT:  I mean --

11            MS. HOFFMAN:  -- Your Honor, it was "a" factor.  It

12   wasn't "the" factor.  And when she sold it to them, she

13   believed it had equal amount of value to what they were paying.

14   And their reason for buying it was a strategic reason that

15   enhanced their ability to meet an objective that they were

16   attempting to reach.  And I think that's an important thing for

17   you to understand.

18            THE COURT:  But are you telling me that they would

19   have bought it anyways if they understood both the value of the

20   asset and the liabilities that were not being disclosed?

21            MS. HOFFMAN:  I believe there's -- I think where

22   there's an issue, as you know from many cases both that you've

23   represented and judged, once you know someone has defrauded

24   you, the logical answer is of course I wouldn't ever deal with

25   them.  So put that piece aside.

Exhibit 1
Page 16 of 70

1          If you put solely as a business decision on the table, and

2     discuss it that way, as a business decision, if they'd known

3     the true financials, they would have bought it.  And I'll show

4     you why.  I mean, I'm not just speaking.  I'd like to show you.

5               THE COURT:  Okay.

6               MS. HOFFMAN:  But we both agree, if someone's lied to

7     you and presented you fraudulent documents, you never want to

8     deal with them.  So I'm taking that piece off the table.

9     Because you're asking me, as a business decision, would it have

10    been something that was attractive financially; am I hearing

11    you correctly?

12              THE COURT:  Well, as a crime, doesn't it require

13    reliance on the misrepresentation?

14              MS. HOFFMAN:  It requires that it be a material

15    factor.

16              THE COURT:  Okay.

17              MS. HOFFMAN:  And we concede that it's a material

18    factor, but we do not concede that it's a but-for factor.

19              THE COURT:  Okay.

20              MS. HOFFMAN:  And, I guess, that's -- since the case

21    never went to trial, and it's a guilty plea, the facts as

22    alleged in the plea petition and in the plea agreement are what

23    controls.  And she pled guilty.  She pled guilty to wire fraud.

24    And there was a material misrepresentation.  But its standard

25    is that it had the potential to influence, not that it did.

Exhibit 1
Page 17 of 70

So, you know, under the terms of this statute, it had the potential.

The issue here is that her mental illness -- and you're aware that sometimes a mental illness can distort a person's logic or a reaction that they have to a situation.  And it can also impact their problem-solving ability.  It's not a defense.  And we're not saying you get found not guilty of this, Your Honor.  But it can deprive people of thinking through better options that others might choose differently.

And as the doctor said, anxiety, at times, can be paralyzing, emotionally.  Best characterized as being too frightened -- and she's -- and he's talking about Ms. Hankins -- and, at other times, may increase their impulsivity.  And depression can lead to hopelessness and decrease motivation to perform tasks.

Dr. Webb, in his opinion, has rendered to you, in the second letter that you received, that he's been treating her since 1998.  She's taking significant medications at his direction.  And I don't want to go through all of that on the public record, but you have it as Exhibit No. 23.

THE COURT:  Right.  I've read it.

MS. HOFFMAN:  So our point is that it compromised, it does not excuse her decision-making process.

Okay.  So I want to deal more with the questions that we were just addressing in our dialogue, which is -- all right.

Exhibit 1
Page 18 of 70

1    Endeavor pays Ms. Hankins 800,000 for their 51 percent

2    ownership April 4th, 2013.  And with the email exchange that I

3    showed you earlier, Ms. Hankins' understanding is that they

4    were partners.

5        So these are the festivals.

6        All right.  After she has sold the share to Endeavor, they

7    then open up a festival called Cape Blanco, Mountain Home.  The

8    Mountain Home Festival, Your Honor, which is important for you

9    to note in answering your question, was the festival that was

10   founded after their partnership.  And it never got traction.

11   It continually lost money.

12       But, in 2016, a crisis occurred financially.  There was

13   excessive heat in the Brownsville, Oregon area.  Cape Blanco

14   did not have enough campsites, so they weren't able to sell all

15   their tickets.  People withdrew their land, I mean, for no

16   reason dealing with the festival.  And the Mountain --

17            THE COURT:  Right.

18            MS. HOFFMAN:  And the Mountain Home lost 1.5 million

19   due to the delta between contracts with artists and revenue.

20       So, basically, in July 2016, Ms. Hankins is facing about a

21   $2.2 million shortfall in being able to pay for bills due on

22   these festivals due to circumstances that she had no control

23   over.  So she goes to her partners and says, "I need money to

24   be able to function going forward."  Her partners do not

25   provide that money without onerous terms and conditions.

Exhibit 1
Page 19 of 70

1    So the first one is -- out of the money that they're

2    willing to provide, I think the first 1.2, or so, goes to pay a

3    remaining fee for Jason Aldean, which is one of their clients

4    that gets a -- they get a cut of.

5    But the rest of it that she needs to keep the doors open

6    on the festivals -- and this is the pivotal problem, Your

7    Honor, that is in this case for Ms. Hankins, where she screwed

8    up.  They took from her financial control of the money that she

9    needed to fund the festivals going forward.  And they locked it

10   up and put it outside of her control.

11   The way festivals are funded, Your Honor, is they're

12   funded through ticket revenue that's generated for future

13   festivals.  They use that.  And then, as they gain revenue,

14   that's repaid.  They take that away from the Willamette --

15   WCMC.  They deprive it of the lifeblood that they need to keep

16   the festivals open.  And they're aware of the problem that the

17   money will not be coming in.

18   And they say to Ms. Hankins, "We will not open up this

19   revenue until prior debt that's due and owing for prior ticket

20   sales," that's been basically borrowed, "is paid off," but

21   leaving no revenue source in which to do it.  She goes along

22   with it, because she knows she has to get these vendors paid

23   and the outstanding bills have to get paid.  That's where she

24   starts making bad decisions.

25   At this time -- and I'm going to show it to you, Your

Exhibit 1
Page 20 of 70

Honor.  Okay.  So we've gone through that.  But what we haven't
talked about is that projected $6 million shortfall.  And we'll
talk about her desire to just put a wall around herself to
operate the company.

     While they're negotiating, Your Honor, the money that she
needs to be able to get out of the hole that she's in -- she
discloses to them the true and accurate finances.  They have
all that.  That's August 2016.

     In her disclosure to them, as to why she needs the money,
she outlines that they have a shortfall of $6 million.  At the
end of the day, Your Honor, when this whole case ends, there's
still the shortfall for $6 million.  And the problem is that
they knew there was a shortfall for 6 million.  And, unlike the
partnership that Ms. Hankins thought that they were going to
be, and that they would all contribute their own money because
Ms. Hankins had been contributing her money, she has this
amount of financing that she's going to have to deal with.

     So what Ms. Hankins does in order to avoid their scrutiny,
and to avoid them micromanaging her, and in her belief cripple
the organization so it can't continue, she creates a smoke
screen.  And the smoke screen is that they are doing better,
financially, and she just earns the right to be left alone.

     And she earns the right to be left alone through
fraudulent bank records.  Nobody is denying that.  But she
believes that if she puts on a happy face, and allows the

Exhibit 1
Page 21 of 70

1  festival to look better off financially, they'll leave her

2  alone, and she can run the festival, and she'll be able to

3  solve this shortfall.

4      What happens, Your Honor, is, in the intervening months,

5  Ms. Hankins does not go back to them again for any money until

6  2018.  She proceeds to come up with funding.  She proceeds to

7  run these festivals.  There is no proof she took any money from

8  them.  Whenever they've been put to the test and said, "Where

9  is the evidence that you have money of theft (sic)," it is

10  never been produced.

11      Mr. Levine, Mr. Flood have spent over 300 hours, Your

12  Honor, going through their documents looking for embezzlement,

13  looking for theft, looking for anything to show that

14  Ms. Hankins stole, because that is part of their civil suit.

15  Nothing.

16      What they did find is the 2018 report that was a draft

17  report from Exiger that says that, at that point, they had

18  found no evidence of embezzlement.  They had not found

19  embezzlement or theft.  What they found are some red flags that

20  needed to be gone into.  But they -- as of 2018, their forensic

21  expert had not found theft.

22      So what she did is she assumes -- I mean, this is not good

23  thinking.  She assumes responsibility for a $6 million

24  shortfall, lies to them that she's doing better, and proceeds

25  to run the festivals.

Exhibit 1
Page 22 of 70

1    In 2017, Your Honor, just before they entered their

2    negotiations, there's serious unexpected events that causes

3    additional stress on the festivals, financially.  And what has

4    happened is there were the mass shootings in Las Vegas, that

5    you're aware of, which was another country festival.  Sixty

6    people were killed.  And the Mountain Home Festival loses a

7    night of performance, so one night's revenue.  So this

8    $6 million nut that she has to crack is getting bigger and

9    harder for her.

10    You've heard discussion about loans that she took out.

11    Every loan that Ms. Hankins took out, she cosigned as being

12    personally obligated.  She continued to cosign, even when she

13    was an employee, Your Honor.

14    So I'd like to now go to this -- what I was -- you asked

15    me a question:  "Would they have bought it anyway?"  And I said

16    to you, "I believe so."

17    In 2013, when they signed their contract with Ms. Hankins,

18    they wrote, "We, again, control all the talent.  And coming out

19    of the box firing with Paisley, Eric Church, and D. Bentley as

20    headliners, she's really kicking ass."  And then she talks --

21    they talk about, "But we, again, control all the talent."

22    "WME Partners for Six Country Festivals, 2014.  They have,

23    again, purchased more and more talent.  They're building their

24    portfolio in the festival sector with investment in six new

25    strategic alliances.  Country is thriving on the touring front,

Exhibit 1
Page 23 of 70

1   and it's joined pop, rock, and EDM as a force in the festival

2   space."

3       August 2nd, Your Honor, they get a cash infusion --

4   Endeavor gets a cash infusion of $1.1 billion.  And the purpose

5   of the cash infusion -- this is when they start negotiating

6   with Anne Hankins to purchase her share.  The 1.1 billion is

7   reported on August 2nd, 2017, just months before they try to

8   buy Ms. Hankins' share.

9       This is their investment partner:  "Silver Lake's

10  long-term thesis, based on the increasing value of premium/live

11  content, continues to fuel growth for WME-IMG.  We believe

12  WME-IMG is a unique platform across media, entertainment, and

13  sports with significant growth opportunities, and we remain

14  optimistic about continued near and long-term equity value."

15      They have to deploy, Your Honor -- in building this

16  acquisition mode of theirs, they now have to deploy

17  $1.2 billion.  So there is synergy -- you asked me, "Would they

18  still have purchased this knowing what the debt was?"  And I

19  said to you, "I believe that they would."  Their whole goal at

20  that point -- it was in effect in '13, '14, '17 -- was the

21  acquiring and maintaining of these kind of festivals.

22          THE COURT:  But you would agree, had they known that

23  the books had been fraudulently presented, they may not have

24  kept Ms. Hankins in the position that they kept her in

25  following the purchase.

Exhibit 1
Page 24 of 70

1           MS. HOFFMAN:  They would have fired her.

2           THE COURT:  Okay.

3           MS. HOFFMAN:  I mean, I can't -- I can't imagine they

4    wouldn't have fired her, unless they'd been able to have a

5    heart to heart, and she'd been able to persuade them why she

6    did it, and they believed that she hadn't stolen anything.  But

7    they're a publicly traded -- I'm not going to say they wouldn't

8    have fired her.  But that's a different matter, Your Honor,

9    than whether they would have acquired that asset.

10          The unit purchase agreement -- we're talking about the

11   1.5 million that was paid for her 49 percent in this case,

12   which was also a subject of your inquiry of me -- is a pretty

13   interesting document.  Ms. Hankins -- actually, before we go to

14   that, Ms. Hankins tried to purchase, as I said earlier, the

15   same festivals for the same amount that they paid her.  And the

16   Endeavor Group said, "No.  That's not how we operate."

17          But Ms. Hankins knew something had to change, because she

18   has this need to control these festivals.  I mean, that's

19   really what she wanted, was to control them.  Or, if she wasn't

20   going to get them, she was going to have to sell.  Because

21   the -- this whole problem that she created through inaccurate

22   reporting was a -- could not continue to be sustained.

23          So she sells her 49 percent interest.  But, Your Honor,

24   it's effectively -- it's an advanced payment.  Because the way

25   that this works is she gets 1.5 million for it.  But what is

Exhibit 1
Page 25 of 70

1    written into the contract is a formula for increased payment

2    over time that will be decided under certain EBITDA terms.

3    But, basically, it's going to be the revenue that's generated

4    over expenses.  And it's going to first -- before she gets any

5    opportunity to get enhanced money over time, she has to

6    continue to work in her position, be the president, do all

7    those functions that I've laid out for you before -- you know,

8    maintain all those roles.

9        And the 1.5 that they have given her for her 49 percent

10   will have to basically be regained by the company.  It will

11   count for them.  And only after that 1.5 is basically returned

12   to them will she be entitled to payment over the 1.5, if you're

13   following me.

14            THE COURT:  I am.

15            MS. HOFFMAN:  So the first 1.5 million would have

16   earned -- is going to get credited to the Endeavor Group.

17       So Ms. Hankins -- do you remember I showed you the

18   6 million number?  Ms. Hankins personally supported the

19   festivals with her own cash, even cash had nothing to do with

20   the 1.5, and her personal guarantees totaling more than

21   6.5 million.

22       Right now, as we stand here today, Ms. Hankins is

23   personally responsible for about $5.8 million that she took on

24   as personal debt in exchange for Endeavor being released from

25   that debt.  This is just right this minute in real time.  So

Exhibit 1
Page 26 of 70

1    she personally borrowed 6,328,000 to pay for festival

2    operations.  She cosigned all the loans.  The other signatory,

3    Your Honor, of course, is WCMC.  But it's not like they have to

4    first go against WCMC and then go against Ms. Hankins.  It's

5    not subordinate like that.  She's co-op.

6        So before she sells to WCMC -- I mean, I'm -- Your Honor,

7    you asked me some questions about her skewed thinking.

8    Ms. Hankins is personally obligating herself, as a partner, for

9    the right to be left alone by them, $5,297,000 she's taken onto

10   her liability account.  She then sells the company on March 1st

11   and becomes a mere employee.  March 1st, Your Honor, she

12   continues to personally borrow money as an employee for WCMC,

13   to the tune of $1,031,000.

14       So when we're talking about either skewed thinking or

15   irrational, what is she doing, she's taking on all of this

16   debt.  Because if WCMC fails or doesn't have the money to pay,

17   there isn't an upward obligation, Your Honor, to the higher-up

18   Endeavor companies.  It is a company unto itself.

19       So if Endeavor doesn't -- if Endeavor, for example,

20   doesn't bail it out, or whatever, WCMC is the cosignatory.  So

21   the ability to pay back this loan debt that she's taken on

22   turns on the success of WCMC.  And it means bankruptcy for

23   Ms. Hankins if she's not successful.

24       I don't know, in any other case that I have been

25   related -- been affiliated with -- where an employee takes on

Exhibit 1
Page 27 of 70

1    corporate debt on themselves after they're a mere employee like

2    this.  But her point, and the point that's been made in our

3    sentencing memorandum is, was she over meshed in the company?

4    Did that create these bad decisions?  Did she believe she could

5    do a better job running the company?  Was it just sheer

6    blindness that she didn't understand the burden that she was

7    taking on?  Was it overoptimism?  But this is what the

8    situation was.

9        Mr. Bruce, in his very persuasive memo to you, goes into

10   the detail by which she creates false bank records.  And he

11   claims that she only paid back this money out of fear of

12   detection -- we read that -- to basically impinge her

13   credibility in this matter and impugn her desires by putting

14   them in obviously a bad light.  That's what he -- what his

15   position was.

16       I need to show you something.  From 2013 on, Your Honor,

17   Jason Lublin, who was on the board, had full access to the

18   account by which she is sending out these false statements.

19   He's the cosignatory and is on the account with her.  It could

20   be argued, well, we trusted her so much, why would we look.

21   But what you are talking about is a very sophisticated

22   company -- and I'm not blaming them for being sophisticated --

23   they should be -- and a foreseeable checks and balance or even

24   bringing in a simple spot review.

25       So the fear of detection, Your Honor, for her false

Exhibit 1
Page 28 of 70

1  reports that she was doing over this time was always there.

2  It's not like one day it became worse.  Her actions were not

3  controlled by fear of detection as she's borrowing all this

4  money or as she's doing these false reports.  It's just she

5  isn't looking at it with a clear and discerning eye.

6          THE COURT:  There is an email where they are

7  requesting, you know, some kind of accounting.  And she --

8          MS. HOFFMAN:  She writes, "This is a problem."

9          THE COURT:  Yeah.

10          MS. HOFFMAN:  Right?  That one?  Yes, it's a problem.

11  Of course it is.  But, in reality, that problem doesn't even

12  come to fruition until months and months and months later.  And

13  after that email, Your Honor, I mean, if you look at this, she

14  used her own money to pay festival expenses in March, April,

15  May, June, July, August, and September.

16      In March, she pays down one of the loan payments by 252.

17  She puts 600,000, out of the 1.5 they gave her, into the

18  operating account.

19      In April, she pays Bi-Mart 75,000 because of expenses that

20  had come up, Your Honor.  They double paid, and a credit hadn't

21  been done, and she personally pays them out of her own money.

22  She puts in 41,000 to pay down a loan -- a Bi-Mart payment --

23  Bi-Mart payment.  She deposits, into an operating account,

24  135,000.  And she makes a vendor payment of 40,000.

25      That email that you saw, where she wrote, "This doesn't

Exhibit 1
Page 29 of 70

1    look good for us," or "for me," or whatever, happened in March.

2            THE COURT:  Right.  So, I mean, that is the

3    Government's argument.  That happened in March.  And she then

4    really didn't have a choice but to take the money and start

5    putting it back to cover up.  I mean, isn't that the argument

6    they're making?

7            MS. HOFFMAN:  That's their argument.  But, Your

8    Honor, she's got a $6 million loan outstanding that she's

9    personally -- it doesn't even scratch the surface of what we're

10   talking about.  But the reality for Ms. Hankins was different

11   than the cynical view that the Government has put on this.  And

12   it's -- we'll deal with that in a minute.

13       The reality to Ms. Hankins is she's now an employee.  And

14   what Ms. Hankins wants to do as an employee of this company is

15   rectify some of the problems that her accounting has created.

16   She'd like to start with a clean slate.  So what is her

17   motivation?  Her motivation is that she makes these payments.

18   So she personally supported the festivals with cash infusions

19   and personal guarantees totaling more than 6.5 million.

20       I'd like to talk about the issue about Government

21   misconduct, because it's critical in this case for multiple

22   reasons.  First of all, Ms. Hankins never was willing to

23   ever -- which is about as empathic as I'll ever be in this --

24   to plead to anything that required her ever to say that she

25   stole, embezzled, took money from WCMC.  She would have gone to

Exhibit 1
Page 30 of 70

1    trial, and Mr. Bruce knew this.  That this was like a poor line

2    that would never be crossed.

3        If you read carefully the allocution and the statement of

4    facts in our plea agreement, that was a carefully crafted

5    document done by Mr. Bruce and our office where what you will

6    see is that Ms. Hankins full-throatedly admits to deceiving

7    Endeavor as to the financial condition of WCMC -- totally

8    admits that.

9        At no point does she admit in the fact allocution that it

10   was done to cheat them.  What you have to meet the factors of

11   Yates is she pleads guilty, as a general guilty plea, to fraud,

12   which, by law, requires the intent to deceive and cheat.  That

13   is the allocution.  But the fact allocution does not have any

14   intent to cheat them, because that was that important to her

15   that she was -- that was not going to be part of this case.

16       And where the cheat is that allows this to be a valid

17   plea -- and some of your questions have been posed in this

18   way -- is that she was aware, when she passed on the false

19   financials in that last financial statement, that the numbers

20   she was importing into the statement as to their financial

21   condition were based off of the false numbers that they'd been

22   given.  She knew that.

23       And she knew that if she changed those numbers suddenly,

24   probably the deal would not go through, because there would be

25   all the inquiries that you're posing.  I think that meets the

Exhibit 1
Page 31 of 70

1    elements.  But we are -- we're dealing with a plea that is that

2    close to the razor's edge of what is a valid plea and what

3    would be potentially not.  But she's squarely on the valid plea

4    side.

5         But the concept of "I did not steal" is so critical to

6    her, because the two things she loved in her life were the

7    family that she had protected against abuse and given an

8    opportunity to thrive and the festivals.  And the things that

9    she did -- taking on the debt, and hiding the debt, not giving

10   accurate financial statements -- she thought was going to help

11   the festivals, and she would do a better job -- hubris -- do a

12   better job running them if she was left alone, even though the

13   cost of that was incurring a crippling financial

14   responsibility.

15        So knowing that, Your Honor -- knowing that that was the

16   bright line, we were offered three points off on the

17   guidelines, and we're not dealing with the guidelines, because

18   of the uniqueness of this case, because it was not a case that

19   was "I'll deceive you to steal from you."  It was a

20   deprivation, basically, of accurate financial information.

21        And the fact that she worked and encumbered herself for

22   the benefit of the company was so unusual for a case like this

23   that we were offered three points, with the understanding that

24   we could ask for more, we could argue about it, and -- okay.

25        In repeated conversations, we were told by the Government

Exhibit 1
Page 32 of 70

1    that this was not a theft case -- Ms. Marchant in our

2    meetings -- okay.  As Ms. Hankins is driving home from the

3    guilty plea, a radio broadcast comes across the radio that

4    quotes the Government's press release.

5         "Ms. Hankins has proven herself to be a serial fraudster,

6    according to Craig Gabriel," as said on the radio.  "And

7    Ms. Hankins blatantly" -- we'll throw in the word

8    "blatantly" -- "deceived her business associate and stole money

9    that never belonged to her."

10        There is no allegation in this case that Ms. Hankins ever

11   stole money that didn't belong to her.  That has never been a

12   Government theory in this case.

13        Prior to that press release, Your Honor, there were

14   Facebook pages that discussed how wonderful Ms. Hankins was,

15   that thanked her for the amazing opportunities that she'd given

16   that had provided this philanthropic benefit to them.  Live

17   people posting online their adoration of Ms. Hankins and the

18   festivals and how they had changed her community.

19        These same people had been cooperative with us prior to

20   that press release.  After the press release, when we were

21   starting to try to obtain witnesses to come before you to

22   present live testimony -- disappeared.  Some of them, like

23   Justin Starck, says he now thought that she'd stolen money.

24        We've outlined in our sentencing memo how one of

25   Ms. Hankins' employers who ran her -- Ms. Hankins has since

Exhibit 1
Page 33 of 70

1    then run an accounting and sort of bookkeeping operation, and

2    she'd helped with a daycare for this person -- had to lay her

3    off.  And the person admitted to us that she'd been criticized

4    after these news articles for continuing Ms. Hankins on her

5    payroll.

6        Don Leber, who worked with Ms. Hankins for Bi-Mart -- he

7    was the Bi-Mart representative -- he knew Ms. Hankins' desire

8    to buy the festivals and could have come into this courtroom,

9    Your Honor, and told you -- in response to your question about

10   the value of the festivals -- we couldn't have had a more

11   esteemed person.  He no longer could because of the fracas and

12   the fallout following these articles.

13       This wasn't an accident, Your Honor.  And I'm not

14   saying -- and we don't know that Endeavor had anything to do

15   with those news articles.  And we don't know how those news

16   articles got generated.  We never had a hearing on it, and we

17   never did the discovery.

18       But what we do know is that Endeavor's strategy was, when

19   it's discussing with their expert, anything would be helpful to

20   establish criminality on her part, protect our reputation,

21   change the PR narrative, substantiate our insurance claim, and

22   defend us against claims.  They are looking for any criminality

23   on her part, and their intent is PR.

24       One of the narratives that's been floating around is that

25   Ms. Hankins' theft deprived vendors from being paid.  That was

Exhibit 1
Page 34 of 70

1   a newspaper article -- Willamette Week.  It was Endeavor that

2   controlled who got paid, not Ms. Hankins.  What they did -- and

3   you've got their worksheet here -- is they broke down all the

4   debts, and they broke them down between high-risk agreement --

5   agreements -- which would be your Jason Aldean and those

6   people -- you know, they had to make sure they got paid -- and

7   low-risk or one-time supplier agreements, which would be the

8   last paid.  So that's how the numbers broke down.

9        In their tier one -- I explained to you what they were --

10  you know, famous billboard names.  But tier four were your

11  local vendors, Your Honor:  The Valley River Inn, RoxyAnn

12  Winery, Human Bean, Doug's Caterers.

13       And so the idea that Ms. Hankins controlled that was

14  inaccurate.  But the Willamette Week chose to run an article

15  where they said, "Now federal prosecutors are filling in the

16  details of why that promoter, Anne Hankins, was a serial

17  fraudster, according to Craig Gabriel.  She faces up to 30

18  years in prison.  By 2018" -- and this is Willamette Week --

19  "her festivals were making headlines, but not because of

20  headliners.  Instead, vendors complained they hadn't been paid.

21  Bi-Mart eventually pulled its sponsorship, and three festivals

22  never returned."

23       That article allowed a narrative that had been percolating

24  around but never caught on to be published in the local

25  newspapers, radio, and other media.  And it was totally

Exhibit 1
Page 35 of 70

1    foreseeable that this would happen.

2         You have a copy of our expert report who -- in support of

3    our motion to dismiss -- who evaluated this.  And I'm sure you

4    read his vitae or résumé, and you know his background.  He has

5    published many, many articles, and his opinion is footnoted and

6    corroborated by many, many people more.  He is a real thing --

7    expert -- who has worked for Government and many other people.

8         And he says, "This story made explicit the connection

9    between prior financial problems and Hankins' current financial

10   crime.  Vendors were unpaid, and the festivals were shut down

11   because of fraud.  The press release contained multiple lexical

12   intensifiers designed to add emotional value, a rhetorical

13   technique designed to sensationalize the news story.  It used

14   dramatic metaphors."

15        "The press release" -- and this is very important to this

16   deprivation of witnesses for us.  "The press release includes

17   extraneous information unrelated to the plea agreement.  The

18   inclusion is noticeable, because it's not contained in any of

19   the related court filings."

20        So, Your Honor, it didn't come from the press pulling up

21   filings.  It was supplied by the Government.

22        "The press release references the festival promoted by

23   Hankins.  While the inclusion of this information may seem

24   innocuous, it directs readers to draw a connection from the

25   current fraud case to her legitimate business activities."

Exhibit 1
Page 36 of 70

1        And this is a long quote, but it's important.  "The most
2   objectionable parts of the press release are embedded in
3   attributed quotes to two Government officials, Craig Gabriel
4   and Bret Kressin.  Government sources and those representing
5   the prosecution in criminal cases carry significant authority.
6   Not only does the press release contain inflammatory
7   information, but it carries additional credibility, because it
8   comes from Government sources involved in the case.  The public
9   is left with a one-side story where the most credible sources
10  confirm the most inflammatory information."
11       "The press release was not just inappropriate and
12  inflammatory, but it was the basis for the local media
13  coverage.  And, most importantly, but for the press release, it
14  is unlikely the plea agreement would have been covered by local
15  media, and the inflammatory information wouldn't be readily
16  available for the public to consume."
17       If you look -- and we documented this in our pleadings,
18  Your Honor -- that press release is without precedent here.
19  The Government, when they report on serial crimes, mean serial
20  crimes, Your Honor, like multiple rapes occurring one after
21  another or multiple murders.
22            THE COURT:  So, I guess, Ms. Hoffman, if your concern
23  is the Government's press release had some impact on me and my
24  decision today --
25            MS. HOFFMAN:  No.

Exhibit 1
Page 37 of 70

1          THE COURT:  -- or Willamette Week -- this is the

2   world we're living in.  We are getting no media coverage in the

3   courtroom unless attorneys start issuing their own press

4   releases.  That's what media coverage of the courthouse has

5   become.  It has become internally written by press releases.

6       It happens on my civil cases.  I get destroyed by various

7   newspapers because an attorney on one side has anonymously

8   issued a press release, and it's run as a news story.  I get

9   it.  I get that it's impacting her reputation.  But so does

10  pleading guilty to a crime.  And I'll take into consideration,

11  yeah, there are collateral impacts here on her reputation.

12      The fact that other witnesses are afraid to come in after

13  reading this -- I know she has support in the community.  I

14  know she has family support.  You don't need to convince me of

15  that.  I know she's done a lot of good in the community.

16      So I know you're spending a lot of time on this, but it's

17  only impacting me to the extent that I will take into account

18  there are collateral consequences to her reputation and her

19  future going forward, based on both criminal conviction and a

20  narrative that's out there in the community that may not

21  reflect what actually occurred.

22          MS. HOFFMAN:  I think there's some important things,

23  Your Honor, that, despite our attempts to pull together her

24  history and the background to this case, would have been very

25  useful for you to hear from people, who -- because of the

Exhibit 1
Page 38 of 70

1    allegations of theft, which people put in a very different

2    position than misleading someone about their financials.

3            THE COURT:  I think a normal person of the public,

4    just reading the facts as they are here, may jump to the

5    conclusion that this would be called generally "theft."  I

6    mean, you're looking at it from a very legal perspective.  The

7    public is a very blunt instrument.  You know, theft.  That's --

8    that's what they see when somebody cooks the books and gets

9    $1.5 million.

10       I don't know how you avoid that narrative, that somebody's

11   going to say, "It sounds like she ripped them off."  You know,

12   there's nothing more to go on.  Unless you get a detailed, you

13   know, press release such as this out, I don't see what else the

14   public would really understand from this case.

15           MS. HOFFMAN:  Well, you've got three things in

16   response to that.  Without the sensational language of the

17   Government in that press release -- "She blatantly stole money

18   that wasn't hers, and now she faces the music, and the curtains

19   come down."  I mean, that kind of language no more should be

20   coming out of a U.S. Attorney's Office.

21           THE COURT:  It's often coming out of a judge's mouth

22   when they decide to jump in and start lecturing defendants, and

23   they overstate things with hyperbole and -- yes, it's -- it's

24   impactful.  I understand that.

25           MS. HOFFMAN:  And when they knew that it was the core

Exhibit 1
Page 39 of 70

1    of her decision to go to trial or not, and witnesses she told

2    before her guilty plea that she was pleading guilty.  That she

3    assured them that she never took any money or stole anything

4    from WCMC.

5         So I'm just saying, Your Honor, that when a Government --

6    first of all, we all know that we live in a clickbait society

7    where the more sensational an article, the more people turn it

8    on, and the more attention that they will pay it.  And we also

9    know that good press these days may not be a dry Wall Street

10   Journal article.  You need the flavor.

11        But that's why there are all these rules here that dictate

12   what a U.S. attorney is allowed to do.  And these are the rules

13   that govern it.  And I'm not going to go through all these

14   rules.  We've gone through it in our pleadings.  But the point

15   was, these rules were violated.

16        And the reason why these rules live on our books and

17   govern the conduct of U.S. attorneys is because they are

18   supposed to be above that frame.  They represent all of us,

19   including Ms. Hankins.  And when they have the power, Your

20   Honor, to destroy, and they're given higher credibility than

21   probably you're given -- a judge is given probably higher

22   credibility -- but certainly not the same credibility as a

23   defense lawyer or a neighbor next door.  They are the

24   Government.  That's why their power is limited and why they're

25   not supposed to do it.  Because it is deemed to be impactful in

Exhibit 1
Page 40 of 70

1    a way that unfairly changes the dynamic.

2        And our position is, if the witnesses had been available

3    to come in, answer your questions, answer our questions, talk

4    about how she -- why would she want to buy the festivals --

5    deal with some of the things you posed to me.  But they're not

6    allowed, because their bosses won't let them now -- or

7    whatever -- they can't do it.

8        So the point is we're left hypothesizing what impact it

9    might have had, had you been able to hear from people who were

10   with her during the time of this offense conduct, and knew what

11   the festivals meant to her, and knew how she wanted to buy.

12            THE COURT:  I'm not counting any of that.  I really

13   just don't know how much that this kind of testimony is

14   impacting me.  I'm much more concerned, again, about issues

15   around remorse, issues around why she did what she did.

16       I think I have a pretty good understanding where things

17   fell apart, as they do with a lot of people involved in other

18   people's money, and they keep thinking it's going to get

19   better.  I can understand why we're here.

20           MS. HOFFMAN:  I hope after this you have a better

21   understanding of what went wrong.  As far as remorse, I think

22   the highest form of remorse is she pled guilty and admitted

23   what she did.  She took over $5 million of debt.

24           THE COURT:  Okay.  I have -- okay.  All right.

25   Anything else?

Exhibit 1
Page 41 of 70

1          MS. HOFFMAN:  Yes.  All right.  Number one, dealing

2    with the sentencing factors.  One, it's outside the heartland

3    of a typical fraud case.  We've already gone through no theft

4    or embezzlement.

5          THE COURT:  Right.

6          MS. HOFFMAN:  That her conduct was the only "A"

7    factor.  We went through that, Your Honor.  She returned, prior

8    to apprehension, 1.2 million of the 1.5 million that she was

9    paid.  She's currently, as I said, liable for more than five --

10   well, more -- she's liable right now for 5.8 million.

11         The case law you're aware of -- that the amount -- you

12   know, the 1.5 -- in different context means different things.

13   And I've explained to you, to her, it had high benefit -- the

14   festivals.

15         Her mental condition, which, although not a defense, is a

16   mitigating factor from two doctors that have evaluated her.

17         The fact the Government -- and we were talking about that

18   with the misconduct -- has already meted out punishment, beyond

19   that, which is what they're legally entitled to mete out if you

20   look at the Lopez case.

21         Unusual reputational harm -- the publicity has reduced the

22   need for more specific deterrence.  You know, she's walking

23   around now with a scarlet letter more than -- you know, a lot

24   of white-collar criminals can say, "Hey, it was just an

25   accounting," whatever, you know, but the point is, now, she

Exhibit 1
Page 42 of 70

1    carries with her the stigma to the point that she lost a

2    long-term job based on a brand that was put on her.

3         The contribution to the community -- 1.5 million in local

4    services.

5         But I'd like to focus in on one specific issue that we

6    have not addressed that I think is maybe one of the most

7    important issues in this case.  You -- in deciding a sentence,

8    her mental health condition, her need for ongoing treatment,

9    the drugs that she's taking that are not available under the

10   BOP guidelines, the high risk she suffers, and the fact that

11   even if, let's say, hypothetically, you said, "I'm going to

12   send you to prison, but I'm going to allow you to titrate off

13   the drugs for a year as, you know, the doctors said," it's the

14   doctor's opinion that it is those drugs that are controlling a

15   very serious mental health condition.

16        And you've read -- and I don't want to go into it

17   publicly -- but you've read that report.  So it's not like

18   giving her a year to titrate off the drugs resolves the

19   underlying problem and the high risk that she presents.  And

20   that factor, and that medical problem, is under the factors to

21   weigh, in and of itself, if the other factors hadn't even been

22   present -- would be a -- grounds to give her probation.

23        Not because you're putting a seal of approval and saying

24   what you did is good, Ms. Hankins.  It's because this is not

25   like a midnight quest to get medical opinions.  This is a

Exhibit 1
Page 43 of 70

1    treatment program, continuously, since 1998.

2         So one of the decisions that has to be made is the most

3    effective medical treatment.  We've gone through this, but I'm

4    just summarizing.  So you've got all of those factors.

5    Correct?

6              THE COURT:  Yes.

7              MS. HOFFMAN:  Okay.  And then the case law that

8    supports it that we gave to you in your memo.

9         But the Third Circuit reversed a case, granted simply

10   advisory for the Ninth Circuit.  But the cases that we've found

11   in the Ninth Circuit, Your Honor, have upheld the judicial

12   discretionary sentence based on this factor of the kind of

13   terms that we're requesting.

14        So what we're saying is probation, a term of home

15   confinement.  The only condition that we would request is that

16   she be allowed, obviously, for her medical treatment, to the

17   extent she needs to confer with counsel, those kind of things,

18   and if you wanted to build in a work release function into the

19   release.  But it could be as strict and highly monitored.  It

20   could be done with a bracelet.  It could be done in any way

21   that you seek to fashion it so that it would not be

22   interpreted, Your Honor, as being an endorsement of her conduct

23   and not punitive, to the extent that you believe the conduct

24   needs to be punished.

25        1,000 hours of community service at some point.  And

Exhibit 1
Page 44 of 70

1    Ms. Hankins has laid out things that she would like to do.   I

2    mean, Ms. Hankins feels -- and you were asking about remorse.

3    I mean, Ms. Hankins has written to you.  She would like to help

4    other people in the future not get into the kind of situation

5    that she's gotten into.

6        And you heard her speak in 2013.  She could be a really

7    helpful advocate to help people who've gone through the cycles

8    that she's been through, that she never dealt with, because

9    they were too painful.  And by not ever really dealing with

10   them on the deep level that she's recently had to deal with,

11   she was forced, in many ways, to have maladaptive behaviors

12   when she felt who she loved and what she loved was under

13   threat:  The festivals, her family, herself.

14       Her conduct was maladaptive.  It was -- it's not ordinary

15   or reasonable conduct, Your Honor.  But, in a weird way, it's

16   not unexpected.  She never learned how to respond in

17   constructive aggressive ways.  She's never developed that

18   skill.  And, of course, at the end of the day, following our

19   restitution hearing, whatever restitution is imposed.

20       So, Your Honor, I hope that I've been able to answer some

21   of your questions as to how did this conduct occur; what did

22   she do; what the case is about; and why we believe, under the

23   factors, that a sentence of home confinement and probation --

24   not to sanctify or bless the conduct -- but it's in recognition

25   of the punishments that are available that would allow

Exhibit 1
Page 45 of 70

1   Ms. Hankins to get the medical treatment she needs, and would

2   recognize the extraordinary things that she has done in the

3   community, as well as the benefits that she has tried to bring

4   to others as part of her life creed, and the fact that she's

5   going to live with this for the rest of her life, and the

6   inordinate amount of debt that she will live with until she

7   dies.  Thank you.

8           THE COURT:  All right.  Thank you, Ms. Hoffman.

9       Let's take a five-minute break.  We'll be in recess for

10  just five minutes.

11

12          (A break was taken from 3:37 PM to 3:43 PM.)

13

14          THE COURT:  Let me just clarify, is there anything

15  else from the Defense?  I certainly read Ms. Hankins' letter

16  last night and again this morning.  Is there anything else?

17          MS. HOFFMAN:  I think we've completed.

18          THE COURT:  Okay.

19          MS. HOFFMAN:  And I appreciate the time.

20          THE COURT:  Oh, no.  I appreciate the time you put

21  into it.

22      All right.  For the Government?

23          MR. BRUCE:  Thank you, Your Honor.

24          MS. HOFFMAN:  Oh, Your Honor, except for Ms. Hankins

25  would like to talk to you before you impose sentence.

Exhibit 1
Page 46 of 70

1          THE COURT:  Okay.  I guess I'd like to hear from her

2     now.

3          MS. HOFFMAN:  Now?

4          THE COURT:  Yes.

5          MS. HOFFMAN:  Okay.

6          THE DEFENDANT:  Your Honor, it was really -- I'm

7     going to try -- pardon me.  It was hard -- really hard writing

8     that letter to you.  Because I want you to understand -- I

9     understand your comment about child -- you know -- child abuse

10    that comes before you.  And I learned a lot about that with

11    dealing with the Heart Gallery and things like that.

12         But I had worked with Dr. Webb for many years.  And to say

13    that -- to explain to Dr. Webb, well, in the hands of my

14    ex-husband and in his addiction, it was mental abuse.  And then

15    he helped me create, you know, healthy boundaries to coparent.

16    But I didn't know any more of that to explain.

17         THE COURT:  Ms. Hankins --

18         THE DEFENDANT:  And it has only been through this

19    process that -- and working with Dr. Hamel -- when I've worked

20    with him, and talked with him, and then read -- read about the

21    levels of abuse and what they mean, it -- when I wrote to you,

22    and I said that it really did -- my life flashed before me.

23    It's like so many things made sense.

24         And I only just recently discovered that through this

25    process.  And it made me understand a lot of things.  And I'm

Exhibit 1
Page 47 of 70

1  not using that as an excuse for my actions by any means.  So

2  please don't interpret it as that.  But I can look back, and I

3  can see how I made irrational decisions that weren't rational.

4      When some of the conflict came with WME, it was -- it was

5  avoidance that -- that clicked in -- that clicked in and not

6  rational decision-making.  You know, when -- when their -- when

7  asking WME for help required this whole list of things, I think

8  they expected me to say, "I don't agree with that."  And I

9  didn't say anything.  I didn't assert what was best for WCMC,

10 which was not what was laid out.  I didn't assert what was best

11 for me.  I didn't assert what was the things to assert as the

12 president in charge of those duties and functions.  It was in

13 avoidance.

14     And I think one of the things that I told Ms. Hoffman is I

15 said -- I look back over the years after -- after reading --

16 reading the report and talking to Dr. Hamel, I look back over

17 the years, I defended so many things.  I defended the festivals

18 in front of boards of commissioners.  I defended my kids.  You

19 know, the things that I didn't do was ever defend myself.  And

20 that seems like such an easy thing to say, because I'm not a

21 stupid person.  But I look back, and I never did that.

22     I didn't do it when the abuse happened with Mark.  And I

23 continued to just never do it.  And what I've learned is that

24 when you have those levels of abuse, it's not an excuse for my

25 actions at all.  But you have to learn how to recognize when

Exhibit 1
Page 48 of 70

it's having a reaction on you or creating a trigger of your

past so your -- the reaction -- so you can create -- so the

action you can create a reaction for it, and understand what

that is, and then make different choices than avoidance or --

from that sort of stuff.  And I just scratched the surface.

     But I cannot believe it at 53 years old.  And that -- that

is just something that -- you know, I talked to Dr. Webb, and

he's like, "I never really understood the level of abuse that

you went through.  And it's not my specialty.  So I need to get

you connected with someone that it is -- that it is their

specialty."

     And, you know, maybe part of it is my fault, because I

didn't -- I never understood the levels.  It was just -- to me

it was mental abuse and intimidation.  I never understood all

the levels and what those long-term things can have on you.

And I'm not using that as an excuse.  I'm very remorseful.  And

guilt is not a good thing for me.

     And I feel very guilty, because one of the things I was

most proud of with festivals was the help that it gave foster

kids to -- not change their lives -- but to change the day, or

of the schools when funding was cut off.  Those were the things

I was truly proud of.  And now those are -- those are forgotten

behind the things that I did do.  And I feel -- I do feel

extremely guilty for that and very remorseful.

     You know, I did teach my kids right from wrong.  And I did

Exhibit 1
Page 49 of 70

1    teach my kids to make the right decision, which may not always

2    be the easiest decision.  And I have great grown kids now.  And

3    I did not make the right decision.  And -- but I did try to

4    make the right decision with pleading what I did do wrong and

5    then taking on debt and making sure that Endeavor was excused

6    from that not being their responsibility.  And that, to me, was

7    being remorseful and doing the right thing.

8        So when I wrote you that letter, I meant what I said

9    with -- I -- I don't want -- I didn't want that letter to --

10   you get hundreds of letters, and I understand that.  But I can

11   never explain to you what I've learned about myself over this

12   process, and how, for every day, it will change my life moving

13   forward.  And this -- that's what I wanted to say.

14           THE COURT:  Okay.

15           THE DEFENDANT:  Thank you, Your Honor.

16           THE COURT:  Thank you, Ms. Hankins.

17      All right.  From the Government?

18           MR. BRUCE:  Thank you, Your Honor.

19      In listening to Ms. Hankins now, and in reading the

20   materials and seeing the presentation, the question of remorse

21   really does come up to me a lot.  Because it seems like she's

22   remorseful that this happened, but I haven't heard, nor did I

23   see it written or anywhere, remorse for deceiving and cheating

24   Endeavor, and deceiving and cheating a business partner, and,

25   instead, with the recommendation for probation.

Exhibit 1
Page 50 of 70

1        It reminds me of a story that I heard when I started, told

2   to me by a retired FBI agent.  And it happened when he was

3   going to -- going to a bank robbery.  He goes to the bank

4   robbery, and he goes to the bank.  They say, "Hey, there's a

5   little cash that was just taken.  It has a tracker in it."

6        So law enforcement go.  They track down -- track it down

7   on Beltline, surround the car.  The subject comes out.  They

8   find the subject.  They find the money.  And before the

9   handcuffs can go on, the subject says, "Well, you have your

10  money.  Can I go now?"  They said, "Well, no, that's not how

11  bank robbery works.  You robbed a bank.  You're going to be

12  held accountable."

13       Now, this isn't about robbing a bank.  This isn't about

14  stealing money.  This is about deceiving and cheating a victim

15  out of $1.5 million.  And whether it was putting some money

16  back into a bank account, or whether it's taking on a liability

17  now, after the fact, the fact is that Ms. Hankins deceived and

18  cheated.

19       Now, I frankly don't -- the Government doesn't appreciate

20  the dichotomy that is attempted to be forced on the Court today

21  that it's really not cheating in the way that we like to think

22  of cheating.  The elements of the offense, which Ms. Hankins

23  agreed are the elements of the offense that she pled guilty to,

24  is intent to defraud.  That is an intent to deceive and cheat.

25  She deceived and cheated Endeavor out of the $1.5 million.

Exhibit 1
Page 51 of 70

1        So I'd like to first just discuss that fraud.  I know it's

2    been discussed in great detail.  So I just want to look at this

3    from another perspective.  Now, as you heard, Endeavor

4    purchased the majority of WCMC in 2013 for $800,000.  An

5    $800,000 payment that had been made to Ms. Hankins.  And things

6    started off well, as you saw in some of the graphics.  In 2013,

7    '14, '15, things were going well.

8        And then, through no fault, necessarily, of Ms. Hankins,

9    there was the heat, there was the issues of the festivals, and

10   they were going to be operating at a large loss.  It was at

11   that time that Endeavor infused $2.1 million into the business.

12   And infusing that money in, it asked for certain items,

13   financial records, and also having more control over the ticket

14   income.  These are things that are entirely reasonable for a

15   company that's a 51 percent majority holder to ask for.

16       So it asked for these financial statements, and it asked

17   for some level of eyes on to make sure that that 2.1 -- or that

18   deficit that Ms. Hankins had discussed -- wasn't going to

19   happen in the future.  And instead of giving them accurate

20   financials, Ms. Hankins altered bank statements by scanning

21   them in, as we put in our sentencing memo.  You can see the --

22   you can see in the exhibits the real bank statement and the

23   fake bank statement that -- we didn't provide all of the pages.

24   But they're meticulously done to remove the liabilities that

25   Ms. Hankins had to obtain in order to make this a functioning

Exhibit 1
Page 52 of 70

1    organization.  So when it looked at the financials that

2    Ms. Hankins provided, it saw a rosy financial picture, such

3    that when it went to purchase, it paid her $1.5 million for

4    that company.

5        And I want to be clear that the evidence in this case

6    shows that Endeavor would not have paid $1.5 million for a

7    company if it had known that it had required $5.3 million in

8    loans to prop up, if it had known that Ms. Hankins was altering

9    bank statements.  That purchase would not have happened.  And

10   certainly Ms. Hankins wouldn't have continued on as an employee

11   of WCMC.  Certainly she wouldn't have been given the $200,000

12   salary.  And certainly she wouldn't have been given a profit

13   sharing agreement, such that when that $1.5 million was earned,

14   she would have earned an additional profit.

15       So what did -- what did they think that they were

16   receiving in 2018?  Well, they believed the revenues were the

17   revenues of a company that was represented in the financials

18   that this president had provided them for 18 months.  They

19   believed the bank account had $1.1 million in it.  And they

20   believed there were no outstanding debts, other than those that

21   were represented in the financials.

22       But, instead, it received a bank account with 16,000, and

23   it received a company that required over $5 million of

24   promissory notes, and by the end of 2018 -- August of 2018 --

25   $6.8 million of promissory notes, I believe, to prop up this

Exhibit 1
Page 53 of 70

1    business.

2        Now, I'd like to touch, briefly, on the money that

3    Ms. Hankins discussed about putting back in.  And this has been

4    shown in this sentencing -- the presentation for Ms. Hankins --

5    that -- this shows that really she just wanted to keep this

6    company going.  And I think the Court has discussed that -- you

7    know, or I should say the Defense is saying this isn't about

8    greed.  This isn't about anything.  This was just about keeping

9    this company going.

10       But there's a reason why she needed to keep this company

11   going.  It was paying her $200,000 a year.  It was providing

12   profit sharing.  This is something that she needed to continue.

13   And I -- the Government does not doubt that Ms. Hankins had

14   strong feelings about the success of this company that she

15   started.  I don't want to discount that.  However, she had to

16   put that money back into an account so that she wouldn't have

17   this fraud -- this fraud wouldn't be found out.

18       Because if they find out about the fraud, the $200,000

19   plus -- $200,000 salary is gone.  If they find out about the

20   fraud, the profit sharing is gone.  So she avoids detection by

21   putting money back in, and she gets paid.

22       Now, there's another point I'd like to make, briefly,

23   about the mitigation evidence that's been submitted.  Now, I

24   certainly am not going to go in depth about the reports that

25   we've received about -- the mental health reports that we have.

Exhibit 1
Page 54 of 70

1   But some of this just doesn't square.  And in one of the

2   reports that we have, it talks about how these -- this -- the

3   mental health leads to passivity and a limited executive

4   functioning.

5       But if you looked at the presentation, certainly of the

6   managing festival slide, you look at what she had to do for all

7   of these festivals, working with state and local, being in very

8   stressful situations, being, as Ms. Hoffman said, the mayor of

9   these towns, that does not come without stress.  That doesn't

10  come with making hard decisions, having people angry at you,

11  upset, forcing concessions from different cities.  But she did

12  that, to her credit, very successfully, for many years.

13      But when Endeavor asks for financial records after a poor

14  year's performance, she now says that that impaired executive

15  functioning caused her to create these false documents and send

16  them to Endeavor for 18 months.  So those two just don't seem

17  to square.

18      Now, the Court has all of our briefing on the allegations

19  of prosecutorial misconduct in this case.  And I'm not going to

20  belabor the point.  We do not agree with the assertions that

21  the Defense has made today or in any of their briefing.  And so

22  we'll rest upon that record, and not go into that, and leave

23  the Court to determine whatever weight it believes is necessary

24  to its determination of the sentence.

25      So, Your Honor, in the end -- and, I guess, there's one

Exhibit 1
Page 55 of 70

more point that I would like to make based on the presentation

today.  And that is about the -- some of the promissory notes

that Ms. Hankins says she now is the sole bearer of that debt.

That's something that is news to the victim and is something

that certainly is probably going to be appreciated to hear for

the victim that they're not in -- that they are not responsible

for the five-plus million dollars to Mr. Hurst.

     That would certainly -- what effect her stating that here

would affect him -- I mean, there has to be some function of

making it so she is only liable for that.  So I'd hope that

that would be something that would happen.

     But one of the things that caught me in this is the --

this tier one, tier two, tier three, tier four presentation

that Ms. Hoffman talked about when looking at the payments for

who was paying -- you know -- who was going to get paid in

2018.  Ms. Hoffman also said that, look, with these promissory

notes, WCMC could just declare bankruptcy and walk away from

them, because it's a separate entity.  Well, they could have

done that with the vendors too.

     The evidence showed that they didn't.  So they didn't need

to look at tier one, two, three, and four.  They could have

walked away.  They didn't.  So it's -- so it's a point that I

think is worth mentioning.  That when the festivals fell,

payments were made when that was not necessarily an obligation

that a parent company had to make.

Exhibit 1
Page 56 of 70

1        So here, Your Honor, in the end, I come back to the

2    sentencing memo.  This is sophisticated but fairly

3    straightforward.  Ms. Hankins altered bank records intending to

4    deceive and cheat Endeavor out of $1.5 million.  They paid

5    $1.5 million to Ms. Hankins.

6        We've already banked into our recommendation a three-level

7    variance for the different factors that -- for the factors that

8    make this case a little bit different than others.  With that

9    three-level variance, that comes to a low-end guideline

10   recommendation of 27 months.  A 27-month sentence is a

11   reasonable sentence.  That 27-month sentence is a sentence that

12   comports with all of the requirements of 3553.  And we ask that

13   the Court follow the Government's recommendation and sentence

14   Ms. Hankins to the 27 months in prison.

15           THE COURT:  What's the Government's position on

16   restitution, and are we resolving that today?

17           MR. BRUCE:  So we have a restitution hearing.  The

18   Government will be requesting the 1.5 million in restitution.

19   It's my understanding, from conversations with representatives

20   of the victims, that they will not be interpleading or making

21   any type of other request.  So the Government will, at that

22   future hearing, be requesting the $1.5 million in restitution.

23           THE COURT:  Okay.

24       Okay.  Any quick points in rebuttal?  I think I'm ready to

25   proceed, but...

Exhibit 1
Page 57 of 70

1          MS. HOFFMAN:   One second.

2      We have nothing else to add.  I think that we've covered,

3  in advance, Ms. Hankins' and our position on these issues,

4  except for one last statement.

5      People respond differently when they are dealing in their

6  professional capacities with external people, such as lawyers

7  with clients, doctors with patients, than they do when what is

8  most important to them is attacked, be it their family or what

9  they truly love.

10      And with Ms. Hankins, her undoubted skill is, in a sense,

11  irrelevant to the flaws that she lives with inside and is only

12  now coming to grapple with.  It is not an inconsistency.  It is

13  just the difference between all of us when we deal with

14  protecting those we care about versus the situations that we

15  thrive and do brilliantly in when they deal with things that

16  don't come as dear to us.  Thank you.

17          THE COURT:   Okay.

18      So, Ms. Hankins, the first thing I need to do is determine

19  where you -- sit.  No, you don't need to stand.  Please be

20  seated.  I just want to talk this through as opposed to lecture

21  you while you stand there in front of me.

22      The first thing I need to do is determine the sentencing

23  guideline advisory range.  It is just advisory, but I do have

24  to determine it.  Your total offense level is 21.  Your

25  Criminal History Category is a I.  And that results in an

Exhibit 1
Page 58 of 70

1    advisory guideline range of 37 to 46 months.

2         So that's not the starting place.  That's just where the

3    sentencing guideline commission, through Congress, has said

4    that's the range that's advisory for judges to consider.  But

5    I'm also to consider what is sufficient but not greater than

6    necessary to achieve certain ends of justice.  And that

7    includes, you know, respect for the law.  It includes

8    rehabilitation.  It includes deterrence.  It includes also a

9    consideration of your history and characteristics.  And those

10   can kind of go both ways.

11        And the things I am considering is that you're 52 years

12   old.  You do have a single criminal bank fraud conviction from

13   2002 for which you served only a 30-day sentence.  And I

14   understand you presented some mitigating circumstances, as

15   well, for that conviction, specifically, your exposure to

16   domestic violence.  But it is a conviction.  And it does

17   highlight the fact that you were aware that you were engaging

18   in criminal activity in this case by doing what you did, by

19   committing fraud.

20        You do have and are being seen by a doctor for certain

21   mental health issues around emotional disorders for which you

22   are taking medication and getting appropriate treatment.

23   You've done very well on pretrial release.  You have no history

24   of violence.  You are educated.  You're certainly employable.

25   You have family and community support.  And you've certainly

Exhibit 1
Page 59 of 70

1   done many wonderful things in the community.  I'm not taking

2   away from that.

3       Looking at the circumstances of the offense itself, the

4   fraudulent conduct did extend over a relatively lengthy period

5   of time:  September 2016 to March 2018.  So you had a lot of

6   time to think about this each time you created these bank

7   statements.

8       I understand why it began, and I understand that, yeah,

9   you were trying to avoid.  You were trying very hard to keep

10  afloat a company that you cared a lot about.  And you wanted to

11  avoid the oversight of your coinvestors, your partners in this,

12  the other shareholders.  But that's what people who commit

13  crimes do all the time.

14      You know, the number of cases I've had where well-meaning

15  money managers start putting out false portfolios to hide the

16  fact they're completely in the red so that their investors, who

17  are dumping money into their accounts, don't know that this

18  whole thing is collapsing, and, of course, they're trying

19  desperately to fix it; right?  They keep paying who they owe

20  now by borrowing from the accounts of people who are paying in

21  now.  It becomes a nightmare for them.  And it keeps on going.

22      Your case is -- what's different about your case is

23  somewhere along that timeline, where I know you're trying to

24  hide everything from your fellow shareholders, majority

25  shareholders, they're making you an offer to give you

Exhibit 1
Page 60 of 70

1    $1.5 million for your shares.

2         Had you told them the truth then, they would have taken

3    you to court and divested you of all your shares for violating

4    some basic tenets of civil law -- failure to behave as a

5    fiduciary -- a whole series of things.  They would have brought

6    a derivative action against you, and they would have ousted

7    you.  There's no way you would have been able to continue

8    holding your shares, holding your job, and getting $1.5 million

9    if, prior to that transaction, you had told them.  And I think

10   you knew that.

11        And that's where the crime is that you're just not

12   admitting to.  That you knew there was no way that transaction

13   was going to take place if you told them in advance.  They

14   would not have paid you the 1.5.  They would not have taken on

15   the debt that they didn't know about.  I'm not sure who has

16   that debt, actually, now, listening to things today.  But I can

17   tell you, any responsible shareholder would have simply brought

18   an action against you and ousted you rather than pay you

19   $1.5 million.  That would never have occurred.

20        And that was your opportunity to avoid this criminal

21   episode.  And you didn't take that opportunity.  So that's

22   really where the crime has occurred here.

23        Should they have been smarter?  Probably.  You know, I've

24   had law firms who have been -- their accountant has stolen

25   millions of dollars from them.  And these were law firms that

Exhibit 1
Page 61 of 70

represent investment banks, and, yet, they had no checks on

their accountant.  That doesn't excuse your behavior.

So, you know, whether we want to call this cheating or

theft, or whether you're a serial fraudster, it's all a matter

of kind of a perspective.  But, for me, I can understand why

things went as they went.  I know you loved this organization.

I know you wanted to save it.  I know you thought you could

save it.  And I know you thought you could probably fix all of

it.

But, at some point, you made a decision to take

$1.5 million without disclosing the reality.  And that reality

certainly would not have resulted in you getting that money or

maintaining any connection with the festival ever again.  You

breached your fiduciary duty of good faith and fair dealing.

That's all that would have -- they would have just had to come

to court, and the court would have divested you of your shares

at that point.

So it does sound like you put a lot of money back into the

corporation or into the company.  Again, that was, I think,

after it became clear they were going to find out.  Because

they're asking to see the books.  And you did take -- I know I

called it a "chunk" of money -- a lot of money -- more money

than I make a year -- way more -- to pay off an old debt of

yours.  And that wasn't altruism.  That wasn't helping the

community.  That was helping you.  And that starts looking a

Exhibit 1
Page 62 of 70

1    little bit like greed.

2        So I have a very different, I guess, view of -- to me the

3    crime is pretty simple.  It's not complicated.  Your life is

4    complicated.  Your thinking process is complicated.  And it's

5    complicated by all sorts of things in your past.  Right?  I

6    mean, I get that.  There isn't one person who appears in front

7    of me who is not suffering from either severe addiction, severe

8    mental health issues, and childhood trauma.  It impacts our

9    thinking.

10       I'm not -- I don't want to lecture you.  You are

11   successful.  You're educated.  You've lived well.  And you've

12   lived in relative comfort all your life.  You have a nice

13   house.  You have a nice car.  You've had a nice salary for much

14   of your life.  You're sophisticated.  You know the difference

15   between right and wrong.  You have family and community

16   support.

17       Today, in America, there were probably over hundreds of

18   kids getting sentenced to jail for a lot less.  You know,

19   they're kids who are shoplifting a six pack of beer.  There's a

20   single mom who is so hopeless she's prostituting herself, and

21   she's being sent to jail.  You know, there are kids driving

22   around in cars acting like idiots who are going to jail.  Drunk

23   drivers are going to jail.  These are all impulsive decisions

24   that people are making that are criminal decisions.  It's

25   criminal thinking.  And they're going to jail.

Exhibit 1
Page 63 of 70

1          A lot of these folks are homeless.  They're drug addicted.

2    They have no education.  They have no family, no family

3    support.  In comparison, you're looking privileged.  I know you

4    have some difficulties in your life.  Many people suffer from

5    depression who do not commit crimes.  Many people have had

6    terrible relationship issues that do not commit crimes.

7          So this does call for some jail time.  Does it call for 27

8    months?  I don't think so.  You haven't really served any kind

9    of extensive sentence in your life.  Your last sentence was I

10   think 30 days' jail.  I think this does have collateral impacts

11   on your life that it does not have on the lives people who

12   already have nothing when they come to federal court.

13         It will impact your ability to get work.  It will impact

14   your ability to succeed in the future.  I get that.  And I am

15   taking that into account.  I am taking into account some of

16   your mental health issues, and your background, and the fact

17   that there's a lot more to you than this event.  There's a

18   reason why you have support in the community.  You're a lovely

19   person in many other respects, other than this one piece of

20   decision-making.

21         You've done a lot for the community.  I mean, Jesus, you

22   got to hang around with Brad Paisley and some of these folks.

23   I mean, you've had a remarkable life.  This is a hiccup.  But

24   it does require some consequences.

25         So I am going to impose a 12-month-and-a-day Bureau of

Exhibit 1
Page 64 of 70

1    Prison sentence followed by three years of supervised release.

2    I will adopt the conditions set forth in the presentence

3    report.  There is a $100 assessment per count I'm required to

4    impose.  I will order restitution, but will make that

5    determination at a later hearing where the parties can present

6    evidence or reach an agreement.

7          What is our hearing date for the restitution matter?

8                THE COURTROOM DEPUTY:  It's May 30th at 11:00 AM.

9                THE COURT:  Okay.

10   I will explain rights to appeal.  But is there anything

11   else that needs to be in the order, first, from the Government?

12               MR. BRUCE:  Nothing on behalf of the Government, Your

13   Honor.

14               THE COURT:  For the Defense?

15               MS. HOFFMAN:  Just two things in your statement,

16   "They don't deal materially," but they do materially.  The

17   Government -- Gavin Bruce -- was provided direct instructions

18   from the major creditor in this case that he had let Endeavor

19   off the loans, and that he had substituted Ms. Hankins -- and

20   this is the $5 million loan -- at Ms. Hankins' request.

21         So I don't want any ambiguity.  Because the Government has

22   possession of the letter that you have possession of and that

23   Ms. Hankins is obligated on this -- it takes her the rest of

24   her life.  She has assumed that liability and deliberately

25   asked not to be let off of it.  So I just want to have no

Exhibit 1
Page 65 of 70

1    ambiguity on this record --

2               THE COURT:  Okay.

3               MS. HOFFMAN:  -- going forward.  And I don't

4    understand how the Government represented that it's news to

5    Endeavor since Endeavor knows it and does the Government.

6               MR. BRUCE:  Your Honor, as the Defense is well aware,

7    Endeavor is not part of our prosecution team.  And so when I

8    received a letter, or I received correspondence, I didn't

9    immediately send that to Endeavor as the victim.  We were still

10   in the process of a prosecution.

11        So I thought that there would be a reasonable

12   communication between Mr. Hurst or Ms. Hoffman and Endeavor in

13   their civil suit that they're having.  And so when I asked

14   Endeavor today whether they were aware that they -- that this

15   was happening -- they said, no, that they weren't.

16               THE COURT:  Okay.  I don't think it's particularly

17   relevant to -- I mean, it sounds like it may be relevant to the

18   civil case.

19               MS. HOFFMAN:  It's just relevant to what Ms. Hankins

20   actually did.  So I just wanted to correct the record --

21               THE COURT:  Okay.

22               MS. HOFFMAN:  -- because both the Government and I

23   are aware of it.

24               THE COURT:  Okay.

25               MS. HOFFMAN:  And then the only other clarification

Exhibit 1
Page 66 of 70

that we need, Your Honor -- and maybe it deals with time of

surrender or whatever you're thinking.  There's no dispute

about the health issues that incarceration poses with

Ms. Hankins' incarceration and not having access to eight of

the -- I think it's eight out of ten -- of the drugs that she

currently needs and the health issues.  So I just need you to

address that.

        THE COURT:  Surrender in 90 days.  It's not going to

be a year.  I mean, we would never -- I -- I'm happy to

recommend a particular institution if there's one that is --

that the Defense wishes me to consider that can address the

mental health issues.  I'll be honest, I don't think BOP would

look at these mental health issues -- and, ultimately, it's

depression -- the reports report much of it around this

litigation -- that they're going to look at it as any more

remarkable than the other 80 percent of their population that

they're serving.

    So I -- you know, I realize the treatment is different in

custody.  But this gives you some time to work with BOP in what

they can and can't do.  I will certainly recommend that BOP

maintain the current prescription regimen that Ms. Hankins is

on while she's in custody with them.  I don't know if that will

mean anything.

        MS. HOFFMAN:  Probably not.  But, yes, we'd

appreciate that.

Exhibit 1
Page 67 of 70

1        THE COURT:  Okay.

2        MS. HOFFMAN:  And we'll look -- we'll look into

3   potential places for incarceration and return to you on that.

4        THE COURT:  All right.

5        MS. HOFFMAN:  I realize you also can't control that,

6   but you can make recommendations that I think would be taken

7   into account.

8        THE COURT:  I'm certainly recommending the lowest

9   security setting that they can place her in.  I'm also

10  recommending she be eligible for any programs they have under

11  the First Step Act for, you know, early release into the

12  community.

13       MS. HOFFMAN:  Thank you.

14       THE COURT:  Okay.  Ms. Hankins, you do -- you may

15  have certain rights to appeal.  If you feel there's something

16  about the sentence you wish to appeal, you have 14 days to file

17  a notice of appeal.  You need to do that directly with the

18  court clerk or through your attorney.  If you can't afford the

19  filing fee, you can apply to have that waived.

20       THE COURTROOM DEPUTY:  The sentence is concurrent to

21  each --

22       THE COURT:  The sentences are concurrent.

23     Are there counts that are to be dismissed?

24       MR. BRUCE:  No, Your Honor.

25       THE COURT:  Okay.

Exhibit 1
Page 68 of 70

1          THE COURTROOM DEPUTY:  Is there an original

2    indictment?

3          MR. BRUCE:  No.  This was on an information.

4          THE COURT:  Okay.  Thank you, folks.

5          MS. HOFFMAN:  Thank you.

6          THE COURT:  We'll be in recess.  Thank you for all

7    the work both sides have done.

8          MR. BRUCE:  Thank you, Your Honor.

9

10          (The proceedings adjourned at 4:25 PM.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 1**
**Page 69 of 70**

1                        C E R T I F I C A T E

2

3              United States of America v. Anne Hankins

4                     Case No. 6:22-cr-00317-MC

5                         Sentencing Hearing

6                            3/30/2023

7

8         I certify, by signing below, that the foregoing is a true

9    and correct transcript of the record, taken by stenographic

10   means, of the proceedings in the above-entitled cause.  A

11   transcript without an original signature, conformed signature,

12   or digitally signed signature is not certified.

13

14   /s/Kendra A. Steppler, RPR, CRR
     Official Court Reporter          Signature Date: 4/15/2023

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1
Page 70 of 70